BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
Krista M. Enns, Cal. Bar No. 206430
Antonia Stabile, Cal. Bar No. 329559
100 Pine Street, Suite 3100
San Francisco, California 94111
Telephone: 628-600-2250
Email: kenns@beneschlaw.com
       astabile@beneschlaw.com

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
Michael J. Barrie (Pro Hac Vice Forthcoming)
Kevin M. Capuzzi (Pro Hac Vice Forthcoming)
1313 N. Market Street, Suite 1201
Wilmington, Delaware 19801
Telephone: 302-442-7010
Email:    mbarrie@beneschlaw.com
          kcapuzzi@beneschlaw.com

Attorneys for CPIF California, LLC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>AGTJ13, LLC,<br><br>Debtor. | Case No.  2:24-bk-11409-SK<br>Chapter 11<br>Hon. Sandra R. Klein |
| In re:<br><br>AGTJ13 Manager, LLC,<br><br>Debtor. | Case No.  2:24-bk-11412-SK<br>Chapter 11<br>Hon. Sandra R. Klein<br><br>Date:  April 10, 2024<br>Time: 9:00 a.m.<br>Place: Courtroom 1575<br>       255 E. Temple Street<br>       Los Angeles, CA 90012 |

## MOTION OF CPIF CALIFORNIA, LLC FOR AN ORDER GRANTING ADEQUATE PROTECTION AND PROHIBITING USE OF CASH COLLATERAL PURSUANT TO SECTION 363(e) OF THE BANKRUPTCY CODE

# <u>TABLE OF CONTENT</u>

**Page**

JURISDICTION ...................................................................................................... 1

BACKGROUND ...................................................................................................... 1

    A.   General Background ....................................................................... 1

    B.   The Debtors, Mr. Sharp, and the Subject Property ....................... 2

    C.   The Lender's Prepetition Loan to the Borrower ........................... 3

    D.   The Senior Debt and the Intercreditor Agreement ........................ 6

    E.   The Borrower's Prepetition Defaults With Respect to the Loan .... 6

    F.   The Borrower's Diversion of Prepetition Rents ........................... 8

    G.   The Prepetition Lawsuit and Motion to Appoint Receiver............ 9

    H.   The Lender's Enforcement of the Assignment of Rents, Mr. Sharp's Intentional Interference with the Same, and Mr. Sharp's Threats and Intimidation of Gaju Market ......................................................... 9

    I.   The Borrower is Failing to Pay Necessary Operating Expenses ......... 11

    J.   To the Extent that the Rents from the Subject Property are Property of The Estate, the Lender Does Not Consent to the Use of Its Cash Collateral Absent the Appointment of a Chapter 11 Trustee ....................... 12

RELIEF REQUESTED ............................................................................................ 12

BASIS FOR RELIEF............................................................................................... 12

    A.   The Rents from the Subject Property Belong to the Lender and Are Not Property of the Bankruptcy Estate. ....................................... 13

    B.   Even if the Rents Are Property of the Bankruptcy Estate, At Minimum, They are the Lender's Cash Collateral and the Lender is Entitled to Adequate Protection. ............................................... 17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Bardell*,
    374 B.R. 588 (N.D. W. Va. 2007) ........................................................................ 13

*Butner v. United States*,
    440 U.S. 48 (1979) ............................................................................................ 14

*Commerce Bank v. Mountain View Village, Inc.*,
    5 F.3d 34 (3rd Cir. 1993) .................................................................................. 16

*In re Contractors Equipment Supply Co.*,
    861 F.2d 241 (9th Cir. 1988) ...................................................................... 14, 15

*In re GOCO Realty Fund I*,
    151 B.R. 241 (Bankr. N.D. Cal. 1993) ............................................................ 15

*In re Jason Realty, L.P.*,
    59 F.3d 423 (3rd Cir. 1995) .............................................................................. 17

*In re Sargent*,
    337 B.R. 661 (Bankr. N.D. Ohio 2006) ........................................................... 13

*United States v. Whiting Pools, Inc.*,
    462 U.S. 198 (1983) .................................................................................... 13, 14

*In re Ventura-Louise*,
    490 F.2d 1141 (9th Cir. 1974) ......................................................................... 15

**Statutes**

11 U.S.C. § 101, *et seq.* ............................................................................................ 1

11 U.S.C. § 361 ....................................................................................................... 13

11 U.S.C. § 363 .......................................................................................... 1, 12, 13

11 U.S.C. § 541 .................................................................................................. 13, 14

11 U.S.C. § 552 ....................................................................................................... 17

11 U.S.C. § 1104 ....................................................................................................... 1

28 U.S.C. § 157.................................................................................................1

28 U.S.C. § 1334...............................................................................................1

28 U.S.C. § 1408...............................................................................................1

28 U.S.C. § 1409...............................................................................................1

28 U.S.C. § 1930.............................................................................................11

Cal. Civ. Code § 2938.............................................................................9, 10, 15, 16

