1   BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
    Krista M. Enns, Cal. Bar No. 206430
2   Antonia Stabile, Cal. Bar No. 329559
    100 Pine Street, Suite 3100
3   San Francisco, California 94111
    Telephone: 628-600-2250
4   Email: kenns@beneschlaw.com
            astabile@beneschlaw.com
5
    BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
6   Michael J. Barrie (Pro Hac Vice Forthcoming)
    Kevin M. Capuzzi (Pro Hac Vice Forthcoming)
7   1313 N. Market Street, Suite 1201
    Wilmington, Delaware 19801
8   Telephone: 302-442-7010
    Email: mbarrie@beneschlaw.com
9           kcapuzzi@beneschlaw.com

10  Attorneys for CPIF California, LLC

11              UNITED STATES BANKRUPTCY COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13                   LOS ANGELES DIVISION

14

15  | In re:                    | Case No.  2:24-bk-11409-SK |
16  |                           | Chapter 11                |
    | AGTJ13, LLC,              | Hon. Sandra R. Klein      |
17  |            Debtor.        |                           |
18  |---------------------------|---------------------------|
19  | In re:                    | Case No.  2:24-bk-11412-SK |
    |                           | Chapter 11                |
20  | AGTJ13 Manager, LLC,      | Hon. Sandra R. Klein      |
    |            Debtor.        |                           |
21

22
    **DECLARATION OF ROBERT SHIELDS IN SUPPORT OF MOTION OF**
23  **CPIF CALIFORNIA, LLC FOR AN ORDER GRANTING ADEQUATE**
    **PROTECTION AND PROHIBITING USE OF CASH COLLATERAL**
24  **PURSUANT TO SECTION 363(e) OF THE BANKRUPTCY CODE**

25      I, Robert Shields, under penalty of perjury, hereby declare as follows:

26      1.      I am Director of Underwriting for the Real Estate Lending strategy group

27  at Columbia Pacific Advisors, an affiliate of CPIF California, LLC ("Lender").   In

28

---

**DECL. OF R. SHIELDS ISO MOTION FOR ADEQUATE PROTECTION**
**Case Nos. 2:24-bk-11409-SK; 2:24-bk-11412-SK**

that capacity, I have personal knowledge of the facts set forth herein and, if sworn as a witness, can testify competently as to the matters affirmed in this declaration.

2.    I make this declaration in support of the Lender's Motion to for an order granting adequate protection and prohibiting use of cash collateral pursuant to Section 363(e) of the Bankruptcy Code (the "Motion") filed concurrently herewith. Capitalized terms used but not otherwise defined herein shall have the meanings given in the Motion.

**A. The Debtors, Mr. Sharp, and the Subject Property**

3.    Debtor AGTJ13, LLC (the "Borrower") filed its case as a Chapter 11 single asset real estate case. The case was filed on the eve of a hearing in California state court to consider the appointment of a receiver over the Borrower's primary asset—a shopping center commonly known as the multi-tenant retail center located at 450 South Western Avenue, Los Angeles, California (the "Subject Property")— which secures a $29,190,000 loan made by the Lender to the Borrower as described in greater detail below (the "Loan").

4.    Mr. Sharp is the Borrower's manager, and in that capacity, he executed all of the loan documents for the Loan on behalf of the Borrower and is otherwise in control of the Borrower. Mr. Sharp is also the managing member and majority member of the Borrower's sole member, Debtor AGTJ13 Manager, LLC (the "AGT Manager"), and a personal guarantor for the Loan under a Limited Recourse Guaranty dated as of January 10, 2022 (the "Guaranty").

5.    The anchor tenant at the Subject Property is Gaju Market Corporation ("Gaju Market").

**B. The Lender's Prepetition Loan to the Borrower**

6.    On or about January 10, 2022, the Borrower executed and delivered to the Lender, among other loan documents, a Promissory Note (the "Note") and a Loan Agreement (the "Loan Agreement") that provided the terms of a Loan to the Borrower

**DECL. OF R. SHIELDS ISO MOTION FOR ADEQUATE PROTECTION**
**Case Nos. 2:24-bk-11409-SK; 2:24-bk-11412-SK**

1  in the amount of $25,103,000.00.[1]  On or about December 30, 2022, the Loan was

2  modified pursuant to an Amended and Restated Promissory Note (the "Amended

3  Note") and a First Omnibus Modification and Reaffirmation Agreement (the "First

4  Omnibus Agreement"), pursuant to which, among other things, the principal amount

5  of the Loan was increased to $29,190,000.00 and the maturity date was extended to

6  July 10, 2023.  On or about September 28, 2023, the Loan was further modified

7  pursuant to a Second Omnibus Modification and Reaffirmation Agreement (the

8  "Second Omnibus Agreement"), pursuant to which, among other things, the maturity

9  date for the Loan was further extended to February 10, 2024.