**Other Authorities**

Fed. R. Bankr. P. 2007.1.....................................................................................1

General Order No. 13-05 ...................................................................................1

CPIF California, LLC ("Lender"), by and through undersigned counsel, hereby moves (the "Motion") for an order granting adequate protection and prohibiting the use of cash collateral pursuant to Section 363(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"). This Motion is supported by the *Declaration of Robert Shields in Support of Motion for an Order Granting Adequate Protection and Prohibiting Use of Cash Collateral* (the "Shields Declaration") filed concurrently herewith. In further support hereof, the Lender respectfully states as follows:

## JURISDICTION

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and the standing order of reference to the Bankruptcy Court provided for in General Order No. 13-05 (Reference of Cases and Proceedings to the Bankruptcy Judges of the Central District of California, and Reference of Appeals to the Bankruptcy Appellate Panel) dated July 1, 2013. This matter is a core proceeding pursuant to 28 U.S.C. § 157. Venue for the Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought by are 11 U.S.C. § 1104(a) and Fed. R. Bankr. P. 2007.1

## BACKGROUND

### A.    General Background

On February 26, 2024 (the "Petition Date"), the above-captioned debtors (the "Debtors") commenced these chapter 11 cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors are remaining in possession and managing their affairs as debtors in possession. No trustee, examiner or official committee of unsecured creditors has been appointed in these cases.

Concurrently herewith, the Lender has filed a *Motion to Appoint a Chapter 11 Trustee* (the "Trustee Motion"). As set forth in the Trustee Motion, the Lender believes there is cause to appoint a Chapter 11 Trustee in these cases given a history of malfeasance by the Borrower's manager, Mr. Lafayette Jackson Sharp, IV ("Mr.

Sharp"), a/k/a Jake Sharp, including diverting monies from the shopping center for the benefit of insiders, incurring debt in violation of the loan agreement with the Lender, refusing to provide the Lender with operating budgets, intimidating and threatening tenants, and similar misdeeds, as well as the presence of certain badges of fraud committed by Mr. Sharp.  The appointment of a Chapter 11 Trustee would also be in the interest of creditors.

## B.    The Debtors, Mr. Sharp, and the Subject Property

Debtor AGTJ13, LLC (the "Borrower") filed its case as a Chapter 11 single asset real estate case.  As noted below, the case was filed on the eve of a hearing in California state court to consider the appointment of a receiver over the Borrower's primary asset – a shopping center commonly known as the multi-tenant retail center located at 450 South Western Avenue, Los Angeles, California (the "Subject Property"), which secures a $29,190,000 loan made by the Lender to the Borrower as described in greater detail below (the "Loan").

Mr. Sharp is the Borrower's manager, and in that capacity, he executed all of the loan documents for the Loan on behalf of the Borrower and is otherwise in control of the Borrower.  Mr. Sharp is also the managing member and majority member of the Borrower's sole member, Debtor AGTJ13 Manager, LLC (the "AGT Manager"), and a personal guarantor for the Loan under a Limited Recourse Guaranty dated as of January 10, 2022 (the "Guaranty").

The anchor tenant at the Subject Property is Gaju Market Corporation ("Gaju Market").  As part of its lease agreement with the Borrower and certain related agreements, Gaju Market claims to have certain "backstop" obligations in that it is responsible for the shortfall in any rents paid by other tenants at the Subject Property together with any vacancies.[1]  As such, an officer of Gaju, Mr. Joshua Park ("Mr.

---

[1] See, *Declaration of Joshua Park*, dated February 20, 2024 (the "Park Declaration"), filed in the State Court Lawsuit (defined below), at ¶ 5.  A true and correct copy of the Park Declaration is attached hereto as Exhibit A.

Park"), who is also an owner of one of the members of AGT Manager, was purportedly engaged by the Borrower to collect tenant rents and manage the property together with a separate property management company affiliated with the Borrower, Secured Properties Management Group, Inc.[2]

According to the list of the 20 largest unsecured creditors attached to the Borrower's petition, the Borrower has only six unsecured creditors whose claims aggregate to less than $200,000.  The Borrower's case was a bare bones filing without any first day motions, schedules of assets and liabilities or statement of financial affairs, any motion to use cash collateral or obtain financing for the case, or any other substantive filing.  AGT Manager's case was filed in similar fashion with no substantive filings other than the petition and no requests for relief.[3]  The reason for this is clear.  These cases were hastily filed on the eve of a hearing to appoint a receiver over the Subject Property, so that Mr. Sharp could retain control over the Subject Property.

## C.    The Lender's Prepetition Loan to the Borrower

On or about January 10, 2022, the Borrower executed and delivered to the Lender, among other loan documents, a Promissory Note (the "Note") and a Loan Agreement (the "Loan Agreement") that provided the terms of a Loan to the Borrower in the amount of $25,103,000.00.  Shields Declaration ¶ 6.[4]  On or about December

---

[2] Id.