10      7.    The Loan is secured by, among other things: (i) a Deed of Trust,

11  Assignment of Leases and Rents, Assignment of Contracts, Security Agreement, and

12  Fixture Filing dated as of January 10, 2022 (the "Deed of Trust"), which was recorded

13  in the Official Records of the Recorder's Office of Los Angeles County, California

14  on January 14, 2022, as Instrument No. 20220057045; (ii) an Assignment of Leases

15  and Rents dated as of January 10, 2022 (the "ALR"), which was recorded in the

16  Official Records of the Recorder's Office of Los Angeles County, California on

17  January 14, 2022, as Instrument No. 20220057046; (iii) the First Amendment to Deed

18  of Trust, dated as of December 30, 2022 (the "Amended Deed of Trust"), which was

19  recorded in the Official Records of the Recorder's Office of Los Angeles County,

20  California, on January 30, 2023, as Instrument No. 20230000663; and (iv) the First

21  Amendment to Assignment of Leases and Rents dated as of December 30, 2022 (the

22  "Amended ALR"), which was recorded in the Official Records of the Recorder's

23  Office of Los Angeles County, California on January 3, 2023, as Instrument No.

24  20230000664.

25

26

---

27  [1] The Loan in January of 2022 was part of a refinance of a prior loan the Lender made to the Borrower in December of
2020 in the amount of $52,500,000.00 to finance the acquisition of the Subject Property.  As explained below, the

28  balance of the prior loan was refinanced through a loan with the Borrower's current senior lender, Lone Oak Fund, LLC
(the "Senior Lender") in the amount of $29,810,000.00 (the "Senior Loan").

**DECL. OF R. SHIELDS ISO MOTION FOR ADEQUATE PROTECTION**
**Case Nos. 2:24-bk-11409-SK; 2:24-bk-11412-SK**

8.    As additional security for the Loan: (i) Debtor AGT Manager pledged to Lender, as security for the Loan, all outstanding equity of the Borrower pursuant to that certain Pledge Agreement dated as of January 10, 2022 (the "Pledge Agreement"); and (ii) Mr. Sharp executed the Guaranty in favor of the Lender.

9.    All rents generated from the leases at the Subject Property were assigned to the Lender pursuant to the recorded ALR and the recorded Amended ALR.  So long as the Borrower was not in default with respect to the Loan, the Borrower was permitted to continue collecting rents but was required to deposit them into a bank account (the "Lender Controlled Account") subject to that certain Deposit Account Control Agreement dated December 4, 2020 between the Lender and First Republic Bank (the "DACA").

10.    In addition, the Lender also filed the following financing statements: (i) Financing Statement filed in Delaware on December 4, 2020, Filing No. 2020 8516397, asserting a blanket all asset lien against the Borrower; (ii) Financing Statement filed in the real estate records of Los Angeles County, California on December 7, 2020, Filing No. 20201592320, as a fixture filing against the Borrower; (iii) Financing Statement filed in California on December 4, 2020, Filing No. U200034815120, asserting a lien on the pledged securities by AGT Manager under the Pledge Agreement.

11.    True and correct copies of the Note, Loan Agreement, Amended Note, First Omnibus Agreement, Second Omnibus Agreement, Deed of Trust, ALR, Amended Deed of Trust, Amended ALR, Pledge Agreement, Guaranty, DACA and the financing statements noted above are attached hereto as **Exhibits 1-15**.

C. **The Senior Debt and the Intercreditor Agreement**

12.    As noted above, the Lender's original loan to the Borrower was in the amount of $52,500,000.00 and was made in or about December 2020.  That original loan was refinanced in January of 2022 through: (i) the Senior Loan made by the Senior Lender; and (ii) the Loan made by the Lender.  The Senior Lender, like the

Lender, has a lien on substantially all assets of the Debtors. The Senior Lender and the Lender are parties to that certain Subordination and Intercreditor Agreement dated as of January 10, 2022 (the "Intercreditor Agreement"), a true and correct copy of which is attached hereto as **Exhibit 16**.

13. The Borrower stopped paying the Senior Lender in February 2024, having failed to pay the amount due to the Senior Lender on February 10, 2024, which constituted another default under the Loan Agreement. On February 22, 2024, the Lender sent the Borrower a Notice of Protective Advance and Additional Default (the "Protective Advance Notice"), advising the Borrower of such default and of Lender's decision to make a protective advance under Section 7.7 of the Loan Agreement in the amount of $221,090.83 to pay the Borrower's outstanding and past-due payment to the Senior Lender. A true and correct copy of the Protective Advance Notice is attached hereto as **Exhibit 17**. The Senior Lender has agreed not to exercise remedies with respect to the Senior Loan provided that the Senior Lender continues to receive its contract rate of interest.