[3] Notably, AGT Manager discloses in its list of top 20 unsecured creditors that it has zero unsecured creditors, which raises the question why a bankruptcy filing was needed for this entity at all?  The answer is obvious.  As discussed below, AGT Manager pledged all of its equity interests in the Borrower to the Lender as security for the Loan.  Thus, even though AGT Manager has no unsecured creditors, it filed bankruptcy simply in order to obtain the protection of the automatic stay for the pledged equity interests and to hinder the Lender's ability to enforce the pledge and not for any legitimate bankruptcy reorganization purpose.  Lender reserves all rights to move to dismiss these bankruptcy cases and/or seek relief from stay to continue the State Court Lawsuit (as defined herein).

[4] The Loan in January of 2022 was part of a refinance of a prior loan the Lender made to the Borrower in December of 2020 in the amount of $52,500,000.00 to finance the acquisition of the Subject Property.  As explained below, the balance of the prior loan was refinanced through a loan

3

30, 2022, the Loan was modified pursuant to an Amended and Restated Promissory Note (the "Amended Note") and a First Omnibus Modification and Reaffirmation Agreement (the "First Omnibus Agreement"), pursuant to which, among other things, the principal amount of the Loan was increased to $29,190,000.00 and the maturity date was extended to July 10, 2023. Shields Declaration ¶ 6. On or about September 28, 2023, the Loan was further modified pursuant to a Second Omnibus Modification and Reaffirmation Agreement (the "Second Omnibus Agreement"), pursuant to which, among other things, the maturity date for the Loan was further extended to February 10, 2024. Shields Declaration ¶ 6.

The Loan is secured by, among other things: (i) a Deed of Trust, Assignment of Leases and Rents, Assignment of Contracts, Security Agreement, and Fixture Filing dated as of January 10, 2022 (the "Deed of Trust"), which was recorded in the Official Records of the Recorder's Office of Los Angeles County, California on January 14, 2022, as Instrument No. 20220057045; (ii) an Assignment of Leases and Rents dated as of January 10, 2022 (the "ALR"), which was recorded in the Official Records of the Recorder's Office of Los Angeles County, California on January 14, 2022, as Instrument No. 20220057046; (iii) the First Amendment to Deed of Trust, dated as of December 30, 2022 (the "Amended Deed of Trust"), which was recorded in the Official Records of the Recorder's Office of Los Angeles County, California, on January 30, 2023, as Instrument No. 20230000663; and (iv) the First Amendment to Assignment of Leases and Rents dated as of December 30, 2022 (the "Amended ALR"), which was recorded in the Official Records of the Recorder's Office of Los Angeles County, California on January 3, 2023, as Instrument No. 20230000664. Shields Declaration ¶ 7.

As additional security for the Loan: (i) Debtor AGT Manager pledged to Lender, as security for the Loan, all outstanding equity of the Borrower pursuant that

---

with the Borrower's current senior lender, Lone Oak Fund, LLC (the "Senior Lender") in the amount of $29,810,000.00 (the "Senior Loan").

certain Pledge Agreement dated as of January 10, 2022 (the "<u>Pledge Agreement</u>");
and (ii) Mr. Sharp executed the Guaranty in favor of the Lender.  Shields Declaration
¶ 8.

All rents generated from the leases at the Subject Property were assigned to the
Lender pursuant to the recorded ALR and the recorded Amended ALR.  Shields
Declaration ¶ 9.  So long as the Borrower was not in default with respect to the Loan,
the Borrower was permitted to continue collecting rents but was required to deposit
them into a bank account (the "<u>Lender Controlled Account</u>") subject to that certain
Deposit Account Control Agreement dated December 4, 2020 between the Lender
and First Republic Bank (the "<u>DACA</u>").  Shields Declaration ¶ 9.

In addition, the Lender also filed the following financing statements: (i)
Financing Statement filed in Delaware on December 4, 2020, Filing No. 2020
8516397, asserting a blanket all asset lien against the Borrower; (ii) Financing
Statement filed in the real estate records of Los Angeles County, California on
December 7, 2020, Filing No. 20201592320, as a fixture filing against the Borrower;
(iii) Financing Statement filed in California on December 4, 2020, Filing No.
U200034815120, asserting a lien on the pledged securities by AGT Manager under
the Pledge Agreement.  Shields Declaration ¶ 10.

The Note, Loan Agreement, Amended Note, First Omnibus Agreement,
Second Omnibus Agreement, Deed of Trust, ALR, Amended Deed of Trust,
Amended ALR, Pledge Agreement, Guaranty, DACA, and the financing statements
noted above, together with all other agreements, documents and instruments
constituting "Loan Documents" (as defined in the Loan Agreement) are collectively
referred herein as the "<u>Loan Documents</u>."   True and correct copies of the Loan
Documents specifically identified above are attached to the Shields Declaration as
Exhibits 1 - 15.