**D. The Borrower's Prepetition Defaults With Respect to the Loan**

14. In late 2023, the Lender noticed suspicious account activity on the Borrower's bank statements: on October 13, 2023, the Borrower made a transfer of $274,000 for "AGTJ partial loan repayment to [Jake Sharp Capital]." Not only would an insider loan of this nature be a breach of section 14.27.8 of the Loan Agreement (which prohibits the Borrower from incurring any additional debt for borrowed money), but the $274,000 repayment also violated section 14.27.7 of the Loan Agreement (which prohibits Borrower from making cash distributions and payments to its partners, members, principals, shareholders, equity holders, owners, and/or Affiliates).

15. The Borrower refused to provide additional information about this payment (which constituted an additional default due to failure to deliver financial reporting information and documentation as required by Section 14.12 and Exhibit B

of the Loan Agreement), resulting in the Lender sending a Notice of Default and Reservation of Rights dated November 13, 2023 (the "November 13 Default Notice"), notifying the Borrower of the defaults and Events of Default under the Loan Documents and accelerating repayment of the Loan.[2]  A true and correct copy of the November 13 Default Notice is attached hereto as **Exhibit 18**.

16.    In order to prevent further diversion of funds, the Lender also exercised its control over the DACA account by sending a Notice of Exclusive Control (the "DACA Notice") to First Republic Bank on November 14, 2024.  A true and correct copy of the DACA Notice is attached hereto as **Exhibit 19**.

17.    Shortly thereafter, the Lender, concerned that the Borrower may have made additional improper distributions and loans to insiders, began reconciling the Borrower's bank statements, only to identify over a million dollars of diverted funds. Based on the Lender's review, the Borrower also made multiple improper cash distributions to its partners, members, principals, shareholders, equity holders, owners and/or affiliates in violation of Section 14.27.7 of the Loan Agreement, including as follows:

- January 2023 - $10,000 (**Exhibit 20** at 3-4 (showing $110,000 in withdrawals and only $100,000 in reimbursement))
- February 2023 - $265,000 (**Exhibit 20** at 10)
- March 2023 - $395,556 (**Exhibit 20** at 16-17)
- April 2023 - $35,000 (**Exhibit 20** at 25-26 (showing $275,000 in withdrawals and only $240,000 in reimbursement))
- May 2023 - $225,000 (**Exhibit 20** at 32-33 (showing $400,000 in withdrawals and only $175,000 in reimbursement))
- June 2023 - $135,000 (**Exhibit 20** at 39-40 (showing $440,000 in withdrawals and only $305,000 in reimbursement))
- August 2023 - $50,000 (**Exhibit 20** at 46-48 (showing $300,000 in withdrawals and only $250,000 in reimbursement))
- October 2023 - $274,000 (**Exhibit 20** at 55)
- November 2023 - $60,000 (**Exhibit 20** at 62)

---

[2] Even had the Loan not been accelerated, the maturity date for the Loan without acceleration was February 10, 2024.

**DECL. OF R. SHIELDS ISO MOTION FOR ADEQUATE PROTECTION**
**Case Nos. 2:24-bk-11409-SK; 2:24-bk-11412-SK**

18.    With the Borrower and Mr. Sharp refusing to return the diverted funds, on December 5, 2023, the Lender sent a second notice of default, that certain Notice of Default, Request for Information, and Reservation of Rights (the "December 5 Default Notice"), wherein the Lender, among other things, identified additional defaults regarding the Borrower's obligations under Section 8 of the Second Omnibus Agreement in connection with the requirement to market and sell the Subject Property. A true and correct copy of the December 5 Default Notice is attached hereto as **Exhibit 21**.

### E. The Borrower's Diversion of Prepetition Rents

19.    In addition to the foregoing improper cash distributions, the Borrower has also diverted rent proceeds from the Subject Property. Throughout 2023, the rents collected and deposited into the DACA account were relatively steady with little variation month-to-month. *See*, **Exhibit 20**. However, in November 2023, the rents deposited into the DACA account dropped by more than 33% from the previous month—a drop of $189,578. *See*, **Exhibit 20**, at 60-62. The drop in rents deposited into the DACA account for December 2023 was even more stark. As shown by the December 2023 DACA account bank statement, Borrower diverted virtually all rents from December 2023—more than $500,000. *See*, **Exhibit 20**, at 64-66.

### F. The Prepetition Lawsuit and Motion to Appoint Receiver

20.    On January 9, 2024, the Lender filed a Verified Complaint for Specific Performance to Enforce Terms and Provisions of an Assignment of Leases and Rents, Appointment of Receiver, and Injunctive Relief (the "Complaint"), a copy of which is attached hereto as **Exhibit 22**, in the Superior Court of the State of California, Case No.: 24STCV00589 (the "State Court Lawsuit").