### D.    The Senior Debt and the Intercreditor Agreement

As noted above, the Lender's original loan to the Borrower was in the amount of $52,500,000.00 and was made in or about December 2020.  Shields Declaration ¶ 12.  That original loan was refinanced in January of 2022 through: (i) the Senior Loan made by the Senior Lender; and (ii) the Loan made by the Lender.  The Senior Lender, like the Lender, has a lien on substantially all assets of the Debtors.    Shields Declaration ¶ 12.  The Senior Lender and the Lender are parties to that certain Subordination and Intercreditor Agreement dated as of January 10, 2022 (the "Intercreditor Agreement").  Shields Declaration ¶ 12. A true and correct copy of the Intercreditor Agreement is attached to the Shields Declaration as Exhibit 16.

The Borrower stopped paying the Senior Lender in February 2024, having failed to pay the amount due to the Senior Lender on February 10, 2024, which constituted another default under the Loan Agreement.  Shields Declaration ¶ 13.  On February 22, 2024, the Lender sent the Borrower a Notice of Protective Advance and Additional Default (the "Protective Advance Notice"), advising the Borrower of such default and of Lender's decision to make a protective advance under Section 7.7 of the Loan Agreement in the amount of $221,090.83 to pay the Borrower's outstanding and past-due payment to the Senior Lender.  Shields Declaration ¶ 13.  A true and correct copy of the Protective Advance Notice is attached to the Shields Declaration as Exhibit 17.  The Senior Lender has agreed not to exercise remedies with respect to the Senior Loan provided that the Senior Lender continues to receive its contract rate of interest.  Shields Declaration ¶ 13.

### E.    The Borrower's Prepetition Defaults With Respect to the Loan

In late 2023, the Lender noticed suspicious account activity on the Borrower's bank statements: on October 13, 2023, the Borrower made a transfer of $274,000 for "AGTJ partial loan repayment to [Jake Sharp Capital]."  Shields Declaration ¶ 14. Not only would an insider loan of this nature be a breach of section 14.27.8 of the Loan Agreement (which prohibits the Borrower from incurring any additional debt

for borrowed money), but the $274,000 repayment also violated section 14.27.7 of the Loan Agreement (which prohibits Borrower from making cash distributions and payments to its partners, members, principals, shareholders, equity holders, owners, and/or Affiliates).  Shields Declaration ¶ 14.

The Borrower refused to provide additional information about this payment (which constituted an additional default due to failure to deliver financial reporting information and documentation as required by Section 14.12 and Exhibit B of the Loan Agreement), resulting in the Lender sending a Notice of Default and Reservation of Rights dated November 13, 2023 (the "November 13 Default Notice"), notifying the Borrower of the defaults and Events of Default under the Loan Documents and accelerating repayment of the Loan.[5]  Shields Declaration ¶ 15.  A true and correct copy of the November 13 Default Notice is attached to the Shields Declaration as Exhibit 18.

In order to prevent further diversion of funds, the Lender also exercised its control over the DACA account by sending a Notice of Exclusive Control (the "DACA Notice") to First Republic Bank on November 14, 2024.  Shields Declaration ¶ 16.  A true and correct copy of the DACA Notice is attached to the Shields Declaration as Exhibit 19.

Shortly thereafter, the Lender, concerned that the Borrower may have made additional improper distributions and loans to insiders, began reconciling the Borrower's bank statements, only to identify over a million dollars of diverted funds.  Shields Declaration ¶ 17.  Based on the Lender's review, the Borrower also made multiple improper cash distributions to its partners, members, principals, shareholders, equity holders, owners and/or affiliates in violation of Section 14.27.7 of the Loan Agreement, including as follows:

---

[5] Even had the Loan not been accelerated, the maturity date for the Loan without acceleration was February 10, 2024.

- January 2023 - $10,000 (Shields Declaration, Exhibit 20 at 3-4 (showing $110,000 in withdrawals and only $100,000 in reimbursement))

- February 2023 - $265,000 (Shields Declaration, Exhibit 20 at 10)

- March 2023 - $395,556 (Shields Declaration, Exhibit 20 at 16-17)

- April 2023 - $35,000 (Shields Declaration, Exhibit 20 at 25-26 (showing $275,000 in withdrawals and only $240,000 in reimbursement))

- May 2023 - $225,000 (Shields Declaration, Exhibit 20 at 32-33 (showing $400,000 in withdrawals and only $175,000 in reimbursement))

- June 2023 - $135,000 (Shields Declaration, Exhibit 20 at 39-40 (showing $440,000 in withdrawals and only $305,000 in reimbursement))

- August 2023 - $50,000 (Shields Declaration, Exhibit 20 at 46-48 (showing $300,000 in withdrawals and only $250,000 in reimbursement))

- October 2023 - $274,000 (Shields Declaration, Exhibit 20 at 55)

- November 2023 - $60,000 (Shields Declaration, Exhibit 20 at 62)

Shields Declaration, ¶ 17.