21.    On January 23, 2024, the Lender filed a Motion for Order Appointing Receiver and for Preliminary Injunction (the "Receiver Motion"), which was scheduled to be heard on February 27, 2024 (the "Receiver Hearing"). The Borrower

**DECL. OF R. SHIELDS ISO MOTION FOR ADEQUATE PROTECTION**
**Case Nos. 2:24-bk-11409-SK; 2:24-bk-11412-SK**

opposed the Receiver Motion and waited until the afternoon on the day before the Receiver Hearing to commence its case, along with the case of AGT Manager.

**G. The Lender's Enforcement of the Assignment of Rents, Mr. Sharp's Intentional Interference with the Same, and Mr. Sharp's Threats and Intimidation of Gaju Market**

22.    Based on all of the Borrower's Events of Default under the Loan Agreement and other Loan Documents, the Lender began enforcing its rights under the recorded ALR and the recorded Amended ALR.  Specifically, on January 12, 2024, the Lender sent the Borrower, Mr. Sharp, and the Borrower's property manager a Demand to Turn Over Rents Pursuant to § 2938 of the California Civil Code and the Assignment of Leases and Rents (the "ALR Enforcement Demand"), a true and correct copy of which is attached hereto as **Exhibit 23**.

23.    The Lender also sent a Demand to Pay Rent to Party Other Than Landlord (Section 2938 of the Civil Code) dated January 12, 2024 to Gaju Market, the anchor tenant at the Subject Property (the "Gaju Market Rent Demand"), a true and correct copy of which is attached hereto as **Exhibit 24**.

24.    It was subsequently discovered, however, that Mr. Sharp instructed Gaju Market's corporate secretary, Mr. Park, to disregard the Gaju Market Rent Demand. Mr. Park submitted a sworn declaration in the State Court Lawsuit stating that he was contacted by Mr. Sharp, who demanded that Gaju Market pay monthly rent and Backstop obligation payments to the Borrower notwithstanding the Gaju Market Rent Demand because Mr. Sharp had purportedly negotiated a loan extension with the Lender and Gaju Market Rent Demand could safely be ignored.  No such loan extension existed.

**H. The Borrower is Failing to Pay Necessary Operating Expenses**

25.    Most recently, in terms of this bankruptcy case, the Borrower the Borrower commenced this case without any proposed operating budget and has been demanding that Gaju Market pay rent into a new bank account other than the bank

8

account under the Lender's control pursuant to the DACA.  It was not until late Friday afternoon/evening on March 8, 2024 that the Borrower finally proposed a cash collateral budget for the Lender's consideration.  The proposed budget covered a three month period (March, April, and May 2024) and included, among other things, $22,500 in payments that would go directly into Mr. Sharp's own pocket for "property supervisor" services ($7,500/month) and $27,000 in payments that would be made to the separate Property Management Company ($9,000/month).  The proposed budget had no provision for any postpetition interest or any other form of adequate protection payments to either the Senior Lender or the Lender and lacks line items for typical postpetition expenses, including attorneys' fees for the debtor, and only has estimated numbers for quarterly fees payable to the United States Trustee under 28 U.S.C. § 1930.

26.    The Lender has also learned from counsel for Gaju Market that a serious public health issue is developing at the Subject Property on account of the Borrower failing to pay for trash disposal and the vendor's refusal to pick up trash.  A true and correct copy of an email from counsel for Gaju Market stating as much is attached hereto as **Exhibit 25**.

I.    **To the Extent that the Rents from the Subject Property are Property of The Estate, the Lender Does Not Consent to the Use of Its Cash Collateral Absent the Appointment of a Chapter 11 Trustee**

27.    As a threshold matter, the Lender believes that the rents from the Subject Property belong to the Lender under the recorded ALR and Amended ALR given the Lender's enforcement of the assignment of rents on the basis of the Borrower's defaults and are not property of the bankruptcy estate.  Without limiting or waiving that argument in any way, at minimum, the rents from the Subject Property constitute the Lender's cash collateral and the Lender has not consented to the use of its cash collateral, has not consented to the rents being deposited in an account other than the account subject to the DACA, and has not been offered or provided with any adequate

1  protection of its interest in the rents.  Given all that has transpired with Mr. Sharp in

2  control of the Borrower, and the sworn allegations of fraud, threats and intimidation

3  by Gaju Market, the Lender will not consent to the use of its cash collateral absent the

4  appointment of a Chapter 11 Trustee.

5      I declare under penalty of perjury under the laws of the United States of

6  America that the foregoing is true and correct.

7      Executed this _11_ day of March, 2024, at Seattle, Washington.

8

9

10                                         Robert Shields, Declarant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECL. OF R. SHIELDS ISO MOTION FOR ADEQUATE PROTECTION**
Case Nos. 2:24-bk-11409-SK; 2:24-bk-11412-SK