With the Borrower and Mr. Sharp refusing to return the diverted funds, on December 5, 2023, the Lender sent a second notice of default, that certain Notice of Default, Request for Information, and Reservation of Rights (the "December 5 Default Notice"), wherein the Lender, among other things, identified additional defaults regarding the Borrower's obligations under Section 8 of the Second Omnibus Agreement in connection with the requirement to market and sell the Subject Property.  Shields Declaration ¶ 18.  A true and correct copy of the December 5 Default Notice is attached to the Shields Declaration as Exhibit 21.

### F.    The Borrower's Diversion of Prepetition Rents

In addition to the foregoing improper cash distributions, the Borrower has also diverted rent proceeds from the Subject Property.  Throughout 2023, the rents collected and deposited into the DACA account were relatively steady with little variation month-to-month.  Shields Declaration, ¶ 19; Exhibit 20 to the Shields

8

Declaration.  However, in November 2023, the rents deposited into the DACA account dropped by more than 33% from the previous month—a drop of $189,578. Shields Declaration, ¶ 19; Exhibit 20 to the Shields Declaration at 60-62.  The drop in rents deposited into the DACA account for December 2023 was even more stark. As shown by the December 2023 DACA account bank statement, Borrower diverted virtually all rents from December 2023—more than $500,000.  Shields Declaration, ¶ 19; Exhibit 20 to the Shields Declaration at 64-66.

### G.   The Prepetition Lawsuit and Motion to Appoint Receiver

On January 9, 2024, the Lender filed a Verified Complaint for Specific Performance to Enforce Terms and Provisions of an Assignment of Leases and Rents, Appointment of Receiver, and Injunctive Relief (the "Complaint"), a copy of which is attached as Exhibit 22 to the Shields Declaration, in the Superior Court of the State of California, Case No.: 24STCV00589 (the "State Court Lawsuit").   Shields Declaration ¶ 20.

On January 23, 2024, the Lender filed a Motion for Order Appointing Receiver and for Preliminary Injunction (the "Receiver Motion"), which was scheduled to be heard on February 27, 2024 (the "Receiver Hearing").  Shields Declaration ¶ 21.  The Borrower opposed the Receiver Motion and waited until the afternoon on the day before the Receiver Hearing to commence its case, along with the case of AGT Manager.  Shields Declaration ¶ 21.

### H.   The Lender's Enforcement of the Assignment of Rents, Mr. Sharp's Intentional Interference with the Same, and Mr. Sharp's Threats and Intimidation of Gaju Market

Based on all of the Borrower's Events of Default under the Loan Agreement and other Loan Documents, the Lender began enforcing its rights under the recorded ALR and the recorded Amended ALR. Shields Declaration ¶ 22.  Specifically, on January 12, 2024, the Lender sent the Borrower, Mr. Sharp, and the Borrower's property manager a Demand to Turn Over Rents Pursuant to § 2938 of the California

Civil Code and the Assignment of Leases and Rents (the "<u>ALR Enforcement Demand</u>").   Shields Declaration ¶ 22.   A true and correct copy of the ALR Enforcement Demand is attached to the Shields Declaration as Exhibit 23.

The Lender also sent a Demand to Pay Rent to Party Other Than Landlord (Section 2938 of the Civil Code) dated January 12, 2024 to Gaju Market, the anchor tenant at the Subject Property (the "<u>Gaju Market Rent Demand</u>"). A true and correct copy of the Gaju Market Rent Demand is attached to the Shields Declaration as Exhibit 24.

It was subsequently discovered, however, that Mr. Sharp instructed Gaju Market's corporate secretary, Mr. Park, to disregard the Gaju Market Rent Demand. Shields Declaration, ¶ 24.  Mr. Park submitted a sworn declaration in the State Court Lawsuit stating that he was contacted by Mr. Sharp, who demanded that Gaju Market pay monthly rent and Backstop obligation payments to the Borrower notwithstanding the Gaju Market Rent Demand because Mr. Sharp had purportedly negotiated a loan extension with the Lender and Gaju Market Rent Demand could safely be ignored. Park Declaration, ¶¶ 6-8.  No such loan extension existed.

Notably, Mr. Park also states in his sworn declaration that Mr. Sharp proceeded to make the following threats: (i) he would start an eviction process for "all" tenants and (ii) he communicated with a third party known as "The Kims," to "annihilate you and your family, and the Rhees.  Obliterate you by making them your landlord." Park Declaration, ¶ 9.  Mr. Park also states in his sworn declaration in the State Court Lawsuit that the Backstop payments that Mr. Sharp was demanding be paid appeared to be overstated by approximately $263,000 and that when "I received the requested rent roll for the basis of the shortfall demand, I discovered an intentionally doctored allocation of the square footage between non-conjoining units in order to apply a higher rate of rent to a particular unit.  Also, there were false presentation of leases that have not been executed according to the 'open date' stated in the rent roll." Park Declaration, ¶ 10.

## I.     The Borrower is Failing to Pay Necessary Operating Expenses

Most recently, in terms of this bankruptcy case, the Borrower commenced this case without any proposed operating budget and has been demanding that Gaju Market pay rent into a new bank account other than the bank account under the Lender's control pursuant to the DACA.  Shields Declaration ¶ 25.  It was not until late Friday afternoon/evening on March 8, 2024 that the Borrower finally proposed a cash collateral budget for the Lender's consideration.  The proposed budget covered a three month period (March, April, and May 2024) and included, among other things, $22,500 in payments that would go directly into Mr. Sharp's own pocket for "property supervisor" services ($7,500/month) and $27,000 in payments that would be made to the separate Property Management Company ($9,000/month).  The proposed budget had no provision for any postpetition interest or any other form of adequate protection payments to either the Senior Lender or the Lender and lacks line items for typical postpetition expenses, including attorneys' fees for the debtor, and only has estimated numbers for quarterly fees payable to the United States Trustee under 28 U.S.C. § 1930.

The Lender has also learned from counsel for Gaju Market that a serious public health issue is developing at the Subject Property on account of the Borrower failing to pay for trash disposal, resulting in the vendor's refusal to pick up trash.  Shields Declaration ¶ 26.  A true and correct copy of an email from counsel for Gaju Market stating as much is attached hereto as Exhibit 25.  On Wednesday, March 6, 2024, counsel for the Borrower finally reached out to counsel for the Lender to discuss arrangements to pay for trash disposal out of the rents of the Subject Property.  Counsel for the Lender responded on March 7, 2024 that the Lender would consent to the limited use of cash collateral to pay the trash disposal bill, but not for any other purpose.  Later that same day, counsel for Gaju Market advised that Gaju Market had already paid the trash disposal invoice directly, having been forced by the Borrower's inaction to take the trash disposal matter into its own hands.

**J.**     **To the Extent that the Rents from the Subject Property are Property of The Estate, the Lender Does Not Consent to the Use of Its Cash Collateral Absent the Appointment of a Chapter 11 Trustee**

As a threshold matter, the Lender believes that the rents from the Subject Property belong to the Lender under the recorded ALR and Amended ALR given the Lender's enforcement of the assignment of rents on the basis of the Borrower's defaults and are not property of the bankruptcy estate.  Without limiting or waiving that argument in any way, at minimum, the rents from the Subject Property constitute the Lender's cash collateral and the Lender has not consented to the use of its cash collateral, has not consented to the rents being deposited in an account other than the account subject to the DACA, and has not been offered or provided with any adequate protection of its interest in the rents.  Given all that has transpired with Mr. Sharp in control of the Borrower, and the sworn allegations of fraud, threats and intimidation by Gaju Market, the Lender will not consent to the use of its cash collateral absent the appointment of a Chapter 11 Trustee.

## RELIEF REQUESTED

The Lender respectfully requests that the Court enter an order, pursuant to Sections 363(e) and 541 of the Bankruptcy Code, (i) finding that rents from the Subject Property are not property of the estate, (ii) prohibiting the use of the Lender's cash collateral, and (iii) granting the Lender adequate protection of its interests therein.

## BASIS FOR RELIEF

A debtor is prohibited from using cash collateral in the ordinary course of business unless each entity that has an interest in such cash collateral consents to its use or the bankruptcy court, after notice and a hearing, authorizes such use in accordance with the provisions of Section 363 of the Bankruptcy Code.  11 U.S.C. § 363(c)(2).  Furthermore, Section 363(e) of the Bankruptcy Code provides, in relevant part, as follows:

12

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).

Section 361 provides a nonexclusive list of examples of adequate protection, including requiring the debtor to make cash payments to the entity whose interest requires protection, granting additional or replacement liens to such entity, or granting such other relief as will result in the realization by such entity of the indubitable equivalent of such entity's interest in the property to be used.  11 U.S.C. § 361.

**A.    The Rents from the Subject Property Belong to the Lender and Are Not Property of the Bankruptcy Estate.**

As a threshold matter, a debtor in possession can only use property that belongs to the bankruptcy estate.  11 U.S.C. §363(b)(1) and (c)(1) (setting forth the parameters for using "property of the estate"); 11 U.S.C. § 541(a) (defining the property of the estate).   Commencing a bankruptcy does not give a debtor in possession greater property rights than existed prepetition.  *See*, *e.g.*, *In re Sargent*, 337 B.R. 661, 665 (Bankr. N.D. Ohio 2006) ("However, merely because property is included in the estate, does not confer upon the trustee any greater rights in the property than that held by the debtor; it has always been a tenant of bankruptcy jurisprudence that property limited in the hands of a debtor is similarly limited in the hands of the trustee."); *In re Bardell*, 374 B.R. 588, 590 (N.D. W. Va. 2007) ("[t]he property interests which pass to the bankruptcy estate are no more extensive than those possessed by the debtor as of the date of the filing.").

Property of the estate generally includes all legal or equitable interests of the debtor in property as of the commencement of the bankruptcy case.  11 U.S.C. § 541(a)(1); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983).  It also includes proceeds, products, offspring, rents, or profits of or from property of the

13

estate, 11 U.S.C. § 541(6), as well as "property in which a creditor has a security interest." *In re Contractors Equipment Supply Co.*, 861 F.2d 241, 244 (9th Cir. 1988). This "encompasses property of the debtor that was seized by a creditor before the petition for reorganization was filed." *Id.*, citing *Whiting Pools*, *supra*, at 209. However, the Supreme Court in *Whiting Pools* "expressly left open whether property becomes property of the estate if the seizure operates to transfer ownership, leaving the debtor with no interest in the property. *Id*.

Whether a debtor in possession has an interest in property is determined by state law. *Id.*; *see also*, *Butner v. United States*, 440 U.S. 48, 55 (1979). "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely be reason of the happenstance of bankruptcy.'" *Butner* at 55. "The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property." *Id*.

In *Butner*, the Supreme Court addressed a situation similar to the one at issue in the case at bar – a dispute over the right to the rents collected during a bankruptcy case. In its syllabus, the Supreme Court held that "[t]he law of the State where the property is located accordingly governs a mortgagee's right to rents during bankruptcy, and ***a federal bankruptcy court should take whatever steps are necessary to ensure that a mortgagee is afforded in federal bankruptcy court the same protection he would have under state law had no bankruptcy ensued***." *Id*. at 49 (emphasis added).

Consistent with the holding in *Butner*, federal courts have analyzed a mortgagee's right to receive rents from mortgaged property by applying state law. For

example, in *Contractors Equipment Supply*, the Ninth Circuit addressed a situation where the debtor, an equipment manufacturer, granted its secured lender a security interest in all future accounts receivable owed by the debtor's customers. Analyzing the Uniform Commercial Code provisions as adopted in the State of Nevada, the Ninth Circuit held that the assignment of receivables in that case did not involve a transfer of title. *Contractors Equipment Supply*, *supra*, at 245. "Because the assignment involved only a security interest ***and did not transfer title***, [the debtor] retained an interest in the account receivable even after [the secured lender's] notice to [the customer]. This interest was sufficient to bring the account receivable into the debtor's reorganization estate." *Id*. (emphasis added).

In contrast, California law holds that a lender receives ***title*** to the rents of mortgaged property under an absolute assignment of rents upon default when the lender takes an affirmative step to enforce the assignment of rents, not just a security interest. *See*, Cal. Civ. Code § 2938; *In re GOCO Realty Fund I*, 151 B.R. 241, 247 (Bankr. N.D. Cal. 1993) ("The import of the enactment of Cal. Civ. Code § 2938 is to clarify that a conditional absolute assignment of rents is properly perfected on recordation, constituting a present transfer of the assignor's interest in existing and future rents."). Section 2938 was "intended to strengthen real estate lenders' claims to rents in bankruptcy" and "codified the holding from *Ventura-Louise* that the effect of a conditional absolute assignment is to transfer title to rents to the lender." *Id*., citing *In re Ventura-Louise*, 490 F.2d 1141 (9th Cir. 1974) (applying California law). "The holding of *Ventura-Louise* is significant because it construes an absolute assignment of rents as a transfer of title." *Id*.

"The literal words of the statute plainly anticipate an enforcement step by a lender who holds legal title to rents arising from a perfected conditional assignment of rents before the lender is entitled to possession." *Id*. Specifically, Section 2938(c) requires an assignee under a recorded assignment of rents to take one or more of the enforcement steps described therein, which includes, among other things: "Delivery

15

1  to any one or more of the tenants of a written demand for turnover of rents, issues,

2  and profits in the form specified in subdivision (k), a copy of which demand shall also

3  be delivered to the assignor; and a copy of which shall be mailed to all other assignees

4  of record of the leases, rents, issues, and profits of the real property at the address for

5  notices provided in the assignment or, if none, to the address to which the recorded

6  assignment was to be mailed after recording."   Cal. Civ. Code 2938(c)(3).

7  Alternatively, the assignee can deliver to the assignor "a written demand for the rents,

8  issues, or profits, a copy of which shall be mailed to all other assignees of record of

9  the leases, rents, issues, and profits of the real property at the address for notices

10  provided in the assignment or, if none, to the address to which the recorded

11  assignment was to be mailed after recording."  Cal. Civ. Code § 2938(c)(4).

12      Because the Lender took the necessary steps to transfer title of the rents to

13  Lender under California law prior to the Petition Date, those rents are not part of the

14  debtor's estate.  At noted above, Lender perfected its interest in the rents from the

15  Subject Property through the recorded ALR and the recorded Amended ALR.  Those

16  instruments provided for an absolute assignment of rents contingent upon the

17  occurrence of a future default.  And, following the numerous defaults by the Borrower

18  as set forth in detail above, on January 12, 2024, the Lender, sent the Gaju Market

19  Rent Demand in the form required by Section 2938(k) and the ALR Enforcement

20  Demand, thereby satisfying the enforcement steps provided for in Section 2938(c)(3)

21  and (c)(4).

22      Thus, as of January 12, 2024, title to the rents was vested in the Lender under

23  California law.

24      Accordingly, the rents from the Subject Property are not property of the

25  Debtors' bankruptcy estate. *See also*, *Commerce Bank v. Mountain View Village, Inc.*,

26  5 F.3d 34, 38 (3rd Cir. 1993) (applying Pennsylvania law and the title theory of

27  assignments of rent and holding that rents were <u>not</u> property of the estate and not

28  available for use in a plan where a mortgage holder exercised assignment of rents after

16

the borrower's default and took the step of enforcing the assignment of rents and collecting the rents prepetition); *In re Jason Realty, L.P.*, 59 F.3d 423, 429 (3rd Cir. 1995) (applying New Jersey law and the title theory of assignments of rents and holding that rents were <u>not</u> property of the estate).

**B.** **Even if the Rents Are Property of the Bankruptcy Estate, At Minimum, They are the Lender's Cash Collateral and the Lender is Entitled to Adequate Protection.**

Even assuming, *arguendo*, that the rents from the Subject Property are property of the Borrower's bankruptcy estate (which they are not), at minimum the rents would be considered the Lender's cash collateral entitled to adequate protection.

Section 552(b) provides that, if a prepetition security interest "extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise."  11 U.S.C. § 552(b)(1).  In addition, that section also provides that, if a prepetition security interest "extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property ... then such security interest extends to such rents ... acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise."  11 U.S.C. § 552(b)(2).

Here, pursuant to the Loan Agreement, the Deed of Trust, the ALR, the Amended Deed of Trust, and the Amended ALR, the Lender holds a prepetition lien on and security interest in the Subject Property and the rents generated from the tenant leases at the Subject Property (again, assuming *arguendo* that the Lender does not

17

hold outright title to the rents).  Thus, pursuant to Section 552(b) of the Bankruptcy Code, such lien and security interest extend to all postpetition rents from the Subject Property as well.

The Borrower commenced this case without seeking consent from the Lender to use cash collateral, without seeking court permission to use cash collateral, without proposing any sort of cash collateral budget for the case, and without offering any form of adequate protection to the Lender on account of its interest in the rents.[6] Instead, the Borrower sidestepped the Lender, went directly to the anchor tenant at the property (Gaju Market), and instructed Gaju Market to disregard the Gaju Market Rent Demand and the ALR Enforcement Demand and to pay all rent into a new bank account not under the control of Lender, which is unacceptable to the Lender.

The first time that the Borrower proposed any form of cash collateral budget for the case was late in the evening on Friday, March 8, 2024, when it finally provided a draft budget covering a three month period (March, April and May, 2024) for the Lender's consideration.  Included within the proposed expenditures is a monthly fee of $7,500 for Mr. Sharp's services as a "property supervisor," which is in addition to $9,000 per month for the Property Management Company's services.  The Lender is open to discussing the use of rents to maintain the Subject Property by paying necessary expenses – utilities, property taxes, and the like – but certainly not to lining Mr. Sharp's pockets with additional money and certainly not without the benefit of an independent Chapter 11 trustee who can maintain and preserve the Subject Property free of further interference by Mr. Sharp.

**WHEREFORE**, the Lender respectfully requests that the Court enter an order granting this Motion, finding that the rents are not property of the estate, prohibiting the use of cash collateral absent further court order, granting the Lender adequate

---

[6] Lender notes that Senior Lender also has an interest in the Subject Property and related rents, meaning that, if the rents are not property of Lender, then the Borrower is using the cash collateral of two secured parties without any formal consent or court authorization for such cash collateral use.

1 | protection, and granting such other and further relief as the Court deems just and
2 | proper.

3

4 | Dated:  March 11, 2024

5

6 |                      BENESCH,  FRIEDLANDER,  COPLAN  &  ARONOFF
LLP

7

8 |                      By:       */s/ Krista M. Enns*

9 |                                     KRISTA M. ENNS, Cal Bar No. 206430

10 |                                     ANTONIA STABILE, Cal. Bar No. 329559
MICHAEL J. BARRIE (*pro hac vice*

11 | forthcoming)

12 | KEVIN M. CAPUZZI (*pro hac vice*
forthcoming)

13

14 | Attorneys for CPIF California, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MOTION OF CPIF CALIFORNIA, LLC FOR ADEQUATE PROTECTION**
**Case Nos. 2:24-bk-11409-SK; 2:24-bk-11412-SK**