RON BENDER (SBN 143364)
BETH ANN R. YOUNG (SBN 143945)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: RB@LNBYG.COM; BRY@LNBYG.COM; KJM@LNBYG.COM

Counsel for Chapter 11 Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>AGTJ13, LLC, a Delaware limited liability company,<br><br>       Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>AGTJ Manager, LLC, a California limited liability company,<br><br>       Debtor and Debtor in Possession.<br>_____<br><br>☒ Affects both Debtors<br><br>☐ Affects AGTJ13, LLC only<br><br>☐ Affects AGTJ13 Manager, LLC only | Lead Case No.: 2:24-bk-11409-SK<br><br>Jointly administered with:<br>2:24-bk-11412-SK<br><br>Chapter 11 Cases<br><br>**DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR AGTJ13, LLC AND AGTJ13 MANAGER, LLC**<br><br>**Disclosure Statement Hearing**<br>Date:   July 10, 2024<br>Time:   9:00 a.m.<br>Place:   Courtroom 1575<br>            255 E. Temple Street<br>            Los Angeles, CA 90012<br><br>**Plan Confirmation Hearing**<br>Date:   TBD<br>Time:   TBD<br>Place:   Same as above |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. 1

I.      INTRODUCTION............................................................................................ 3

II.     GENERAL DISCLAIMER AND VOTING PROCEDURE.............................. 6

III.    WHO MAY OBJECT TO CONFIRMATION OF THE PLAN ....................... 7

IV.     WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN .......................... 7

V.      VOTES NECESSARY TO CONFIRM THE PLAN ....................................... 8

VI.     INFORMATION REGARDING VOTING IN THIS CASE ............................ 9

VII.    DESCRIPTION OF THE DEBTORS' PAST AND FUTURE BUSINESS AND
        EVENTS PRECIPITATING BANKRUPTCY FILING .................................. 9

VIII.   CRITICAL PLAN PROVISIONS.................................................................. 22

IX.     DESCRIPTION AND TREATMENT OF CLAIMS....................................... 23

X.      SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS ........ 32

XI.     FINANCIAL RECORDS TO ASSIST IN DETERMINING WHETHER PROPOSED
        PLAN IS FEASIBLE ...................................................................................... 33

XII.    ASSETS AND LIABILITIES OF THE ESTATES ....................................... 34

XIII.   TREATMENT OF NONCONSENTING CLASSES....................................... 35

XIV.    TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING CLASS
        (CHAPTER 7 LIQUIDATION ANALYSIS) .................................................. 36

XV.     FUTURE DEBTOR ....................................................................................... 38

XVI.    SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF CONTRACTS AND
        LEASES; OTHER PROVISIONS.................................................................... 43

XVII.   BANKRUPTCY PROCEEDINGS.................................................................. 48

XVIII.  TAX CONSEQUENCES OF THE PLAN ...................................................... 49

XIX.    EFFECT OF CONFIRMATION OF THE PLAN........................................... 54

1

**XX.      DECLARATION IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN ....... 57**

AGTJ13, LLC ("<u>Property Co</u>") and AGTJ13 Manager, LLC ("<u>Hold Co</u>" and together with Property Co, the "<u>Debtors</u>"), the debtors and debtors in possession in the above-referenced, jointly-administered Chapter 11 bankruptcy cases, hereby jointly file this combined Disclosure Statement and Plan of Reorganization.

## I.    <u>INTRODUCTION</u>

On February 26, 2024, the Debtors each filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code ("<u>Code</u>").  The document you are reading is both the Plan of Reorganization ("<u>Plan</u>") and the Disclosure Statement ("<u>DS</u>").  The Debtors (sometimes referred to herein as the "<u>Proponents</u>") have proposed the Plan to treat the claims of the Debtors' creditors and the interests of membership interest holders.  A DS describes the assumptions that underlie the Plan and how the Plan will be executed. The Bankruptcy Court ("<u>Court</u>") has approved the form of this document as an adequate DS, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. The Court has not yet confirmed the Plan, which means the terms of the Plan are not now binding on anyone.

The effective date of the Plan ("<u>Effective Date</u>") will be the first business day that is at lest fifteen (15) days following the date of entry of the Court order confirming the Plan (the "<u>Plan Confirmation Order</u>") when and provided that all of the following conditions to the effectiveness of the Plan have been satisfied or waived: (a) there shall not be any stay in effect with respect to the Plan Confirmation Order, (b) the Plan Confirmation Order shall not be subject to any appeal or rehearing; and (c) the Plan and all documents, instruments and agreements to be executed in connection with the Plan have been executed and delivered by all parties to such documents, instruments and agreements.

The primary asset of these jointly-administered estates is certain real property located at 450 S. Western Avenue, Los Angeles, CA (the "<u>Property</u>").  The Property is a highly valuable, highly-coveted three-story, open air, grocery anchored retail center totaling approximately 120,000 square feet with approximately 80,046 leasable square feet and a 125,000 square foot, four story, 362 space parking garage on approximately 1.67 acres in a prime location (with the closest major intersection being two blocks to the south, at Wilshire Blvd. and Western Avenue), in the heart of Koreatown.

The fundamental purpose of the Plan is for the Debtors to pay all creditors the full amount of their claims pursuant to a refinancing or sale of the Property pursuant to an active and thorough marketing process designed to maximize value for creditors and interest holders.  The basic timeline within which this will occur will be during the period from the Effective Date through no later than March 31, 2025, provided, however, that the Plan includes numerous milestones and deadlines between the Effective Date and March 31, 2025, pertaining to the refinancing and sale process, including, without limitation, deadlines for the Debtors to: (1) identify, select and obtain Court approval of a broker, (2) prepare and disseminate marketing materials; (3) provide due diligence access to interested parties; (4) receive written offers; (5) identify and accept a successful offer; and (6) close a refinance or sale.  The Debtors are already seeking refinancing options and under the Plan will commence a sale process while the Debtors seek refinancing that pays all secured debt in full or as otherwise agreed to by the Debtors' secured creditors.

The Debtors' proposed timeline for the refinancing and sale process to occur is based on a number of factors, including, the Debtor believes that an active and thorough marketing process for the purpose of either a refinance or a sale will take a number of months: approximately 3 – 5 months for a refinancing, and 5-9 months for a sale.  The Debtors also submit that this timeline will maximize value for a number of reasons, including, such a timeline: (1) will not be perceived by the market as a "fire sale" scenario, but rather, a market-based, methodical, competitive, non-distressed process; (2) will allow for the Debtors to retain appropriate third party professionals and allow such professionals to conduct a thorough marketing and sale process; (3) will potentially present a more advantageous interest rate and economic environment which could potentially create additional value for the Debtors' estates.

The Debtors have already commenced efforts to identify refinancing solutions but additional time is necessary and warranted in light of a number of events and developments that have occurred both before and during these chapter 11 cases, as discussed further below, including, Property Co's negotiation with its secured lenders to employ a CRO and the employment of a CRO which commenced on May 1, 2024, approximately and only one month ago, the Debtors' and CRO's efforts to address tenant matters, enhance operations, collect rents and enforce leases, and create a cohesive, streamlined, operating, rent collection and expense payment process for the Property (which process was historically not as cohesive as a result

4

of some rents being collected by a third party affiliated with the anchor tenant). The Debtors believe that these efforts and the continued efforts of the Debtors and the CRO, including to prepare detailed and complete historical financial information will position the Property for a successful refinance and sale process. The Debtors believe it undisputed that there is equity in the Property (potentially a massive amount of equity), as the Debtors believe that the Property is worth $100,000,000 or more.

During the proposed time period under the Plan for a refinancing or sale to occur, commencing with the first full month after the Effective Date of the Plan, Property Co will continue to make monthly debt service payments to its senior secured lender – Lone Oak Fund, LLC ("Lone Oak") in the amount of $221,090.83, and Property Co will make monthly payments to the Los Angeles County Treasurer-Tax Collector on account of its allowed claim and to CPIF California, LLC on account of its allowed claim as set forth herein, though the Debtor submits that even absent such payments, the Debtors' secured creditors are adequately protected by a sufficient equity cushion and will remain protected by a sufficient equity cushion during the relatively short term of the Plan. Moreover, the Plan milestones that the Debtor will fulfill will ensure progress toward the ultimate payment of allowed claims, and the allowed remaining claims of such parties will be paid in full upon a refinance or, if a refinance has not occurred, a sale, with the absolute outside date of any such payment being March 31, 2025, but potentially much sooner.

Additionally, on the Effective Date, Property Co will make a pro rata distribution of $10,000 to holders of allowed general unsecured claims, and commencing with the first full month after the Effective Date of the Plan, Property Co will commence making monthly payments to general unsecured creditors (approximately $243,000 in scheduled claims) in the amount of approximately $10,000 per month on account of their allowed claims, to the extent cash remains after taking into account monthly payments to secured creditors with allowed claims, the payment of administrative and priority claims, the payment of post-confirmation expenses of the Debtors, and appropriate operating reserves. To the extent any general unsecured claims are unpaid as of the closing date of a refinancing or sale, such remaining general unsecured claims shall be paid from net sale proceeds remaining after the payment of all other claims and expenses of the Debtors with priority over general unsecured claims. Equity interests in the Debtors will remain intact and are not impaired under the Plan but shall not receive any distribution under the Plan

unless and until all creditors' allowed claims are paid in full, and then, and only then, solely in accordance with the Debtors' respective corporate governance provisions.

The Proponents have reserved _____, **2024** in courtroom 1575 for a hearing to determine whether the Court will confirm the Plan.

Any interested party desiring further information should contact bankruptcy counsel to the Proponents: Levene, Neale, Bender, Yoo & Golubchik L.L.P., 2818 La Cienega Avenue, Los Angeles, CA 90034, Attn: Krikor J. Meshefejian, Esq. (Email: KJM@LNBYG.COM); Tel: (310) 229-1234; Fax: (310) 229-1244.

## II.    GENERAL DISCLAIMER AND VOTING PROCEDURE

PLEASE READ THIS DOCUMENT, INCLUDING THE ATTACHED EXHIBITS, CAREFULLY. IT EXPLAINS WHO MAY OBJECT TO CONFIRMATION OF THE PLAN.  IT EXPLAINS WHO IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. IT ALSO TELLS ALL CREDITORS AND ANY SHAREHOLDERS OR PARTNERS WHAT TREATMENT THEY CAN EXPECT TO RECEIVE UNDER THE PLAN, SHOULD THE PLAN BE CONFIRMED BY THE COURT.

THE SOURCES OF FINANCIAL DATA RELIED UPON IN FORMULATING THIS DOCUMENT ARE SET FORTH IN THE DECLARATION IN SECTION XX BELOW. ALL REPRESENTATIONS ARE TRUE AND CORRECT TO THE PROPONENTS' KNOWLEDGE.  NO REPRESENTATIONS CONCERNING THE DEBTORS THAT ARE INCONSISTENT WITH ANYTHING CONTAINED HEREIN ARE AUTHORIZED EXCEPT TO THE EXTENT, IF AT ALL, THAT THE COURT ORDERS OTHERWISE.

After carefully reviewing this document and the attached exhibits, please vote on the enclosed ballot and return it in the enclosed envelope.

The Proponents have reserved a hearing date for a hearing to determine whether the Court will confirm the Plan. Please refer to Section I above for the specific hearing date. If, after receiving the ballots, it appears that the Proponents have the requisite number of votes required by the Code, the Proponents will file a Motion for an Order Confirming the Plan.

The Motion shall at least be served on all impaired creditors and partners or shareholders who reject the Plan and on the Office of the United States Trustee. Any Opposition to the Motion shall be filed and served on the Proponent no later than fourteen days prior to the hearing date. Failure to oppose the confirmation of the Plan may be deemed consent to the Plan's confirmation.

### III.    WHO MAY OBJECT TO CONFIRMATION OF THE PLAN

Any party in interest may object to confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

### IV.    WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN

A party can vote to accept or reject the Plan only if the party has an allowed and impaired claim or interest. A claim is defined by the Code to include a right to payment from one or bother of the Debtors. An interest represents an ownership stake in one or both of the Debtors.

In order to vote a creditor or interest-holder must first have an <u>allowed claim or interest</u>. With the exceptions explained below, a claim is allowed if proof of the claim or interest is properly filed before any bar date and no party in interest has objected, or if the Court has entered an order allowing the claim or interest. Please refer to Section VI below for specific information regarding bar dates in this case.

Under certain circumstances a creditor may have an allowed claim even if a proof of claim was not filed and the bar date for filing a proof of claim has passed. A claim is deemed allowed if the claim is listed on the Debtors' schedules and is not scheduled as disputed, contingent, or unliquidated. **<u>Exhibit 1</u>** contains a list of claims that are not scheduled as disputed, contingent, or unliquidated (unless otherwise indicated therein).

Similarly, an interest is deemed allowed if it is shown on the list of equity security holders filed by the Debtor with the Court and is not scheduled as disputed.

In order to vote, an allowed claim or interest must also be impaired by the Plan.

<u>Impaired creditors</u> include those whose legal, equitable, and contractual rights are altered by the Plan, even if the alteration is beneficial to the creditor.  A contract provision that entitles a creditor to accelerated payment upon default does not, however, necessarily render the claimant impaired, even if the Debtor defaulted and the Plan does not provide the creditor with accelerated payment. The creditor is

deemed unimpaired so long as the Plan cures the default, reinstates the maturity of such claim as it existed before default, compensates for any damages incurred as a result of reasonable reliance upon the acceleration clause, and (except for a default arising from failure to operate a nonresidential lease subject to 11 U.S.C.A. § 365 (b)(1)(A) (West Supp. 2006)) compensates for any actual pecuniary loss incurred as a result of any failure to perform a non-monetary obligation.

<u>Impaired interest-holders</u> include those whose legal, equitable, and contractual rights are altered by the Plan, even if the alteration is beneficial to the interest holder.

There are also some types of claims that the Code requires be treated a certain way. For that reason they are considered unimpaired and therefore holders of these claims cannot vote.

<u>To summarize, there are two prerequisites to voting: a claim or interest must be both allowed and impaired under the Plan.</u>

If a creditor or interest-holder has an allowed and impaired claim or interest, then he or she may vote either to accept or reject the Plan (unimpaired claimants or interest- holders are deemed to have accepted the Plan). Impaired claims or interests are placed in classes and it is the class that must accept the Plan. Members of unimpaired classes do not vote, although as stated above, they may object to confirmation of the Plan. Even if all classes do not vote in favor of the Plan, the Plan may nonetheless be confirmed if the dissenting classes are treated in a manner prescribed by the Code.

Please refer to Section VI below for information regarding impaired and unimpaired classes in this case.

Section IX sets forth which claims are in which class. Secured claims are placed in separate classes from unsecured claims. Fed. R. Bankr. P. 3018(d) provides: "A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim shall be entitled to accept or reject a plan in both capacities."

## V.    VOTES NECESSARY TO CONFIRM THE PLAN

The Court may confirm the Plan if at least one non-insider impaired class of claims has accepted the Plan and certain statutory requirements are met as to both nonconsenting members within a consenting class and as to dissenting classes. A class of claims has accepted the Plan when more than one-half in

number and at least two-thirds in amount of the allowed claims actually voting, vote in favor of the Plan. A class of interests has accepted the Plan when at least two-thirds in amount of the allowed interests of such class actually voting have accepted it. It is important to remember that even if the requisite number of votes to confirm the Plan are obtained, the Plan will not bind the parties unless and until the Court makes an independent determination that confirmation is appropriate. That is the subject of any upcoming confirmation hearing.

## VI.    INFORMATION REGARDING VOTING IN THIS CASE

As of May 28, 2024, the Court has not set a bar date for filing a proof of claim in this case, and there is no bar date for objecting to claims at this time.  Accordingly, the total amount and nature of claims against the Debtors' estates has not been established with finality at this time.   The Plan contains the following classes of claims and interests:

**Class 1 – Los Angeles County Treasurer-Tax Collector**

**Class 2 – Lone Oak Fund, LLC**

**Class 3 – CPIF California, LLC**

**Class 4 – General Unsecured Creditors**

**Class 5 – Equity Interests in Property Co**

**Class 6 – Equity Interests in Hold Co**

In this case the Proponents believe that classes 1, 2, 3 and 4 are impaired and therefore entitled to vote. Classes 5 and 6 are unimpaired and therefore do not vote. A party that disputes the Proponents' characterization of its claim or interest as unimpaired may request a finding of impairment from the Court in order to obtain the right to vote.

Ballots must be received by the Proponents, addressed to Levene, Neale, Bender, Yoo & Golubchik L.L.P., Attn: Krikor J. Meshefejian, Esq., 2818 La Cienega Avenue, Los Angeles, CA 90034, by **_____**, **2024**.

## VII.    DESCRIPTION OF THE DEBTORS' PAST AND FUTURE BUSINESS AND EVENTS PRECIPITATING BANKRUPTCY FILING

### A.    The Debtors and the Property

Property Co is a Delaware limited liability company and Hold Co is a California limited liability company.  Property Co is wholly owned by Hold Co.

Property Co is the owner of that certain real property located at 450 S. Western Avenue, Los Angeles, CA (the "Property").  The Property is a highly valuable, highly-coveted three-story, open air, grocery anchored retail center totaling approximately 120,000 square feet with approximately 80,046 leasable square feet and a 125,000 square foot, four story, 362 space parking garage on approximately 1.67 acres in a prime location (with the closest major intersection being two blocks to the south, at Wilshire Blvd. and Western Avenue), in the heart of Koreatown.

The Property is one of the newest retail properties in Koreatown, Los Angeles, which is one of the most densely populated areas in the United States.  The Property also benefits from having a 362 space parking garage in an area where parking is very limited.  The Property is one of the largest open-air venues in the immediate area, similar in concept to the Grove in Hollywood.  The Property is located in the most desirable area of Koreatown which is the western-most corner, north of Wilshire Blvd., directly adjacent to Hancock Park.  The Property offers views of the "Hollywood" sign and Grifith Park Observatory and is safe, secure and accommodating to visitors, families, local students and the like.

The Property is 100% leased pursuant to a vacancy guarantee provided by Gaju Market Corporation.  The Property contains an eclectic mix of tenants, including Gaju Market Corporation (a large grocery store occupying approximately 45% of the Property) which is Property Co's anchor tenant.  The Property is managed day-to-day by a third-party property management company – Secured Properties, Inc./Secured Properties Management Group Inc.

**B.      Financial Information Regarding the Property**

The Property generates rents of more than $400,000 per month, and CAM charges of approximately $150,000+ per month for expenses, assuming that tenants timely pay the full amount of rents and other charges due under their leases.  The Property has predictable and relatively consistent operating expenses.  Assuming tenants pay all required rent and other charges required under their leases, the Property generates net operating income (income after operating expenses) of nearly $5,000,000 per year (before taking into

account real property taxes, tenant improvements and debt service payments).  A current rent roll is attached as **Exhibit 2** hereto.

### C.    Property Co's Anchor Tenant

The anchor tenant of the Property is Gaju Market Corporation ("Gaju"), which occupies approximately 45% of the Property.  Gaju is a retail grocery store with a strong presence in and ties to the community within which the Property is located.

Property Co and Gaju are parties to a Commercial Lease Agreement, as amended by that certain Amendment dated November 13, 2020 (the "Amended Lease").

The Amended Lease expires on November 13, 2035, and contains one five year option to Gaju. Under the Amended Lease, Gaju's monthly base rent is currently $205,168.00, and will increase every year by 2.5%, and Gaju's monthly CAM charge is currently approximately $73,358.66.

Additionally, pursuant to the Amended Lease, Gaju has agreed to guaranty base rent and CAM charges with 2.5% annual increases for any vacancies or non-payment of rents, such that Property Co is entitled to receive 100% of rents and CAMs through approximately November 13, 2025. *See* para. 13 of the Amendment.  The current base rent guaranty is approximately $4.31/square foot and the current CAM charge guaranty is at least $2.06/square foot.  The Amendment is attached as **Exhibit 3** hereto.[1]

Historically, including in 2023 and leading up to the Petition Date, Gaju generally paid rents, CAM charges and a vacancy guarantee generally in accordance with the Amended Lease (subject to a full accounting with the Debtors reserving all rights[2]).  Post-petition, Gaju inexplicably failed to pay all rents and other charges due for March and April 2024, and breached its lease and vacancy guarantee obligations. At that time, the Debtors were advised by purported representatives of Gaju Market Corporation that such obligations were "contested" post-petition even though they were not contested pre-petition.  However, in May 2024, the Debtors learned that a previous purported representative and the purported secretary of

---

[1] The original Commercial Lease Agreement is approximately fifty (50) pages and is not attached hereto but a copy thereof is available upon the request of any party in interest.

[2] The Debtors are investigating whether the vacancy guarantee payments made by Gaju were sufficient and CAM charge adjustments for prior years may require additional payments to Property Co.  Additionally, there are late fees and interest due and owing in connection with unpaid and/or late rents.

Gaju– Joshua Park – was no longer authorized to act as a representative of Gaju and that Gaju had retained new counsel to replace prior counsel.  Since such events occurred, Gaju paid May 2024 rents in accordance with the Lease Amendment (but has not yet paid the May 2024 vacancy guarantee for which it has requested an invoice) and has indicated to the Debtors that it intends to pay past due rent obligations for March 2024 and April 2024.

The Debtors and Chief Restructuring Officer employed by Property Co pursuant to Court order were prepared to commence lease enforcement measures against Gaju but given these recent developments have not yet commenced legal action in order to determine over the coming days whether Gaju will actually pay all past due rents and other charges, and whether it will comply with all of its obligations going forward.[3]  The Debtors have received some indications that Gaju intends to comply with all of its obligations under the Amended Lease.  Whether and to what extent Gaju complies with its lease obligations will impact whether Property Co will need to take lease enforcement actions against Gaju and whether and to what extent Property Co may need to evict Gaju and identify an alternative tenant.  The Debtors understand that it is Gaju's goal to remain in the location, comply with its Amended Lease obligations and see that the Property is operating smoothly.  The Debtors shares these goals and expect that Gaju will comply with its obligations under the Amended Lease and address any and all past due rent and vacancy guarantee amounts.

### D.    The Value of the Property

Based on the rents generated by the Property, and the expenses of the Property, and the significant net operating income and cash flow generated by the Property, the Debtors believe that the Property has a fair market value of $100,000,000.00 or more.  Property Co has listed the Property on Schedule A of its Schedules of Assets and Liabilities with a current value of $100,000,000.00 [Doc 25].  The Property is insured, secured, and well-maintained.

### E.    The Debtors' Current Cash Position

---

[3] Property Co has received authority to use some cash collateral to retain a landlord-tenant attorney to assist Propery Co with tenant relations, including with respect to Kreation Enterprises, Inc., which holds multiple tenancies and against which lease enforcement measures may be required to be taken, including the service of a 3-day notice to pay rent or quit.

As of May 22, 2024, Property Co is holding the total sum of approximately $878,220.27 in its debtor in possession accounts.  CPIF California, LLC ("CPIF") has control over a pre-petition account at First Republic Bank which is holding the sum of approximately $77,681.86 as of May 22, 2024.   The Debtors assert that all of such cash unequivocally constitutes property of Property Co's bankruptcy estate pursuant to both Section 2938 of the California Civil Code and Section 541(a)(1) and (6) of the Bankruptcy Code, and CPIF contests the Debtors' assertion.  The Debtors project that as of September 1, 2024 (which the Debtors project would approximately be the Effective Date), Property Co will have in excess of $500,000 in cash available to use to fund expenses under the Plan.  Property Co will also continue to generate and collect rents which will be used to fund payments under the Plan until a refinance or a sale occurs at which point any and all outstanding claims under the Plan will be paid in full.

**F.    Background Information Regarding Property Co's Acquisition of the Property**

Property Co purchased the Property over three years ago, in December 2020, during the pandemic, from 450 S. Western, LLC ("Western"), for a final purchase price of $57,847,344, pursuant to a section 363 sale conducted in Western's chapter 11 case which was commenced on January 10, 2020 and originally assigned to the Honorable Ernest M. Robles, Case No. 2:20bk-10264-SK (the case was subsequently assigned to the Honorable Sandra R. Klein).  The bankruptcy court in Western's bankruptcy case entered a sale order on October 23, 2020, authorizing and approving the sale of the Property to Jake Sharp Capital (which is an affiliate of the Debtors) or its assignee, as the winning bidder at an auction conducted in Western's bankruptcy case.[4]  Jake Sharp Capital's designated assignee was Property Co, which acquired and has owned the Property since December 2020.

Western sold the Property to Property Co years ago.  There is no material connection between Western's bankruptcy cases and these cases, except the Debtors understand and disclose that the 13% membership interest holder of Hold Co – Kalo Avrio, LLC – shares or shared common ownership with

---

[4] The bankruptcy court in Western's bankruptcy case confirmed Western's chapter 11 plan of liquidation after the sale of the Property, and in February 2024, the bankruptcy court in Western's bankruptcy case entered a final decree closing Western's bankruptcy case.

Western.[5]   Additionally, the Debtors understand and disclose that Kalo Avrio, LLC shares common ownership/control with Property Co's/the Property's anchor tenant Gaju Market, and potentially other tenants owned and/or controlled by Joshua Park (who Property Co understands was the secretary of Gaju Market Corporation until very recently and a member of Kalo Avrio, LLC), Hyun Rhee, David Rhee and Stephanie Rhee (who Property Co understands are insiders of Gaju Market Corporation).  But these cases involve different disputes with different secured lenders.

In connection with Property Co's acquisition of the Property, in December 2020, Property Co obtained a loan in the principal amount of $52,500,000 from CPIF, which loan was to be secured by a first position deed of trust on the Property, an assignment of leases and rents, and Hold Co's membership interests in Property Co pursuant to a pledge agreement[6].   The initial maturity date of that loan was December 4, 2021.  That loan required the payment of various fees including an origination fee of 2.5% of the loan amount ($1,312,500) and an exit fee of 1% ($525,000).

Property Co faced operating and capital challenges immediately after it purchased the Property because of an immediate interest payment that was due to CPIF a few days after the loan closed and a last minute, day of closing removal of an operating reserve.  On December 16, 2020, Property Co paid $297,569.43 to CPIF's loan servicer for an advance partial interest payment (with the rest of the interest payment being applied from the interest reserve).  In order to provide sufficient capital and liquidity to Property Co, Jake Sharp Group and Jake Sharp Capital agreed to loan money to Property Co in the form of a line of credit starting around December 2020, when the Property was purchased.  The Debtors believe

---

[5] The Chief Restructuring Officer in Western's bankruptcy case disclosed to the bankruptcy court in Western's bankruptcy case that "Jake Sharp Capital may have entered into some type of joint venture arrangement with certain of [Western's] insiders including Mrs. Rhee and/or [Western's] anchor tenant Gaju Market with respect to Jake Sharp Capital's purchase of the Property.  Thus, while I am unsure of the nature of any arrangement between one or more of the Debtor's insiders and Jake Sharp Capital, I acknowledge that Jake Sharp Capital could perhaps be deemed an 'insider' of the Debtor as that term is defined under 11 U.S.C. § 101(31) on account of its arrangement with one or more current insiders [of Western]." *See Supplemental Declaration Of Richard J. Laski In Support Of A Good Faith Finding With Respect To The Sale Of Property To Jake Sharp Capital"* (Case No. 2:20-bk-10264-SK, Docket No. 238).
[6] Holdco's sole asset is its membership interest in Property Co, and Holdco does not conduct business activities other than owning its 100% interest in Property Co.  Hold Co has pledged its membership interest in Property Co to CPIF as security for the CPIF Loan.

CPIF was aware of this arrangement since December 2020. As a result, Property Co began to receive funds from and pay back funds to Jake Sharp Capital and Jake Sharp Group. These transactions were an area of focus and dispute in connection with CPIF's now-resolved motion to appoint a chapter 11 trustee. The Debtors understand that CPIF may contest these statements by the Debtors and the Debtors' characterization of these statements, and the Debtors understand that CPIF has made various assertions against the Debtors' manager including that loans made to Property Co to affiliates and payments made by Property to affiliates were not authorized and were improper. The Plan preserves all claims and causes of action of the estate against any third parties.

In January 2022, the Property was refinanced. The original loan from CPIF to Property Co was paid pursuant to: (1) a loan Property Co obtained from Lone Oak in the principal amount of $29,810,000.00 (the "Lone Oak Loan"), to be secured by a first priority deed of trust on the Property and other security; and (2) a loan Property Co obtained from CPIF in the original principal amount of $25,103,000.00 which was subsequently increased to $29,190,000.00 (the "CPIF Loan"), to be secured by a second priority deed of trust on the Property, an assignment of leases and rents, Hold Co's membership interests in Property Co pursuant to a pledge agreement and a limited recourse guaranty by Mr. Sharp. An original $52,500,000 loan from CPIF had increased to a nearly $60,000,000 debt load.

G.     **Brief Summary of Dates and Circumstances that Led the Debtors to File Their Bankruptcy Cases**

What follows is a brief summary of the dates and circumstances that led the Debtors to file their bankrupty cases:

Both the Loan Oak Loan and the CPIF Loan recently matured, on February 10, 2024. Prior to then, Property Co had initiated refinancing efforts. However, CPIF filed the CPIF State Court Action (defined below) seeking the appointment of a receiver over the Property, pending CPIF's non-judicial foreclosure of the Property. The commencement of the CPIF State Court Action by CPIF occurred immediately following the delivery by George Smith Partners (a commercial loan brokerage firm who was hired by Property Co to obtain takeout financing) of a Wells Fargo term sheet for a proposed $64 million loan that would have paid Lone Oak and CPIF in full. The filing of the CPIF State Court Action interfered with

15

those refinancing efforts.  The existence of a lawsuit pertaining to the Property negatively impacted conventional refinancing efforts.  The Debtors' bankruptcy cases were filed to provide Property Co a breathing spell from receivership proceedings,[7] and allow the Debtors an opportunity to operate without interference so that the Debtors could achieve a successful refinance of Lone Oak's and CPIF's debts.

### H.    The Debtors' Secured Debt Obligations

#### 1.    <u>Real Property Tax Claim of the Los Angeles County Treasurer and Tax Collector</u>

On March 20, 2024, the Los Angeles County Treasurer and Tax Collector filed a proof of claim in the amount of $1,567,788.28, comprised of the sum of $765,664.28 for the the 2023-2024 tax year (asserted by the tax collector as a pre-petition claim), and an estimated sum of $802,124.00 for the 2024-2025 tax year (the first payment for the 2024-2025 tax year is not due until December 2024).  The Debtors propose to commence making monthly payments on account of this claim as set forth below, and for any outstanding amounts to be paid in full upon a refinance or sale of the Property.

#### 2.    <u>The Lone Oak Loan.</u>

The Lone Oak Loan, in the original principal amount of $29,810,000.00, which matured on February 10, 2024, originally had a nondefault rate of interest of 4.9% per annum and a default/post-maturity rate of interest of 24%.  The nondefault rate of interest graduated over time.  Prior to the maturity date of the Lone Oak Loan, Lone Oak received required monthly interest payments on the Lone Oak Loan.  Post-petition, Lone Oak has received monthly interest/debt service payments of $221,090.83 for March 2024 and May 2024, in accordance with the cash collateral orders of the Court.  Property Co intends to continue to pay Lone Oak's monthly debt service payments and repay Lone Oak (which enjoys a massive equity cushion) as set forth in the Plan.

#### 3.    <u>The CPIF Loan.</u>

---

[7] CPIF's ex parte application for appointment of receiver was denied on January 18, 2024. CPIF then filed a noticed motion for the appointment of receiver which was set for hearing on February 27, 2024, which did not take place because of the Debtors' commencement of these bankruptcy cases the day before.

The CPIF Loan (which is subordinate to Lone Oak's liens and interests pursuant to intercreditor subordination agreements), in the original principal amount of $25,103,000.00 which was subsequently increased to $29,190,000.00, which matured on February 10, 2024, had a nondefault rate of interest of 13% per annum and a default rate of interest of the lesser or the maximum legal rate or 25%. The CPIF Loan Agreement between CPIF and Property Co and related modifications created and provided for the funding of a number of reserves, including but not limited to an interest reserve, a TI/LC reserve and a capital expenditure reserve (collectively, the "Reserves"). The Debtors continue to investigate the current status of the Reserves. CPIF alleges that as of January 5, 2024, the payoff amount of the CPIF Loan was $29,074,389.25. CPIF has not filed a proof of claim in this case as of May 28, 2024.

On December 30, 2022, Property Co and CPIF entered into an Amended and Restated Promissory Note and First Omnibus Modification and Reaffirmation Agreement (the "First CPIF Modification") allegedly increasing the original principal amount of the CPIF Loan from $25,103,000 to $29,190,000, and extending the maturity date of the CPIF Loan to July 10, 2023.

Pursuant to the First CPIF Modification, the TI/LC reserve was increased from $500,000 to $2,200,000, the interest reserve was funded in the amount of $894,199.45, the capital expenditure reserve was reduced from $400,000 to $300,000 (with the $100,000 amount removed being used to fund CPIF's alleged costs and expenses), a beauty school reserve was funded in the amount of $450,000 in connection with a buyout/move of a tenant, and a redemption reserve of $500,000 was funded in connection with a potential redemption by Hold Co of the 13% equity interests in Hold Co held by Kalo Avrio (which redemption did not occur). Property Co disputes that CPIF properly applied the Reserves and in connection with analyzing any proof of claim filed by CPIF will request from CPIF an accounting to determine the balance of the Reserves, what payments were made with the Reserves and whether those payments by CPIF were in accord with the CPIF Loan terms.

Additionally, pursuant to the First CPIF Modification, Property Co agreed to deliver to CPIF no later than May 31, 2023 "a commitment letter for take-out financing, in form and substance acceptable to [CPIF], from either (a) a lender acceptable to [CPIF], or (b) a lender with a net worth of not less than $1,000,000,000 as verified by [CPIF] to its satisfaction" (defined in the First CPIF Modification as a

"Commitment Letter").  If Property Co did not timely deliver a Commitment Letter, it was required, "prior to the Extended Maturity Date, to retain, upon commercially reasonable market terms and conditions, a nationally recognized brokerage team reasonably acceptable to [CPIF] as the exclusive real estate broker to market, advertise and sell the Project." *See* First CPIF Modification, para. 11.  Additionally, Property Co was required to actively market the Property for sale and lease no later than September 1, 2023, and to deliver to CPIF a copy of the unexecuted brokerage agreement (defined in the CPIF First Modification as the "Brokerage Agreement") for CPIF's review and approval.

On September 28, 2023, but effective as of July 10, 2023, the Property Co and CPIF entered into a Second Omnibus Modification and Reaffirmation Agreement (the "Second CPIF Modification"), pursuant to which the maturity date of the CPIF Loan was extended to February 10, 2024.

Pursuant to paragraph 3 of the Second CPIF Modification, CPIF agreed that the remaining TI/LC reserve of $1,909,292 would be disbursed to Property Co to pay for (i) the costs of completing tenant improvement work in Units 222/203 in the amount of $227,601.00, (ii) the costs of completing a build out of the second floor kiosk in the amount of $13,000.00 and (iii) leasing commissions in the amount of $3,545, but paragraph three does not indicate what would occur with the remaining balance of the TI/LC reserve of $1,665,146.  It appears that pursuant to paragraph 7 of the Second CPIF Modification, that remaining balance was reallocated to the interest reserve.  Additionally, pursuant to the Second CPIF Modification, the capital expenditure reserve of $300,000 and the beauty school reserve of $450,000 were reallocated to the interest reserve.  The Second CPIF Modification does not describe what occurred to the redemption reserve of $500,000 and only provides that as of July 10, 2023 "the remaining balance of the redemption reserve was $0."  Additionally, the Second CPIF Modification modified certain of the dates, deadlines and terms pertaining to obtaining a Commitment Letter (November 30, 2023), retaining a Broker (November 30, 2023 if no Commitment Letter obtained), and marketing the Property for sale (marketing start date of December 31, 2023).

## I.    The Debtors' Unsecured Debts

Hold Co does not have any unsecured debt obligations – it has pledged its membership interests in Property Co as collateral, as set forth above.  Property Co listed on Schedule F of its Schedules of Assets

and Liabilities, approximately $243,024.51 of general unsecured claims.  To date, only one general unsecured claim has been filed in Property Co's case, in the amount of $20,400, by the Internal Revenue Service.  The Plan provides for all allowed general unsecured claims to be receive monthly payments of approximately $10,000 depeonding on cash availability, and a lump sum payment upon a refinance or sale of the Property by March 31, 2025.

### J.    Specific Disputes and Events Leading To The Bankruptcy Filings

On November 13, 2023, shortly after the parties entered into the Second CPIF Modification, and prior to the maturity date of the CPIF Loan, CPIF issued a Notice of Default, alleging that Property Co (a) incurred debt in violation of the CPIF Loan Agreement, (b) transferred assets by making cash distributions, (c) failed to deliver financial reporting information and documentation, and (d) failed to deliver lease documentation. Additionally, in November 2023, CPIF asserted control over Property Co's bank account at First Republic Bank allegedly pursuant to a Deposit Account Control Agreement, resulting in Property Co's inability to access funds in that account to pay operating expenses including insurance and property maintenance costs.  After CPIF took control of that account, its approval was required by First Republic Bank on any disbursement.  The Debtors have evidence that CPIF's representatives denied payment of critical, necessary and basic operating expenses of the Property, including the Los Angeles Department of Water and Power, Property Co's insurance provider, and Property cleaning maintenance providers, resulting in such payments bouncing and disruption of business relationships with vendors.  The Debtors understand that CPIF denies the Debtors' allegations and contends that it has done nothing wrong.  The disputes between the Debtors and CPIF will ultimately have to be resolved either by way of mutual agreement of the parties or Court intervention, but it is the Debtors preference to mutually resolve all disputes with CPIF and obtain the consent of CPIF to the Debtors' Plan such that the Debtors' refinancing and/or sale efforts will proceed smoothly and so that the value of the Property is maximized for the benefit of all stakeholders.

It is the Debtors' goal to develop and foster an atmosphere of cooperation where the goals of the primary parties in interest are aligned, and the Debtors, Lone Oak and CPIF are working toward the same goal of refinancing the Property in a stable operating environment – the opposite of what the Debtors have

previously faced.  From the Debtors' perspective, certain actions of CPIF starting in November 2023 and culminating in a lawsuit filed against Property Co to appoint a receiver prior to the maturity of the CPIF Loan and while Property Co was engaged in refinancing efforts, jeopardized the ability of Property Co to maintain CPIF's collateral, interfered with Property Co's operations, interfered with Property Co's refinancing efforts and damaged Property Co.  CPIF disagrees with the Debtors.

Property Co was current on all of its required payments to CPIF under the terms of the CPIF Loan Agreement, significant interest reserves existed for the benefit of CPIF, and Property Co was identifying take-out financing and generating a Commitment Letter.

Additionally, on November 30, 2023, Property Co retained Marcus & Millichap to serve as Property Co's sales broker, and to list the Property for sale for $120,000,000.[8]

Additionally, on December 14, 2023, Property Co received from Wells Fargo Bank, N.A., a proposed draft term sheet with a proposed funding amount of $64,000,000.

On January 4, 2024, CPIF issued another Notice of Default, and on January 9, 2024, despite efforts being made to refinance the Property, CPIF filed in the Superior Court of the State of California, County of Los Angeles (the "State Court"), a "Verified Complaint For 1. Specific Performance to Enforce Terms and Provisions of an Assignment of Leases and Rents, Appointment of Receiver, and Injunctive Relief" (the "CPIF Complaint") (Case No. 24STCV00589) (the "CPIF State Court Action").  Additionally, on January 17, 2024, CPIF filed in the CPIF State Court Action an ex parte application for, among other things, the appointment of a receiver over the Property.

From Property Co's perspective, CPIF's actions during the approximate 60 days prior to the filing of the CPIF Complaint, and CPIF's filing of the CPIF Complaint and the receivership application interfered with Property Co's refinancing efforts to pay off the CPIF Loan prior to its maturity date.

---

[8] On December 5, 2023, CPIF issued another Notice of Default, alleging that Property Co failed to comply with the "Brokerage Requirement" by not providing an unexecuted copy of the sale brokerage agreement to CPIF in advance and entering into the agreement without CPIF's approval."  Project Co submits that the Second CPIF Modification provides that CPIF's review and approval of the brokerage "shall not be unreasonably withheld, conditioned or delayed."

Property Co opposed the ex parte application and the State Court denied the ex parte application "without prejudice to a noticed motion being reserved and filed" indicating "[t]here is insufficient showing of irreparable harm or immediate danger."

On January 22, 2024, CPIF filed another application (this time on a noticed basis) for, among other things, the appointment of a receiver over the Property. On February 13, 2024, Property Co filed an opposition to that application. On February 26, 2024, Lone Oak (which asserts a first priority deed of trust against the Property), filed in the CPIF State Court Action, an ex parte application for entry of an order granting Lone Oak leave to intervene in the CPIF State Court Action as to the appointment of a receiver, and requesting that the State Court appoint an alternative receiver.

Prior to the hearing on the above-referenced applications in the CPIF State Court Action, the Debtors commenced their bankruptcy cases in order to preserve and protect the value of and massive equity in the Property, stay the CPIF State Court Action and any receivership or foreclosure actions, and provide the Debtors breathing room to attempt to refinance/reorganize/monetize the Property.

The Debtors determined in the exercise of their business judgment that the best option available to the Debtors would be to obtain breathing room, including with respect to the payment of rents by tenants who were receiving conflicting instructions from CPIF and Property Co's property manager, in order to engage in refinancing efforts in a deliberate, unobstructed manner, engage in discussions with both CPIF and Lone Oak regarding their respective claims, and operate the Property without interference pending a refinancing/reorganization process. The Debtors believe there is significant, and potentially massive equity in the Property, and that Lone Oak and CPIF are adequately protected by a significant, if not massive, equity cushion.

It is the Debtors' preference to work with Lone Oak and CPIF in achieving a collectively acceptable pathway forward in these cases but the Debtors believe that receivership and foreclosure pathways would definitely result in a loss of value and jeopardize recoveries in these cases for all stakeholders, including, without limitation, Lone Oak, CPIF, Property Co's general unsecured creditors and tenants, and equity holders.

What follows is a brief description of the Debtors business and future business plans. Further details

relating to the Debtors' financial condition and post-confirmation operation of the Debtors are found in sections X, XI, XII, XVI, and XV.

The Debtors' business plan is to continue to operate the Property, generate rent, address any tenant matters including the failure of any tenant to pay rents in accordance with lease terms, continue to work with Property Co's Chief Restructuring Officer, Lone Oak and CPIF in establishing an agreed-upon course of action with respect to any tenants that are not complying with lease obligations and replace such tenants, if necessary, and either refinance Lone Oak's and CPIF's loans or commence a sale process and sell the Property and pay creditors' claims in full.

Additionally, it is the Debtors' intent to discuss the Plan and DS with Lone Oak and CPIF and obtain and consider their views regarding the Debtors' proposed course of action and refinancing and sale timeline, and it is the Debtors' desire and preference to work with Lone Oak and CPIF in a consensual manner and obtain Lone Oak's and CPIF's consent to and acceptance of the Plan.  The Debtors, Lone Oak and CPIF consensually resolved CPIF's motion to appoint a chapter 11 trustee by virtue of the appointment of the CRO, which has assisted the Debtors in connection with reinstating, promoting and enhancing stability and normalcy at the Property, including in connection with rent collection and lease enforcement, and developing a cohesive process for the collection of rents and payment of expenses.  The Debtors believe that the ongoing efforts of management and the CRO will continue to promote the financial performance and stability of the Property, and the Debtors believe that the best, most prudent and sensible course of action in these cases is an orderly, methodical and effective refinancing and sale process pursuant to the Plan designed to maximize value, pay all claims in full, and preserve (by a refinance) and/or provide (by a sale) value to equity interest holders.

### VIII.   CRITICAL PLAN PROVISIONS

Listed below are the sources of money earmarked to pay creditors and interest-holders.

a.      The Debtors' cash on hand;

b.      Rents generated by the Property; and

c.      Proceeds from a refinance and/or proceeds from a sale of the Property.

The Debtors propose to make monthly payments to secured creditors pending a refinance or sale of the Property. Most likely, general unsecured creditors (whose claims are classified in Class 4) can also expect payments after the Effective Date of the Plan on a monthly, pro rata basis, of $10,000 per month, from the cash remaining after Plan payments to holders of allowed class 1, class 2 and class 3 claims, allowed administrative claims, and post-Effective Date operating expenses, after taking into account an appropriate operating reserve, until a refinance or a sale which shall occur by no later than March 31, 2025. Upon a refinance or, if applicable, a sale, any remaining allowed and unpaid class 4 claims will be paid in full.

There are numerous other critical Plan provisions, in particular, pertaining to the refinancing and sale timeline and process, pursuant to which the Debtors will continue to engage in efforts to identify financing options and immediately after the Effective Date, commence a concurrent marketing and sale process so that a refinancing or sale occurs no later than March 31, 2025. Specific information regarding the Debtors' proposed refinance and sale process is set forth in Section XVI below.

## IX.    DESCRIPTION AND TREATMENT OF CLAIMS

a.    Overview of Plan Payments

Below is a summary of who gets paid what, when and from what source. The identity of members within a particular class is explained beginning on the next page. The second column lists two amounts. First, the amount of each payment, or if only one is to be made, then that amount; second, the total amount that will be paid. <u>The Proponents are usually not required by law to pay an unsecured creditor or interest holder everything it would otherwise be entitled to, had a bankruptcy case not commenced.</u> The "Payment Due Date" column states the frequency with which payments will be made and the starting and ending dates. Look at the starting date to figure out who will be paid before and after you and in what amount. The "Source of Payment" column describes the expected source of payment. Further details regarding the source of paymen are found in sections X and XI.

The timing of payments to many creditors is determined by the "Effective Date." Administrative claims, unless otherwise stated, must be paid by the Effective Date. The timing of payments to impaired

creditors is measured from the Effective Date.  In this case, the Effective Date is anticipated to be on or around September 1, 2024.  Here is a summary of the timing of payments to creditors:

| Payment Recipient | Amount of each Payment (Total amount to be paid) | Payment Due Date | Source of Payment |
|---|---|---|---|
| 1. Levene, Neale, Bender, Yoo & Golubchik L.L.P. | $200,000 (est.) ($200,000 (est.)) [9] | Effective Date or at a later date as agreed by LNBYG | Cash on Hand, Post-Confirmation Rents, and Refinancing/Sale Proceeds |
| 2. Empire Brokerage & Real Estate Services, Inc. dba Receivership Specialists | $10,000(est.) ($10,000 (est.)) [10] | Effective Date or at a later date as agreed by Empire Brokerage & Real Estate Services, Inc. dba Receivership Specialists | Cash on Hand, Post-Confirmation Rents, and Refinancing/Sale Proceeds |
| 3. Law Offices of Rosenthal & Associates | $10,000 (est.) ($10,000 (est.)) [11] | In the ordinary course | Cash on Hand and Rents |
| 4. Class 1 – Los Angeles County Treasurer-Tax Collector | $23,516.82 monthly payments (calculated by applying 18% statutory rate of interest on total proof of claim amount asserted by Tax Collector) ($1,567,788.28 (est.) plus interest (See Proof of Claim No. 2-1)) | Monthly interest payments commencing on the first full month after Effective Date; and lump sum payment upon closing of refinancing/sale no later than March 31, 2025 | Cash on Hand, Post-Confirmation Rents, and Refinancing/Sale Proceeds |
| 5. Class 2 – Lone Oak Fund, LLC | $221,090.83 monthly debt service ($29,810,000 (est.)) lump sum payment of allowed claim upon closing of refinancing or sale | Monthly debt service payments commencing on the first full month after Effective Date; and lump sum payment upon closing of refinancing/sale no later than March 31, 2025 | Cash on Hand, Post-Confirmation Rents, and Refinancing/Sale Proceeds |

[9] This amount constitutes fees and expenses estimated as of the Effective Date, and not any post-Effective Date fees or expenses.  Post-Effective Date fees and expenses incurred by LNBYG shall be paid from cash on hand, rents and/or refinancing/sale proceeds in the ordinary course of business.

[10] Post-Effective Date fees and expenses incurred by the CRO shall be paid from cash on hand, rents and/or refinancing/sale proceeds in the ordinary course of business.

[11] Post-Effective Date fees and expenses incurred by the special counsel shall be paid from cash on hand, rents and/or refinancing/sale proceeds in the ordinary course of business.

| 6. | Class 3 – CPIF California, LLC | $77,681.86 plus an amount equal to March 2024 and April 2024 past due rents collected from Gaju (projected Effective Date payment)<br><br>Monthly payments of available net operating income<br><br>($29,074,389.25 (est.)) lump sum payment of allowed claim upon closing of refinancing or sale | Effective Date; monthly payments (if available) commencing on the first full month after the Effective Date; and lump sum payment upon closing of refinancing/sale no later than March 31, 2025 | Cash in CPIF California, LLC's possession, Cash on Hand, Post-Confirmation Rents, and Refinancing/Sale Proceeds |
| 7. | Class 4 – General Unsecured Creditors | $10,000 (Effective Date payment)<br><br>$10,000 (monthly projected pro rata share of available cash)<br><br>(TBD – Total remaining allowed general unsecured claims) lump sum payment upon closing of refinancing or sale | Effective Date; monthly (if available) commencing on the first full month after the Effective Date; and lump sum payment upon closing of refinancing/sale no later than March 31, 2025 | Cash on Hand, Post-Confirmation Rents, and Refinancing/Sale Proceeds |

**ON THE DATE THAT A PAYMENT TO A CREDITOR WOULD OTHERWISE BE DUE UNDER THE PLAN BUT FOR SUCH CREDITORS CLAIM BEING DISPUTED BY THE DEBTORS, THE DISBURSING AGENT WILL DEPOSIT INTO A SEGREGATED ACCOUNT ("RESERVE ACCOUNT") AN AMOUNT OF CASH EQUAL TO THE PAYMENT THAT WOULD OTHERWISE BE MADE TO SUCH CREDITOR UNDER THE PLAN. SUCH CASH TOGETHER WITH INTEREST ACCRUING THEREON (TO THE EXTENT SUCH CLAIMANT IS ENTITLED TO RECEIVE INTEREST) WILL BE HELD IN TRUST FOR THE BENEFIT OF SUCH HOLDER(S) OF DISPUTED CLAIM(S).**

**WHEN A DISPUTED CLAIM BECOMES ALLOWED, THE DISBURSING AGENT WILL DISTRIBUTE TO THE HOLDER THEREOF AN AMOUNT EQUAL TO WHAT SUCH HOLDER IS ENTITLED TO RECEIVE UNDER THE PLAN PLUS ACCRUED INTEREST THEREON (TO THE EXTENT SUCH HOLDER IS ENTITLED TO INTEREST) AT A RATE DETERMINED BY THE COURT. IF A SURPLUS ARISES FROM THE FACT THAT NOT ALL CLAIMS ARE ALLOWED, THEN THAT MONEY SHALL BE AVAILABLE FOR PAYMENTS UNDER THE PLAN TO CREDITORS WITH ALLOWED CLAIMS IN ACCORDANCE WITH THE TERMS OF THE PLAN, AND IF ALL CREDITORS CLAIMS HAVE BEEN PAID IN FULL, SUCH MONEY SHALL REVERT TO THE DEBTOR.**

Below is a detailed description and treatment of administrative expenses, claims and interests.

b. <u>Administrative Expenses</u>

1. These include the "actual, necessary costs and expenses of preserving the estate" as determined by the Court after notice to creditors of a request for payment and after a hearing thereon.

2. The Code requires that allowed administrative expenses be paid on the Effective Date unless the party holding the administrative expense agrees otherwise.

<u>Administrative Expense #1.</u>

Claimant: Office of the United States Trustee

$0 (est.), for quarterly fees due and owing prior to the Effective Date of the Plan. The Debtors anticipate being current on all of their obligations to the Office of the United States Trustee prior to the Effective Date, but to the extent any outstanding amounts are due and owing, they will be paid in the ordinary course of business.

<u>Administrative Expense #2.</u>

Claimant: Levene, Neale Bender, Yoo & Golubchik L.L.P.

$200,000.00 (est.), subject to court approval[12]

<u>Administrative Expense #3.</u>

---

[12] The Court must approve all professional fees and expenses listed herein before they may be paid.  For all professional fees and expenses except fees owing to the Clerk of the Bankruptcy Court and fees owing to the United States Trustee, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application.  Only the amount of fees and expenses allowed by the Court will be required to be paid under the Plan.  The administrative claim amounts set forth above simply represent the Debtors' best estimate as to the amount of allowed administrative claims in these cases.  The actual administrative claims may be higher or lower.  Much of whether the actual administrative claims described above for professionals will be higher will be dependent upon whether the Debtors are required to engage in any substantial litigation regarding the confirmation of the Plan or otherwise and/or objecting to claims.  To the extent the Debtors ire required to engage in any such substantial litigation, the Debtors' professionals are likely to incur professional fees and expenses in excess (and possibly substantially in excess) of the figures set forth above.  By voting to accept the Plan, creditors are not acknowledging the validity of, or consenting to the amount of, any of these administrative claims, and creditors are not waiving any of their rights to object to the allowance of any of these administrative claims.  Similarly, professionals who have been employed in these cases are not being deemed to have agreed that the figures contained herein represent any ceiling on the amount of fees and expenses that they have incurred or are entitled to seek to be paid pursuant to Court order as such fees and expenses are just estimates provided at the time of the preparation of the Plan.

26

Claimant:  Empire Brokerage & Real estate Services, Inc. dba Receivership Specialists (the "CRO")

$10,000 (est.), subject to court approval.  The Debtors anticipate being generally current on all of their obligations to the CRO as of the Effective Date, so they have estimated the sum of $10,000.

Administrative Expense #4.

Claimant: Law Offices of Rosenthal & Associates (proposed special counsel for landlord tenant matters)

$10,000 (est.).  The Debtors anticipate being generally current on all of their obligations to special counsel as of the Effective Date, so they have estimated the sum of $10,000.

Administrative Expense #5.

Claimant(s):  Ordinary course vendors

$100,000 (est.).  Depending on the timing of the Effective Date, Property Co may have accrued expenses for services provided immediately prior to the Effective Date which have not yet been invoiced or paid.  Any such amounts for serviced provided prior the Effective Date will be paid in the ordinary course of business.

TOTAL $320,000 (est.)

c.  Unsecured Tax Claims

1.  These include certain types of property, sales, and income taxes.

2.  The Code requires that the holders of such claims receive regular installment payments in cash over a period ending not later than five years after the date of the order for relief, unless agreed otherwise. The total cash payments must have a present value equal to the amount of the allowed claim. In this case, the Debtors are not aware of any priority unsecured tax claims.  The proof of claim filed by the IRS has been filed as a general unsecured claim.

d.  CLASS ONE

Secured Claim of Los Angeles County Treasurer-Tax Collector

Total amount of allowed claim: $1,567,788.28 (est.) – *See* Proof of Claim No. 2-1

Total amount of payments (over time) to satisfy the secured claim: $1,567,788.28

Interest rate (to compensate creditor because claim is paid over time): Statutory rate of interest of 18% or such other rate as determined by the Court.

**<u>Impaired</u>**

First payment date: 15th day of the first full month after the Effective Date

Amount of each installment: $23,516.82 monthly payment (based on an allowed claim amount of $1,567,788.28 and statuory rate of interest of 18%)

Frequency of payments: Monthly, with lump sum via refinancing or sale of the Property to occur no later than March 31, 2025

Total yearly payments: N/A, Plan term is less than twelve months

Final payment date: No later than March 31, 2025

Lien is not modified in any way by the Plan.

Description of Collateral: The real property owned by Property Co (defined above as the Property)

Additional comments:  The class 1 claim of the Los Angeles Treasurer and Tax Collector is comprised of the sum of $765,664.28 for the the 2023-2024 tax year (asserted by the tax collector as a pre-petition claim), and an estimated sum of $802,124.00 for the 2024-2025 tax year (the first payment for the 2024-2025 tax year is not due until December 2024).  The Debtor will make monthly payments as set forth above, with a lump sum payment upon a refinance or a sale, by no later than March 31, 2025.

   e.   CLASS TWO

<u>Secured Claim of Lone Oak Fund, LLC</u>

Total amount of allowed claim: To be determined, as Lone Oak has not yet filed a proof of claim (and a bar date has not yet been set), though the Debtors estimate that the allowed claim of Lone Oak is approximately $29,810,000.00

Total amount of payments (over time) to satisfy the secured claim: Monthly debt service payments of $221,090.83; lump sum payment of allowed remaining claim amount no later than March 31, 2025, from either a refinance or a sale of the Property

Interest rate (to compensate creditor because claim is paid over time): Nondefault rate of interest in accordance with pre-petition loan agreement or such other rate as determined by the Court

**Impaired**

First payment date: 15th day of first full calendar month after the Effective Date of the Plan

Amount of each installment: $221,090.83 monthly debt service payments

Frequency of payments: Monthly; with lump sum payment no later than March 31, 2025

Total yearly payments: N/A, Plan term is less than twelve months

Final payment date: No later than March 31, 2025

Lien is not modified in any way by the Plan.

Description of Collateral: The Property and rents generated by the Property, in accordance with and subject to the pre-petition loan documents between Property Co and Lone Oak

Additional comments:  Lone Oak shall retain all of its liens and security interests with the same validity, priority and extent as existed as of the Petition Date, and Lone Oak shall retain all of its rights and remedies under its loan documents and applicable law, but shall not be entitled to enforce any such rights or remedies provided that the Debtor remains in compliance with the terms of the Plan.  Lone Oak shall be entitled to enforce its rights and remedies to the extent the Debtors fail to meet any of the refinancing/sale milestones of the Plan and/or fails to pay Lone Oak's allowed claim in full by March 31, 2025.

    f.   CLASS THREE

Secured Claim of CPIF California, LLC

Total amount of allowed claim: To be determined, as CPIF has not yet filed a proof of claim (and a bar date has not yet been set), though the Debtors estimate that the claim of CPIF is approximately $29,074,389.25

Total amount of payments (over time) to satisfy the secured claim: (1) Effective Date payment equal to $77,681.86 (from cash in Property Co's First Republic Bank account in the control of CPIF), plus an amount equal to any past due March 2024 and April 2024 rents collected from Gaju prior to the Effective Date; (2) Monthly debt service payments equal to net operating income available after setting aside an operating reserve to be agreed upon by the Debtors and CPIF or as ordered by the Court, after taking into account monthly payments to class 1 and class 2; and (3) lump sum payment of allowed remaining claim amount no later than March 31, 2025, from either a refinance or a sale of the Property

Interest rate (to compensate creditor because claim is paid over time): The class 3 claim, as and to the extent allowed, shall accrue interest after the Effective Date at the non-default rate set forth in CPIF's pre-petition loan documents or such other rate as determined by the Court.

**Impaired**

First payment date: Effective Date of the Plan, and monthly payments commencing on the 15th day of first full calendar month after the Effective Date

Amount of each installment: Monthly payments will vary, depending upon available net operating income, as set forth above

Frequency of payments: On Effective Date and monthly; lump sum payment no later than March 31, 2025

Total yearly payments: N/A, Plan term is less than twelve months

Final payment date:          No later than March 31, 2025

Lien is not modified in any way by the Plan.

Description of Collateral: The Property and rents generated by the Property, in accordance with and subject to the pre-petition loan documents between Property Co and CPIF

Additional comments: CPIF shall retain all of its liens and security interests with the same validity, priority and extent as existed as of the Petition Date, and CPIF shall retain all of its rights and remedies under its loan documents and applicable law, but shall not be entitled to enforce any such rights or remedies provided that the Debtor remains in compliance with the

terms of the Plan.  CPIF shall be entitled to enforce its rights and remedies to the extent the Debtor fails to meet any of the refinancing/sale milestones of the Plan and/or fails to pay CPIF's allowed claim in full by March 31, 2025.

g.  CLASS FOUR

Unsecured Claims

See **Exhibit 1** for list of claimants and amount owed each.

Total amount of allowed claims: To be determined, claims bar date not yet set.  The Debtors have scheduled a total of $243,024.51, and the Internal Revenue Service has filed a general unsecured claim in the amount of $20,400.

Total amount of payments (over time) to satisfy the unsecured claims: $243,024.51 - $263,424.51, subject to allowance of claims.

Interest rate (to compensate creditor because claim is paid over time): To the extent the Court orders that interest be paid on account of general unsecured claims, holders of allowed general claims will be entitled to receive interest on account of such allowed claims.

**Impaired**

First payment date: Effective Date payment of $10,000

Amount of each installment: $10,000 per month (est.), and lump sum payment by March 31, 2025

Frequency of payments: Monthly pro rate distributions of $10,000 (est.), and lump sum payment by no later than March 31, 2025

Total yearly payments: N/A, Plan term is less than twelve months

Final payment date: No later than March 31, 2025

Additional comments:  On the Effective Date, Property Co will make a pro rata distribution of $10,000 to holders of allowed general unsecured claims, and commencing with the first full month after the Effective Date of the Plan, Property Co will commence making monthly payments to general unsecured creditors (approximately $243,000 in scheduled claims) in the

amount of approximately $10,000 per month on account of their allowed claims, to the extent cash remains after taking into account monthly payments to secured creditors with allowed claims, the payment of administrative and priority claims, the payment of post-confirmation expenses of the Debtors, and appropriate operating reserves.  To the extent any general unsecured claims are unpaid as of the closing date of a refinancing or sale, such remaining general unsecured claims shall be paid from net sale proceeds remaining after the payment of all other claims and expenses of the Debtors with priority over general unsecured claims.

h. CLASS FIVE

Membership Interests in Property Co

Under the Plan, Hold Co, which is the sole membership interest holder of Property Co, retains its membership interests, and is not impaired

i. CLASS SIX

Membership Interests in Hold Co

Under the Plan, membership interest holders (comprised of Lafayette Jackson Sharp, IV, Kalo Avrio, LLC and F&G Global, LC) simply retain their membership interests, and are not impaired.

## X.    SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS

The Plan cannot be confirmed unless the Court finds that it is "feasible," which means that the Proponents have timely submitted evidence establishing that the Debtors will have sufficient funds available to satisfy all expenses, including the scheduled creditor payments discussed above. What follows is a statement of projected cash flow for the duration of the Plan. The focus is on projected cash receipts and cash disbursements. All non-cash items such as depreciation, amortization, gains and losses are omitted. A positive number reflects a source of cash; a (negative number) reflects a use of cash. A more

detailed statement of cash flow projections (prior to Plan payments) for the duration of Plan payments are attached as **Exhibit 4**.[13]

Current Cash (as of May 28, 2024): $944,036.33

Projected Cash as of September 1, 2024: $520,000 (est.)[14]

Projected Receipts for the period from September 1, 2024 – March 31, 2025: $3,657,495.39

Projected Expenses for the period from September 1, 2024 – March 31, 2025: $1,326,196.97

Net Cash Flow for the period from September 1, 2024 – March 31, 2025: $2,331,298.42

Total Available Cash (Est.):  $2,851,298.42

Class 1 Payments: Monthly payments of $23,516.82, for a total of $164,617.74 from September 2024 – March 2025 (prior to refinance or sale)

Class 2 Payments: Monthly payments of $221,090.83, for a total of $1,547,635.81 from September 2024 – March 2025 (prior to refinance or sale)

Class 3 Payments: Effective Date payment of at least $77,681.86, plus an amount equal to remaining March and April 2024 rents collected from Gaju prior to the Effective Date, plus monthly payments depending on available net operating income

Administrative Claims: $320,000 on or around the Effective Date

Class 4 Payments: Monthly payments of approximately $10,000, for a total of $70,000 from September 2024 – March 2025 (prior to refinance or sale)

Projected Refinancing/Sale Proceeds: $65,000,000+ (refinancing)/$100,000,000+ (sale)

Section XV(c) states the assumptions and details surrounding the statement of projected cash flow.

## XI.    FINANCIAL RECORDS TO ASSIST IN DETERMINING WHETHER PROPOSED PLAN IS FEASIBLE

---

[13] The projections set forth herein are subject to modification, depending on the facts and circumstances of these cases as they arise and the Debtors reserve the right to amend the projections as additional information becomes known and as further developments occur in these cases.

[14] *After* taking into account monthly debt service payments to Lone Oak Fund, LLC, in May, June, July and August 2024, and *before* taking into account any September 2024 or past due rent collections.

The Debtors, with the assistance of the Debtors' CRO (whose employment order was entered on May 1, 2024) is preparing balance sheets and profit and loss statements for the most recent twelve-month calendar year and all months subsequent thereto, and anticipate that such financial statements will be prepared by June 28, 2024.  The Debtors will supplement this Plan and DS to include such information. Attached hereto as **Exhibit 2** is the Property's Rent Roll.  Attached hereto as **Exhibit 4** is  an analysis of projected monthly income and expenses.

## XII.    ASSETS AND LIABILITIES OF THE ESTATES

The identity and fair market value of the estates' assets are listed below (with the primary, if not only material, asset of the estates being the Property).  The Plan proposes to refinance or sell the Property by no later than March 31, 2025.

**Property Co**

a.   Assets

Real Property (the Property): $100,000,000+

Personal Property:

      Cash: $944,036.33 (approx., as of May 28, 2024)

      Deposits and Prepayments: $84,400.29 (approx.)

      Rent Receivables:   (estimated and subject to reconciliation) (primarily comprised of past due rents and other obligations of Gaju and Kreation Enterprises)

      Fixtures and equipment located at the Property: Unknown value

      Loan receivable: $215,000 (pursuant to Loan Agreement between Property Co as lender, and Kreation Enterprise, Inc. as borrower) (unknown value)

      Potential claims and causes of action against third parties: Unknown value

b.   Liabilities

Secured Debt Obligations:

      Los Angeles Treasurer and Tax Collector: $1,567,788.28 (est. and includes amounts not yet due) (*See* Proof of Claim No. 2-1)

      Lone Oak Fund, LLC: $29,810,000.00 (est.) (no proof of claim filed)

CPIF California, LLC: $29,074,389.25 (est.) (no proof of claim filed, scheduled as disputed)

Unsecured Debt Obligations: Approximately $243,024.51[15]

c.   Summary

The fair market value of all assets equals approximately $100,000,000+.   Total liabilities equal approximately $59,856,617.84 (not including additional interest and fees that may be asserted, and any proofs of claim that may be filed).

**Hold Co**

a.   Assets

Membership interests in Property Co: Approximately $40,000,000+

Cash: $382.00

b.   Liabilities

Hold Co has pledged its membership interests in Property Co as collateral as set forth above.

c.   Summary

The fair market value of all assets equals approximately $40,000,000+.   Total liabilities equal approximately $0.

Attached hereto as **Exhibit 1** is a claim analysis chart setting forth all scheduled claims and all filed proofs of claim.

## XIII.   TREATMENT OF NONCONSENTING CLASSES

As stated above, even if all classes do not consent to the proposed treatment of their claims under the Plan, the Plan may nonetheless be confirmed if the dissenting classes are treated in a manner prescribed by the Code.   The process by which dissenting classes are forced to abide by the terms of a plan is commonly referred to as "cramdown."   The Code allows dissenting classes to be crammed down if the Plan does not "discriminate unfairly" and is "fair and equitable." The Code does not define discrimination, but it does provide a minimum definition of "fair and equitable." The term can mean that secured claimants

---

[15] Property Co has received correspondence from an attorney for an individual named Hui Pun Kim, asserting unspecified "injuries" with a date of loss of June 3, 2022 (pre-petition).   The claimant's attorney has been notified of the bankruptcy filing and automatic stay, and wil receive notice of a claims bar date in this case.

retain their liens and receive cash payments whose present value equals the value of their security interest. For example, if a creditor lends the Debtor $100,000 and obtains a security interest in property that is worth only $80,000, the "fair and equitable" requirement means that the claimant is entitled to cash payments whose present value equals $80,000 and not $100,000. Here, all secured creditors will receive payment of the full amount of their allowed claims, with interest (as and to the extent allowed by the Court). Thus, such creditors will receive cash payments whose present value equals the value of their security interest.

The term means that <u>unsecured claimants</u> whose claims are not fully satisfied at least know that no claim or interest that is junior to theirs will receive anything under the Plan, except where the Debtor is an individual, has elected to retain property included in the Estate under 11 U.S.C.A. § 1115 (West Supp. 2006) and has satisfied 11 U.S.C.A. § 1129(b)(2)(B)(ii) (West Supp. 2006). "Fair and equitable" means that each <u>holder of an interest</u> must receive the value of such interest or else no junior interest is entitled to receive anything. Therefore, if a class of general unsecured claims votes against the Plan, the Plan cannot be confirmed where the Debtor or a class of interest holders (e.g. shareholders or partners) will receive or retain any property under the Plan, <u>unless</u> the Plan provides that the class of general unsecured claims shall be paid in full with interest. These are complex statutory provisions and the preceding paragraphs do not purport to state or explain all of them. Here, the Plan provides that general unsecured creditors will be paid in full (and with interest to the extent required by the Court).

## XIV.  TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING CLASS (CHAPTER 7 LIQUIDATION ANALYSIS)

The Plan must provide that a nonconsenting impaired claimant or interest holder of a consenting class receive at least as much as would be available had the Debtor filed a Chapter 7 petition instead.

In a Chapter 7 case the general rule is that the Debtors' assets are sold by a trustee. Unsecured creditors generally share in the proceeds of sale only after secured creditors and administrative claimants are paid. Certain unsecured creditors get paid before other unsecured creditors do. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the total amount of allowed claims.

A creditor would recover from the assets of the bankruptcy estate less under Chapter 7 than under Chapter 11 for three reasons. First, the Debtor believes the liquidation value for the Property in a "fire sale" scenario would be substantially less than its fair market value of $100,000,000+ under an organized, fully-marketed sale process designed to maximize value because of a number of reasons, including that, an organized refinancing and/or sale process with a meaningful timeline: (1) will not be perceived by the market as a "fire sale" scenario, but rather, a market-based, methodical, competitive, non-distressed process; (2) will allow for the Debtors to retain appropriate third party professionals and allow such professionals to conduct the process proposed under the Plan; (3) will potentially present a more advantageous interest rate and economic environment which could potentially create additional value for the Debtors' estates. Additionally, there is no advantage or additional value that would be created pursuant to a sale process under chapter 7 as compared to a refinancing and sale process in chapter 11 under the Plan.

Second, in a chapter 7 case a trustee is appointed and is entitled to compensation from the bankruptcy estate in an amount no more than 25% of the first $5,000 of all moneys disbursed, 10% on any amounts over $5,000 and up to $50,000, 5% on all amounts over $50,000 and up to $1,000,000, and such reasonable compensation no more than 3% of moneys over $1,000,000.

|  | CHAPTER 7 | CHAPTER 11 |
|---|---|---|
| Value of Assets (Comprised of the Real Property) | $70,000,000 (assumes fire sale, distressed scenario) | $100,000,000+ (assumes comprehensive marketing process and sale timeline proposed under Plan) |
| City of Los Angeles Real Property Transfer Tax (5.5%) | $3,850,000 | $5,500,000 |
| Costs of Sale (includes broker commissions and other charges) (5%) | $3,500,000 | $5,000,000 |

| Capital Gains Tax (33.3%) (assumes tax basis of $60,000,000) | $3,330,000 | $13,320,000 |
|---|---|---|
| NET CASH AVAILABLE | $59,320,000 | $76,180,000 |
| Secured Claims | $61,181,381.60 (est.) | $61,181,381.60 (est.) |
| Chapter 11 Administrative Claims | $320,000 | $320,000 |
| Priority Unsecured Claims | $0 | $0 |
| Chapter 7 Administrative Claims (Chapter 7 Trustee's professionals' fees and expenses) | $100,000 | $0 |
| Chapter 7 Trustee's Statutory Fee | $2,123,250 | $0 |
| **NET CASH AVAILABLE FOR GENERAL UNSECURED CREDITORS AND EQUITY INTEREST HOLDERS** | $0.00 | $14,678,618.40 |

## XV.    FUTURE DEBTOR

a.    <u>Management of the Debtors</u>

　　1.    Names of persons who will manage the Debtors' business affairs: Lafayette Jackson Sharp, IV as manager of the Debtors, and until further Court order, Kevin Singer (the CRO) of Empire Brokerage & Real Estate Services, Inc. (the Consultant)

　　2.    Proposed compensation to persons listed above:  Mr. Sharp will not receive any compensation during the term of the Plan.  The CRO/Consultant will receive compensation in accordance with the terms of the employment application approved by the Court, providing for reimbursement of expenses and an hourly rate of compensation as follows:

　　　　a.    Mr. Singer at $350 an hour;

38

    b. Senior Project Managers at $295 an hour (including Rick Marquis who is taking a lead role in providing CRO services);

    c. Accountants at $250 an hour;

    d. Bookkeeping and administrative staff at $95 any hour; and

    e. Messengers at $55 an hour.

3. Qualifications:

<u>Lafayette Jackson Sharp, IV</u>:  Mr. Sharp is the Manager of Property Co and Hold Co, and the majority member of Hold Co (which wholly owns Property Co).  Mr. Sharp has approximately thirty-three (33) years' experience in the commercial real estate industry, including in connection with building construction, leasing, financing, and the acquisition and disposition of real estate.  He also has significant experience with some of the most complicated real estate financing transactions over the past 13+ years.  He is a licensed real estate broker and the owner of Jake Sharp Group and Jake Sharp Capital.  Jake Sharp Capital is a corporation that Mr. Sharp uses for the purpose of engaging in commercial real estate acquisitions.  For example, Jake Sharp Capital or its assignee was the winning bidder at a bankruptcy auction held in 2020 for the purchase of the Property owned by Property Co.  Property Co was Jake Sharp Capital's assignee in that transaction. Jake Sharp Group is a long-standing licensed real estate brokerage firm focused on commercial real estate which, among other things, provides commercial real estate sale, leasing, construction and financing advisory services to real estate sponsors and owners, in the $15 million - $300+ million value range.

<u>The Consultant/CRO</u>: The Consultant is comprised of individuals who specialize in the operation and management of real property such as the Property, and Mr. Singer and Mr. Marquis have, as applicable, vast experience as a receiver, referee, special master, trustee and bankruptcy trustee.

4. Affiliation of persons to Debtors:  Se above descriptions.

5. Job description:

<u>Lafayette Jackson Sharp, IV</u>.  Manager of limited liability companies, and responsible for the overall operation and functioning of Debtors, and handling the sale, refinancing and restructuring efforts of the Debtors.

<u>The Consultant/CRO</u>.  The Consultant has agreed to provide Property Co services through the CRO as identified in Schedule A (the "<u>Scope of Work</u>") to the Engagement Agreement approved by the Court.  The Scope of Work is comprised of the following duties and responsibilities of the CRO:

a.    Responsible for collection of rents and common area charges from tenants, including sending all required notices to tenants, enforcing leases, and addressing maintenance concerns or other tenant requests.  Rents shall be deposited into the Specified Account as that term is defined in the *Stipulation Between Debtor, CPIF California, LLC And Lone Oak Fund, LLC Regarding Collection And Deposits Of Rents And Other Proceeds* (Doc 39).

b.    Negotiates, including through resolution or settlement, disputes with tenants solely to the extent involving disputes regarding lease terms and rents, provided, however, that any resolution or settlement of any dispute with Gaju Market Corporation or Kreation Enterprises, any material settlements involving a monetary amount or dispute in excess of $50,000, material modifications to leases, or any other transaction outside of the ordinary course of business, is subject to Manager approval and Bankruptcy Court order.  For the avoidance of doubt, the CRO's approval is not required for Property Co to pursue any claims or causes of actions or otherwise pursue its rights or remedies against Gaju Market Corporation or Kreation Enterprises or any of their principals, but the CRO will have consultation rights in connection with, and will be kept informed of, any such actions or pursuits.

c.    Responsible for entering into new leases and otherwise pursuing the Debtor's business plan. The CRO will have the authority to enter into new leases with existing tenants or prospective tenants to the extent reflecting market terms, subject to Bankruptcy Court approval to the extent necessary pursuant to the Bankruptcy Code. For the avoidance of doubt, any lease with a term (including extension rights that may be exercised by tenant without landlord consent) in excess of 12 months or representing annual rent of more than 15% of the annual budgeted income of the Property will require approval from the Manager (Lafayette Jackson Sharp, IV) of Property Co.

d.    Negotiate cash collateral budget with lenders and the terms of any consent thereto with the input of Propety Co and its Manager; *provided that* the Manager of Property Co will retain the right to approve any conditions of such cash collateral usage that include stipulation of amounts owing under any credit facility or the waiver of any claims, defenses, or rights against any Secured Creditor.

e.    Approve and oversee all expenses, the incurrence of liabilities, and payment of expenses and adequate protection payments. CRO will be responsible for monitoring and reporting on Property Co's compliance with any cash collateral budget. No disbursement of funds will be made without approval of the CRO and the Manager. If Property Co fails to comply with a

40

cash collateral budget, the CRO shall promptly notify the Secured Creditors and work to rectify the failure.

f.      Subject to Property Co's Manager's right to be consulted, supervises and has authority to direct the day to day operations of the Business and Property, such as vendor invoices or contracts, making any changes to the scope of work related to the existing property management and operations, except to the extent that prior court approval is required; and to manage the property manager, any employees and all outside contractors/vendors (other than lawyers or professionals engaged primarily to address the needs of the Company in connection with its bankruptcy case). The Consultant may also engage any outside services, professionals or property management companies, at their respective billing rates to fulfill the Scope of Work, subject to approval of the Bankruptcy Court to the extent such engagement requires Bankruptcy Court approval under the United States Bankruptcy Code. The Manager of Property Co shall be consulted in connection before any decisions made under this subpart (f).

g.      Participate in weekly meetings or written updates with Property Co's Manager and Secured Creditors (which may be separate meetings). For the avoidance of doubt, the Secured Creditors may require a meeting in lieu of a written update in their sole discretion.

h.      Support the Debtors' reorganizational efforts. The CRO will be responsible for remaining informed about the status of any and all sale, refinancing, or restructuring efforts of the Company and its Manager (the "Reorganization Efforts") such that the CRO can answer reasonable questions from the Secured Creditors related to such Reorganization Efforts. The CRO may request to be included on meetings, calls, and communications with any and all potential credit sources, brokers, buyers, and other strategic alternative partners (collectively, the "Strategic Partners"). To the extent that the CRO determines, in its reasonable discretion, that it is not being kept informed of all Reorganization Efforts and Manager does not cure such issues promptly, the CRO is authorized to contact Strategic Partners directly.

i.      The CRO will be consulted prior to Property Co entering into any agreement related to the sale of its Property or any refinancing; *provided that* such consultation rights will not divest the Manager of final authority in making such decisions.

j.      To the extent Property, its Manager, or its representatives or agents prevent the CRO from satisfying his obligations and duties under this Agreement and the order of the Bankruptcy Court authorizing the CRO's employment, the CRO shall provide to Property Co and its Manager written notice via email (at email addresses designated by Property Co and its

Manager) of any such contentions of CRO and the CRO shall work with the Manager of Property Co to address any such matters. To the extent the CRO and Property Co are unable to promptly (and in any event, within five (5) Business Days) resolve any such contentions, the CRO will notify the Secured Creditors and the Court in writing of any such disputes no later than one (1) Business Day following the end of such five Business Day period.

b.    <u>Disbursing Agent</u>

Property Co will be responsible for collecting money intended for distribution to claimants and transmitting it to them.

c.    <u>Future Financial Outlook</u>

The Proponents believe that the Debtors' economic health will allow for Property Co to refinance its secured debt obligations and pay creditors in full by December 31, 2024. However, concurrent with the Debtors' refinancing efforts, the Debtors will commence a marketing and sale process, and, to the extent a refinance has not occurred by December 31, 2024, the Debtors will have already commenced a sale process with an outside closing date of March 31, 2025. To the extent the Debtors are able to obtain refinancing to pay in full all allowed claims by March 31, 2025, the Debtors will not be required to sell the Property. However, to the extent refinancing is not obtained, a sale of the Property shall occur by no later than March 31, 2025. The Debtors believe that there is no question that a sale of the Property will result in payment of all claims in full so long as such a sale is conducted pursuant to an organized, methodical and fully marketed sale process. Section XVI describes in detail the required refinancing/sale process timeline and conditions and requirements of the Plan.

Section X provides a summary of the projected cash flow of the Debtor for the duration of the Plan (thorugh the outside date of March 31, 2025). The following assumptions underlie the projections:

1.    The Property will continue to operate in the ordinary course of business;

2.    Tenants will generally pay rent on a timely basis in accordance with lease terms and as tenants have historically done so over the past three and a half years;

3.    Gaju, the anchor tenant, will pay its rent and other obligations on a timely basis; and

4.    The Property's expenses remain generally stable.

As previously stated, Plan payments will come from: (1) the continued operation of the Property and the collection of rents; and (2) a refinancing and/or sale of the Property as set forth above. The Debtors do not believe that there will be insufficient funds to provide all of the Plan payments, because the Debtors believe (and no party in interest has disputed) that there is sufficient equity in the Property to pay all claims in full, and, to the extent the Debtors do not refinance the Property and pay creditors pursuant to a refinance, the Debtors will sell the Property and use the proceeds of the sale to pay creditors on account of their allowed claims in accordance with the priorities of the Bankruptcy Code.

## XVI.    SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF CONTRACTS AND LEASES; OTHER PROVISIONS

The Plan provides for the following:

**A.    The refinancing or sale of the Property, in accordance with the following timeline and conditions and requirements:**

June 1, 2024 – August 31, 2024: DS and Plan approval process

Present date – September 30, 2024: Refinancing process to continue

September 1, 2024: Effective Date of Plan (projected)

September 1, 2024: Deadline for Debtors to identify up to three real estate brokers for the purpose of marketing and selling, or refinancing, the Property and provide such information to Lone Oak and CPIF

September 1, 2024 – October 31, 2024: Solicitation of financing commitments

September 30, 2024: Deadline for Property Co to retain, upon commercially reasonable market terms and conditions, a nationally recognized brokerage team reasonably acceptable to Lone Oak and CPIF, or as approved by the Court, as the exclusive real estate broker to market, advertise and sell the Property.

October 1, 2024: Deadline for retained broker to disseminate marketing materials and commence actively marketing the Property for sale (for the avoidance of doubt, the Debtors may still engage in refinancing efforts and the broker may actively market the Property for refinancing).

Ocober 1, 2024 – December 31, 2024: Site visits and due diligence pursuant to executed non-disclosure agreements between Property Co and interested parties (for the avoidance of doubt, site visits

and due diligence may occur both prior to and after this time period), solicitation of offers and negotiations with potentially interested parties

January 17, 2025: Deadline for interested parties to submit offers and deposits

March 31, 2035: Deadline to close sale of Property or refinance all secured debt obligations (payment in full of all outstanding and allowed Class 1, Class2, and Class 3 claims)

Additional Requirements:

The Debtors shall promptly deliver to Lone Oak and CPIF all form non-disclosure agreements, letters of interest, indications of interest, term sheets, or other written commitments or agreements pertaining to refinancing or a sale of the Property received by the Debtor; *provided that* Lone Oak and CPIF shall keep all such information obtained by Lone Oak and CPIF confidential pursuant to a written non-disclosure agreement, and shall not initiate contact any counterparty to any such documents without the prior written consent of the Debtors.

The Debtors shall meet and confer with Lone Oak and CPIF prior to filing any application to employ any third-party professionals for any refinance or sale efforts and shall provide to Lone Oak and CPIF reasonable time to consult with the Debtor with respect to the employment of any such third-party professional and the terms and conditions of such employment.  The Debtors shall not propose to use cash collateral to pay any such third-party professional absent the prior written consent of Lone Oak and CPIF, to be provided or withheld in their commercially reasonable discretion (as exercised by a similarly positioned secured real estate lender).

The Debtors shall make available to Lone Oak and CPIF the Debtors' real estate broker in order for Lone Oak and CPIF to receive direct sale progress reports from the real estate broker, and the Debtors and the real estate broker shall make themselves available to representatives of Lone Oak and CPIF upon reasonable notice to participate in conferences and answer questions of Lone Oak and CPIF pertaining to the sale and refinancing process.

Any refinance of the Property shall generate at least sufficient proceeds to pay all allowed secured claims in full, unless any secured creditor that would not receive payment in full consents to such refinancing.

Any sale of the Property shall generate at least sufficient proceeds to pay all allowed secured claims in full, unless any secured creditor that would not receive payment in full consents to such sale.

Additionally, subject to section 363(k) of the Code, any sale of the Property shall be free and clear of all liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of section 1129(2)(A) of the Code, to the extent applicable.

Additional Refinancing/Sale Process Provisions:

The Debtors, Lone Oak and CPIF may mutually agree to modify the dates and deadlines set forth above, provided that, any extension of the outside closing date of March 31, 2025 shall require Bankruptcy Court approval. Additionally, the Debtors, Lone Oak and CPIF may also mutually agree to include additional milestones or requirements, including requirements regarding potential buyers' qualifications, offer requirements, and other sale procedures as determined by the Debtors, Lone Oak and CPIF by mutual agreement, without further Court order.

Additionally, the Debtors intend to discuss with Lone Oak and CPIF all of the proposed terms and conditions of the Plan, particularly as it relates to the refinancing and sale process timeline, with the goal of reaching mutually agreeable refinancing and sale process milestones and deadlines, and the Debtors reserve the right to modify this DS and Plan to take into account such discussions and any agreements reached between the Debtor, Lone Oak and CPIF.

## B.    The Assumption, Rejection or Assignment of Executory Contracts or Unexpired Leases

All of the Debtors' executory contracts and unexpired leases which have not been previously assumed or rejected are identified as **Exhibit 5**. On the Effective Date, all of the Debtors' remaining executory contracts and unexpired leases which have not previously been assumed or rejected by the Debtors shall be deemed to be assumed by the Debtors and to become valid and binding executory contracts and unexpired leases of the post-Effective Date Debtors (the "Assumed Contracts and Leases"). No later than fourteen days prior to the date of the Plan Confirmation Hearing, the Debtors shall file a pleading with the Court identifying all of the executory contracts and unexpired leases, if any, that the Debtors intend to reject, provided, however, the Debtors shall have up to and including the day prior to the Plan Confirmation

Hearing to designate contracts and leases as rejected contracts and leases.  All of the Debtors' executory contracts and unexpired leases which are designated for rejection shall be deemed rejected effective as of 11:59 PST on the Effective Date.  With respect to all of the Assumed Contracts and Leases for which a default exists on the Effective Date, the Debtors will be required to (a) cure or provide adequate assurance that the Debtors will promptly cure any default existing under any such executory contracts and unexpired leases, (b) compensate or provide adequate assurance that the Debtors will promptly compensate any other party to such executory contracts and unexpired leases for any actual pecuniary loss to such parties resulting from any default existing under any such executory contracts and unexpired leases, and (c) provide adequate assurance of future performance under such executory contracts and unexpired leases.  **THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF AN UNEXPIRED LEASE OR EXECUTORY CONTRACT WHICH IS REJECTED ON THE EFFECTIVE DATE WILL BE THIRTY DAYS AFTER THE EFFECTIVE DATE.**  Any claim based on the rejection of an unexpired lease or executory contract will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

The Court must make certain findings of fact before approving the aforementioned provisions as part of the Plan.  The Proponents will request that the Court make the appropriate findings at the confirmation hearing, based upon evidence submitted in support of the confirmation motion.

### C.    Retention of Jurisdiction

After confirmation of the Plan and occurrence of the Effective Date and until the entry of the Final Decree, the Bankruptcy Court will retain such jurisdiction over the Debtors' bankruptcy estates as is legally permissible including for the following purposes:

      i.     To resolve any and all disputes regarding the operation and interpretation of the Plan;

      ii.     To resolve any and all disputes regarding the operation and interpretation of the Plan Confirmation Order;

iii.     To determine the allowability, classification, or priority of any claims upon or liens against assets of the Debtors' bankruptcy estates upon objection by the Debtors or any other parties in interest with standing to bring such objection or proceeding and to consider any objection to claim or challenge to the validity, priority and extent of any asserted lien whether such objection is filed before or after the Effective Date;

iv.     To determine the extent, validity and priority of any lien asserted against property of either of the Debtors' esates;

v.     To construe and take any action to enforce the Plan, the Plan Confirmation Order, and any other order of the Bankruptcy Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan and the Plan Confirmation Order, and all matters referred to in the Plan and the Plan Confirmation Order, and to determine all matters that may be pending before the Bankruptcy Court in this case on or before the Effective Date with respect to any person or entity related thereto;

vi.     To determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date, and after the Effective Date (provided, however, that professionals shall not be required to file fee applications for post-Effective Date services, but may do so at their discretion), or any objection asserted to any requested fees or expenses of any professionals employed by the Authorized Estate Representative;

vii.     To determine any request for payment of administrative expenses and post-confirmation and post-Effective Date expenses;

viii. To determine motions for the rejection, assumption, or assignment of executory contracts or unexpired leases and the allowance of any claims resulting therefrom;

ix.     To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of these bankruptcy cases whether before, on, or after the Effective Date including avoidance causes of action, and the Debtors, as the authorized representatives of their respective estates, shall have the right and standing to commence any avoidance

causes of action after the Effective Date and to continue with the prosecution of any avoidance causes of action commenced by either of the Debtors prior to the Effective Date;

x.    To determine such other matters and for such other purposes as may be provided in the Plan Confirmation Order;

xi.    To modify the Plan under Section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose;

xii.    Except as otherwise provided in the Plan or the Plan Confirmation Order, to issue injunctions, to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Plan Confirmation Order, or the execution or implementation by any person or entity of the Plan or the Plan Confirmation Order;

xiii. To issue such orders in aid of consummation of the Plan or the Plan Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules; and

xiv.    To enter the Final Decree closing this chapter 11 case.

## XVII.  BANKRUPTCY PROCEEDINGS

The following material events have occurred during the Debtors' chapter 11 cases:

### A.  Joint Administration of Cases

On March 22, 2024, the Court entered an order (Doc 45) for joint administration of the Debtors' bankruptcy cases.

### B.  Rent Stipulation Between Property Co, Lone Oak and CPIF

On March 20, 2024, Property Co, Lone Oak and CPIF entered into that certain *Stipulation between Debtor, CPIF California, LLC, And Lone Oak Fund, LC Regarding Collection And Deposits Of Rents And Other Proceeds* (the "Rent Stipulation") (Doc 39) pursuant to which Property Co is authorized to collect all rents and deposit such rents into a specified debtor in possession account.  On March 25, 2024, the Court entered an order (Doc 52) approving the Rent Stipulation.

### C.  CPIF's Motions To Appoint A Chapter 11 Trustee and Adequate Protection

48

On March 11, 2024, CPIF filed motions to appoint a chapter 11 trustee and adequate protection, and the Debtors filed oppositions to the motions.  The Debtors, CPIF and Lone Oak resolved the motions (which have been withdrawn without prejudice) by the employment of the CRO.

**D.  The Retention of the Consultant and CRO and Resolution of CPIF's Motions**

On April 18, 2024, Property Co filed its application (Doc 102) to employ the Consultant and CRO, approval of which would cause the withdrawal of CPIF's motion to appoint a trustee and motion for adequate protection.  On May 1, 2024, the Court entered an order approving the employment of the Consultant and CRO.  The Consultant and CRO are providing services to Property Co in accordance with the terms of the parties' agreement, and are assisting Property Con in connection with, among other things, the collection of rents and enforcement of leases, the preparation of budgets and financial information, and the operations of the Property.

**E.  Cash Collateral Orders**

The Court has entered two cash collateral orders authorizing the use of acsh collateral to pay the Debtors' expenses for the period from February 22, 2024 through and including May 31, 2024, and a continued hearing on the use of cash collateral is scheduled for June 12, 2024.

**F.  Stipulation with Athens Services**

The Debtor and Athens Services have entered into a stipulation providing for adequate assurance of future performance and continued services, which the Court has approved.

**G.  Stipulation with Los Angeles Dept. of Water and Power**

The Debtor and Los Angeles Dept. of Water and Power are in the process of filing a stipulation with the Court pertaining to the provision of adequate assurance of future performance and continued services.

**H.  Employment of the Debtors' Bankruptcy Counsel**

On March 26, 2024, the Debtors filed their application (Doc 53) to employ Levene, Neale, Bender, Yoo & Golubchik L.L.P. as their bankruptcy counsel.  On April 17, 2024, the Court entered an order (Doc 98) approving the application.

**XVIII. TAX CONSEQUENCES OF THE PLAN**

**INTERNAL REVENUE SERVICE ("<u>IRS</u>") CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, EACH HOLDER OF A CLAIM IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL INCOME TAX CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "<u>TAX CODE</u>"); (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following disclosure (the "<u>Tax Disclosure</u>") summarizes certain federal income tax consequences of the implementation of the Plan to holders of allowed general unsecured claims and the Debtor.  It does not address the specific federal income tax consequences to those with a unique position with respect to their treatment, such as those holding secured claims or other claims treated under the terms of separate agreements made with the Debtor.  Priority claims are also not specifically addressed, for they are unimpaired.  General withholding obligations are, however, addressed for all holders of claims.

Moreover, the Tax Disclosure summarizes only some of the federal income tax consequences associated with the Plan's implementation; other consequences are not addressed.  Certain of the federal income tax consequences described in the Tax Disclosure are complex and are subject to uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  It is important to note that the Debtors have not retained any tax professional, including any tax counsel or tax accountant.

In addition, the Tax Disclosure does not attempt to consider any facts or limitations applicable to any particular holder of a claim which may modify or alter the consequences described below.  Examples

of particular taxpayers who might have special tax treatment include but are not limited to those who hold a claim as a capital asset, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities.  The Tax Disclosure also does not address state, local, or foreign tax consequences or the consequences of any federal tax other than the federal income tax.

The following summary is based on the Tax Code, the regulations promulgated thereunder by the Department of the Treasury ("Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS in effect on the date hereof.  Changes in, or new interpretations of, such rules may have retroactive effect and could significantly affect the federal income tax consequences described below.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM.  EACH HOLDER OF A CLAIM IS URGED TO CONSULT HIS, HER OR ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

A.    **Withholding Applicable to all Holders of Claims**

All payments transferred under the Plan are subject to applicable tax withholding (including employment tax withholding).

Under federal income tax law, interest and other reportable payments may be subject to "backup withholding," at a rate of 28%.  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails to report properly interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt

from backup withholding.

**B.** **Tax Consequences to Holders of Allowed General Unsecured Claims**

1. Recognition of Gain or Loss Generally

Pursuant to the Plan, except to the extent that the holder of a class 4 claim agrees to a different treatment, such persons will receive on account of their allowed claim, payments over time and a lump sum payment by no later than march 31, 2025 based upon the amount of the respective holder's allowed claim and claim priority. In general, each holder of such an allowed claim will recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value of any other property that such class 4 claim holder receives in satisfaction of its claim (other than in respect of any claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest due to the post-Effective Date distribution of such consideration upon the resolution of disputed claims), and (ii) such holder's adjusted tax basis in its claim (other than any claim for accrued but unpaid interest).

Due to the possibility that a holder of an allowed claim may receive more than one distribution subsequent to the Effective Date (including due to the subsequent disallowance of certain disputed claims or unclaimed distributions), the imputed interest provisions of the IRC may apply to treat a portion of such later distributions to such holders as imputed interest. In addition, it is possible that any loss realized by a holder in satisfaction of an allowed class 4 claim may be deferred until all subsequent distributions relating to disputed claims are determinable, and that a portion of any gain realized may be deferred under the "installment method" of reporting. Holders of such allowed claims are urged to consult their own tax advisors regarding the possibility for deferral and the potential ability to elect out of the installment method of reporting any gain realized in respect of their claims.

Where a claimant recognizes gain or loss in respect of its claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the claimant, whether the claim constitutes a capital asset in the hands of the claimant and how long it has been so held, whether the claimant had acquired the claim at a market discount, and whether and to what extent the claimant had previously claimed a bad debt deduction. A

claimant that purchased its claim from a prior claimant at a market discount may be subject to the market discount rules of the IRC.  Under those rules, assuming that the claimant has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such claim as of the date of the exchange.

2.      Distributions in Payment of Accrued But Unpaid Interest

Distributions to any holder of an allowed class 4 claim will be allocated first to the original principal portion of such claim as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, and to the extent such claimant is entitled to interest, to the portion of such claim representing accrued but unpaid interest.  However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

To the extent a holder of debt receives an amount of cash or property in satisfaction of interest accrued during its holding period, such claimant generally recognizes taxable interest income in such amount (if not previously included in the claimant's gross income).  Conversely, a claimant generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each claimant is urged to consult its own tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal income tax purposes.

C.      **Tax Consequences for the Debtors**

The Debtors does not believe that there will be any negative tax consequences to the Debtors resulting from the confirmation of the Plan, and the Debtors do not believe there will be any negative tax consequences to the Debtors upon a refinanacing of the Property.  A sale of the Property will result in tax consequences and tax obligations which are taken into account in the liquidation analysis provided in this DS.

D.      **Tax Consequences for Equity Interest Holders**

The Debtors do not believe that there will be any tax consequence to equity interest holders resulting from the confirmation of the Plan or upon a refinancing of the Property.  However, there may be tax

consequences to equity security holders in connection with a sale and equity security holders should consult with their own tax professionals regarding their particular tax situations and the potential impact thereon of a sale of the Property and any distributions to equity interest holders from a sale of the Property.

## XIX.    EFFECT OF CONFIRMATION OF THE PLAN

a.    <u>General Comments</u>

The provisions of a confirmed Plan bind the Debtors, any entity acquiring property under the Plan, and any creditor, interest holder, or general partner of the Debtors, even those who do not vote to accept the Plan.  The confirmation of the Plan vests all property of the estates in the Debtors.  The automatic stay is lifted upon confirmation as to property of the Debtors' estates. However, the stay continues to prohibit collection or enforcement of pre-petition claims against the Debtors or the Debtors' property until the date the Debtors receive a discharge, if any. If the Debtors do not seek a discharge, the discharge is deemed denied, and the stay as to the Debtors and the Debtors' property terminates upon entry of the order confirming the Plan (subject to the terms of the Plan).  The Debtors seek a discharge.

b.    <u>Discharge of Liability for Payment of Debts; Status of Liens; Equity Security Holders</u>

Unless the Debtor is not entitled to receive a discharge pursuant to 11 U.S.C.A. 1141(d)(3) (West 2004), the Debtor may obtain a discharge only upon specific order of the Court.

**The confirmation of the Plan does not discharge the Debtor from any debt of a kind specified in 11 U.S.C.A. § 523(a)(2)(A)-(B) (West 2004 & Supp. 2006) that is owed to a domestic governmental unit, or owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 or any similar State statute, or for a tax or customs duty with respect to which the debtor made a fraudulent tax return or willfully attempted in any manner to evade or to defeat such tax or such customs duty.**

c.    <u>Modification of the Plan</u>

The Proponents may modify this Plan at any time before confirmation.  However, the Bankruptcy Court may require a new disclosure statement and/or re-voting on this Plan if the Debtors modify this Plan before confirmation.  The Proponents  may seek to modify this Plan at any time after confirmation of this

Plan so long as (1) this Plan has not been substantially consummated, and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

       d.     <u>Post-Confirmation Causes of Action</u>

To the best knowledge of the Proponents, Property Co has the following claims and causes of action:

1.     Claims and causes of action against tenants for payment of any past due rents and other charges (including with respect to Gaju, Gaju's vacancy guarantee obligations), and interest and fees in connection therewith.

The Debtors continue to investigate potential claims and causes of action, and hereby disclose that numerous disputes presently exist between the Debtors, CPIF and the Debtors' Manager, pertaining to, among other things, the loans made by CPIF to Property Co, loans made by affiliates of the Debtors to Property Co, and distributions and other payments made by Property to affiliates of the Debtor, including, without limitation, Jake Sharp Group and Jake Sharp Capital. The Debtors submit that the primary asset of these estates is the Property, and under the Plan, all creditors with allowed claims will be paid in full pursuant to either a refinance or a sale of the Property, and all equity interest holders will retain all of their rights, including with respect to rights and claims as between equity interest holders (which claims as between Property Co's equity interest holders do not concern the Debtors' estates).

The Debtors are designated as the representatives of the estate under 11 U.S.C.A. § 1123(b)(3) (West 2004) and shall have the right to assert any or all of the above causes of action postconfirmation in accordance with applicable law. All claims, causes of action and avoidance actions of the Debtors and their estates, to the extent remaining and to the extent not settled, are not affected by the Plan, and the Debtors shall have full power and authority to settle, adjust, retain, and enforce any claim, cause of action or avoidance actions as the representatives of the Debtors' estates under section 1123(b) of the Bankruptcy Code or otherwise, regardless of whether such claims, causes of action or avoidance actions were commenced prior or subsequent to the Effective Date.

       e.     <u>Final Decree</u>

Once the Plan has been consummated, a final decree may be entered upon motion of the Proponents.

The effect of the final decree is to close the bankruptcy cases. After such closure, a party seeking any type

of relief relating to a Plan provision can seek such relief in a state court of general jurisdiction.

Dated: May 28, 2024

AGTJ13, LLC and AGTJ13 MANAGER, LLC

By: _____

Lafayette Jackson Sharp, IV,
Manager

PRESENTED BY:

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.

By: ___/s/ Krikor J. Meshefejian___
       RON BENDER
       BETH ANN R. YOUNG
       KRIKOR J. MESHEFEJIAN
Counsel for Chapter 11 Debtor and Debtor in Possession

## XX.    **DECLARATION IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN**

I, Lafayette Jackson Sharp, IV, declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct based upon my personal knowledge.

1.    I am the Manager of AGTJ13, LLC ("Property Co") and the Manager and majority member of AGTJ13 Manager, LLC ("Hold Co" and together with Property Co, the "Debtors").  I have served as Manager for Property Co and Hold Co since approximately December 2020, when Property Co and Hold Co were formed for the purpose of and in connection with Property Co's acquisition in December 2020 of the real property located at 450 South Western Avenue, Los Angeles, CA 90020 (the "Property").

2.    The Debtors are the proponents of the Plan and Disclosure Statement and I caused to be prepared the Disclosure Statement and Plan with the assistance of the Debtors' bankruptcy counsel.  Krikor J. Meshefejian of Levene, Neale, Bender, Yoo & Golubchik L.L.P. was the primary attorney that assisted the Debtors with drafting the Plan and Disclosure Statement, with my input and direction.  I have reviewed and approved the Plan and Disclosure for filing with the Court.

3.    The source of all financial data is the Debtors' books and records.

4.    To the best of my knowledge and belief, no fact material to a claimant or equity security holder in voting to accept or reject the proposed Plan has been omitted.

5.    The name of the persons who prepared the cash flow projections are myself, Ryan Yatman of Secured Properties, Inc. (the Property's property management company) and Rick Marquis (part of the CRO team).  The CRO team is also assisting the Debtors with preparing historical financial statements which the Debtors will provide as a supplement to the Disclosure Statement.  Such persons are and were acting within the capacities set forth above.

6.    The accounting method used to prepare the cash flow projections are on a cash basis.

Signature: _____    Print Name: Lafayette Jackson Sharp, IV____

Title: _Manager of AGTJ13, LLC and AGTJ13 Manager, LLC____    Date: May 28, 2024____

# EXHIBIT "1"

| Creditor | Claim No. | FILED CLAIM Claim Amount | SCHEDULED CLAIM Claim Amount | | CURRENT DEEMED ALLOWED AMOUNT | NOTES |
|---|---|---|---|---|---|---|
| Acosta Power Sweeping Services, Inc. | | | $38,839.12 | General Unsecured | $38,839.12 | |
| Amtrust North America | | | $43,722.00 | General Unsecured | $43,722.00 | |
| Athens Service | | | $53,559.60 | General Unsecured | $53,559.60 | |
| City of Los Angeles | | | $0.00 | General Unsecured | $0.00 | |
| CPIF California, LLC | | | $29,074,389.25 | Secured | $0.00 | Claim scheduled as disputed |
| F&G Global, LLC | | | Unknown | General Unsecured | $0.00 | No proof of claim filed |
| Franchise Tax Board | | | $0.00 | General Unsecured | $0.00 | |
| Internal Revenue Service | 1-1 | $ 20,400.00 | $0.00 | General Unsecured | $20,400.00 | |
| Jake Sharp Capital | | | $0.00 | General Unsecured | $0.00 | |
| Jake Sharp Group | | | $0.00 | General Unsecured | $0.00 | |
| Ju Ma Security | | | $43,665.30 | General Unsecured | $43,665.30 | |
| Kreation Enterprise, Inc. | | | Unknown | General Unsecured | $0.00 | No proof of claim filed |
| L.A. Dept. of Water and Power | | | $15,507.65 | General Unsecured | $15,507.65 | |
| Lone Oak Fund, LLC | | | $29,810,000.00 | Secured | $29,810,000.00 | |
| Los Angeles County Treasurer-Tax Collector | 2-1 | $ 1,567,788.28 | $729,204.08 | Secured | $1,567,788.28 | |
| Mitsubishi Electric US Americas | | | $29,735.36 | General Unsecured | $29,735.36 | |
| Secured Properties Inc. | | | $17,995.48 | General Unsecured | $17,995.48 | |

# EXHIBIT "2"

# RENT ROLL

| | | Owner: AGTJ13, LLC | PROPERTY IS 100% LEASED | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 450 S. Western Ave., Los Angeles, CA 90020 | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | APN: 5503-014-020 | | | | | | | TOTAL RENT: | | | $ | 589,324.02 |
| | OPEN DATE | LESSEE | SUITE | SIZE SQ.FT. | RENT RATE | BASE AMOUNT | CAM RATE | CAM % | CAM AMOUNT | Food Court CAM RATE | Food Court CAM AMOUNT | | TOTAL RENT |
| 1 | 12/1/2015 | Gaju Market Corporation | 101 | 35,611 | $ 5.76 | $205,168.00 | $ 2.06 | 44.49% | $ 73,358.66 | | | | 278,526.66 |
| 2 | 1/1/2017 | Gaju Market Corporation | 201 | 1,200 | $ 5.21 | $ 4,500.00 | $ 2.06 | 1.50% | $ 2,472.00 | | | $ | 6,972.00 |
| 3 | 12/4/2020 | Gaju Market Corporation | 204 | 863 | $ 4.31 | $ 3,719.53 | $ 2.06 | 1.08% | $ 1,777.78 | | | $ | 5,497.31 |
| 4 | 1/2/2020 | Walter Kim | 205, 206 | 2,442 | $ 2.81 | $ 6,871.23 | $ 2.06 | 3.05% | $ 5,030.52 | | | $ | 11,901.75 |
| 5 | 12/4/2020 | Emerald Enterprise | 207 | 503 | $ 4.64 | $ 2,331.41 | $ 2.06 | 0.63% | $ 1,036.18 | | | $ | 3,367.59 |
| 6 | 11/26/2016 | Eden Beauty LLC | 208 | 565 | $ 6.76 | $ 3,821.83 | $ 2.06 | 0.71% | $ 1,163.90 | | | $ | 4,985.73 |
| 7 | 12/13/2019 | Se Woon Park / E Young | 209 | 531 | $ 4.15 | $ 2,231.79 | $ 2.06 | 0.66% | $ 1,093.86 | | | $ | 3,325.65 |
| 8 | 12/4/2020 | Gaju Market Corporation | 210 | 1,338 | $ 4.31 | $ 5,766.78 | $ 2.06 | 1.67% | $ 2,756.28 | | | $ | 8,523.06 |
| 9 | 12/4/2020 | Gaju Market Corporation | 212 | 2,155 | $ 4.31 | $ 8,210.55 | $ 2.06 | 2.69% | $ 4,439.30 | | | $ | 12,649.85 |
| 10 | 6/15/2019 | Jiyoung Park | 212-A | 250 | $ 7.20 | $ 1,900.00 | $ - | 0.31% | $ - | | | $ | 1,800.00 |
| 11 | 8/1/2023 | Kimberly Hae Sun Kim | | 400 | $7.50 | $3,000.00 | | 0.50% | | | | | $3,000.00 |
| 12 | 7/28/2016 | Pacific City Bank | 213 | 1,400 | $ 6.58 | $ 10,826.52 | $ 2.06 | 1.75% | $ 2,884.00 | | | $ | 13,710.52 |
| 13 | 8/1/2017 | Myeong Ho Hwang | 214 | 454 | $ 4.73 | $ 2,149.30 | $ 2.06 | 0.57% | $ 935.24 | | | $ | 3,084.54 |
| 14 | 12/4/2020 | ELSIS, LLC | 215A | 353 | $ 6.34 | $ 2,236.08 | $ 2.06 | 0.44% | $ 529.50 | | | $ | 2,765.58 |
| 15 | 5/1/2017 | Myeong Ho Hwang | 215B | 163 | $ 7.38 | $ 1,203.04 | $ 2.06 | 0.20% | $ 335.78 | | | $ | 1,538.82 |
| 16 | 2/1/2016 | Tae Ub Yoon | 215C | 110 | $ 7.60 | $ 836.07 | $ 2.06 | 0.14% | $ 226.60 | | | $ | 1,062.67 |
| 17 | 7/1/2017 | Jay Hyung | 216 | 762 | $ 6.57 | $ 5,004.27 | $ 2.06 | 0.95% | $ 1,569.72 | | | $ | 6,573.99 |
| 18 | 7/6/2018 | Kreation Enterprise, Inc. | 217 | 912 | $ 5.65 | $ 5,152.80 | $ 2.06 | 1.14% | $ 1,878.72 | | | $ | 7,031.52 |
| 19 | 7/6/2018 | Kreation Enterprise, Inc. | 218 | 1,721 | $ 5.65 | $ 9,723.65 | $ 2.06 | 2.15% | $ 3,545.26 | | | $ | 13,268.91 |
| 20 | 7/6/2018 | Kreation Enterprise, Inc. | 219,221 | 6,151 | $ 5.65 | $ 34,753.15 | $ 2.06 | 7.68% | $ 12,671.06 | | | $ | 47,424.21 |
| 21 | 12/4/2020 | Kreation Enterprise, Inc. | 203,222 | 4,775 | $ 5.46 | $ 26,092.00 | $ 2.06 | 5.97% | $ 9,836.50 | | | $ | 35,928.50 |
| 22 | 10/19/2019 | CNP Gaju #1, Inc. and Dong Hun Yoo | 305/FC1 | 1,368 | $ 3.83 | $ 5,231.98 | $ 2.06 | 1.71% | $ 2,818.08 | $ 1.00 | $ 1,368.00 | $ | 9,418.06 |
| 23 | 10/19/2019 | CNP Gaju #2, Inc. and Dong Hun Yoo | 305/FC2 | 1,322 | $ 3.83 | $ 5,056.05 | $ 2.06 | 1.65% | $ 2,723.32 | $ 1.00 | $ 1,322.00 | $ | 9,101.37 |
| 24 | 7/1/2021 | Catherine Park | 305/FC3 | 1,346 | $ 4.12 | $ 5,545.52 | $1.50 | 1.68% | $ 2,019.00 | $ 0.50 | $ 673.00 | $ | 8,237.52 |
| 25 | 3/6/2019 | Alice Kang | 305/FC4 | 1,336 | $ 3.38 | $ 6,766.56 | $ 2.06 | 1.67% | $ 2,752.16 | $ 1.00 | $ 1,336.00 | $ | 10,854.72 |
| 26 | 6/4/2019 | Gaju Market Corporation | 305/FC5 | 1,364 | $ 4.31 | $ 5,878.84 | $ 2.06 | 1.70% | $ 2,809.84 | $ 1.00 | $ 1,364.00 | $ | 10,052.68 |
| 27 | 12/4/2020 | Gaju Market Corporation | 307 | 1,095 | $ 4.31 | $ 4,719.45 | $ 2.06 | 1.37% | $ 2,255.70 | | | $ | 6,975.15 |
| 28 | 12/4/2020 | Gaju Market Corporation | 309,310,311,312 | 5,821 | $ 4.31 | $ 25,088.51 | $ 2.06 | 7.27% | $ 11,991.26 | | | $ | 37,079.77 |
| 29 | 12/15/2018 | PPS-Capital Inc. and Dong Hun Yoo | 313 | 435 | $ 8.93 | $ 3,886.63 | $ 2.06 | 0.54% | $ 896.10 | | | $ | 4,782.73 |
| 30 | 5/1/2021 | SINJEON / JeongJu Han | 314 | 1,400 | $ 4.24 | $ 5,941.04 | $ 2.06 | 1.75% | $ 2,884.00 | | | $ | 8,825.04 |
| 31 | 11/17/2019 | Warren Wi Kim | 315,316 | 1,600 | $ 3.06 | $ 5,042.28 | $ 2.06 | 2.00% | $ 3,296.00 | | | $ | 8,338.28 |
| 32 | 3/8/2019 | T-Mobile West, LLC | Roof | 300 | $ 7.17 | $ 2,419.84 | $ 1.00 | 0.37% | $ 300.00 | | | $ | 2,719.84 |
| | | | | 80,046 | | $ 421,074.70 | | 100% | $ 162,286.32 | | $ 6,063.00 | $ | 589,324.02 |

# EXHIBIT "3"

AMENDMENT TO LEASE BETWEEN
GAJU MARKET CORPORATION AND 450 S. WESTERN, LLC

This Lease Amendment ("Amendment") is entered into effective as of November 13, 2020 by and between GAJU MARKET CORPORATION ("GAJU" or "LESSEE") and JAKE SHARP CAPITAL, a California corporation, or Assignee (sometimes collectively referred to as "JAKE" and/or "LESSOR"), with respect to the Lease dated March 1, 2015 (the "Lease") concerning 450 S. Western Ave., Los Angeles, California (the "Premises")and should any conflict arise between the two documents then this document shall prevail.  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. Paragraph 1.5 and any and all other clauses or details regarding parking of the Lease is amended and the following language is substituted in the entirety for the subject of parking:

Lessee may reasonably use the unreserved parking spaces per Lessor's guidelines, designations or instructions Lessor in its reasonable discretion may establish, modify, amend and enforce.  In the event Lessor elects to charge for parking, Lessee may validate visitor parking by such method or methods as Lessor may approve, provided that there shall be no charge for the first sixty (60) minutes of such visitor parking during the Term of this Lease and any extension thereof.

2. Paragraph 1.6 of the Lease is amended and the following language is substituted for subparagraphs (1)-(6) as follows:

(1) Execution Date: November 9, 2020, and conditioned on Lessor acquiring title to the Premises no later than November 13, 2020.

(2) Term: Fifteen (15) years.

(3) Commencement Date:  November 14, 2020.

(4) Expiration Date:   November 13, 2035.

(5) Optional Terms:   One Five(5) year option from the Expiration Date, only if Lessee gives Lessor a prior written notice of Lessee's exercise of the Option right, no earlier than 120 days nor later than 90 days, prior to the Expiration Date.

(6) Omitted.

3. Lessee's Share of Common Area Operating Expenses.  Paragraph
1.7 is amended in the entirety and the following language is
substituted:

The monthly charge for Lessee's share of Common Area Operating
Expenses shall be as follows:

| | |
|---|---|
| Year 1 | $53,416.50 |
| Year 2 | $54,751.91 |
| Year 3 | $56,120.71 |
| Year 4 | $57,523.73 |
| Year 5 | $58,961.82 |
| Year 6 | $60,435.87 |
| Year 7 | $61,949.76 |
| Year 8 | $63,495.43 |
| Year 9 | $65,082.82 |
| Year 10 | $66,709.89 |
| Year 11 | $68,377.64 |
| Year 12 | $70,087.08 |
| Year 13 | $71,839.25 |
| Year 14 | $73,635.24 |
| Year 15 | $75,476.12 |

Note: Common Area Operating Expenses may go either up or down in
a 12 month period and will be audited at the end of each year's
operations.  Any savings or additional costs will be passed onto
all the tenants in the property to share in such savings or
additional expenses of operating the property Common Area.  The
cost per square foot given to each tenant shall be dictated by
the previous year's total + CPI for the future year CAM charges.

4. Paragraph 1.8(2) of the Lease is amended as follows:
Commencing November 14, 2020 base rent shall be $190,518.85
for the Premises occupied pursuant to the estoppel agreement
attached hereto as Exhibit "A".  Annual Base Rent Increase
Escalation: At Commencement of Second Year, through the term
of the lease and Option Period, of 2.5% per annum in
accordance with the following schedule:

Base Rent Schedule

Year 1 $190,519.00 A Month
Year 2 $195,282.00 A Month
Year 3 $200,164.00 A Month
Year 4 $205,168.00 A Month
Year 5 $210,297.00 A Month

```
Year  6 $215,554.00 A Month
Year  7 $220,943.00 A Month
Year  8 $226,467.00 A Month
Year  9 $232,129.00 A Month
Year 10 $237,932.00 A Month
Year 11 $243,880.00 A Month
Year 12 $249,977.00 A Month
Year 13 $256,226.00 A Month
Year 14 $262,632.00 A Month
Year 15 $269,198.00 A Month
```

Commencing Year 16, Base Rent shall be recalculated based on a determination of Fair Market Rent and the total space used by The Gaju Market shall be measured and used for the calculation of the new Market Rent. For example if upon measuring the actual space Gaju Market uses for its operations is not actually 35,611 square feet but 39,000 square feet then the actual square footage The Gaju Market uses shall be the number times the new Market Rent rate used to calculate the new starting rent.  For further example only, if GAJU occupies 39,000 sq. ft. and FMV rent is $7.50 sq. ft., then Base Rent shall be $292,500.00 per month.

If, upon exercise of the option at the end of Year 15, Lessor and Lessee cannot agree among themselves on such Fair Market Rent within twenty (20) days after the first request made by one of the parties to do so, then either party may notify the other of a Person selected to act as appraiser (such Person, and each other Person selected as provided herein, an "First Appraiser") on its behalf. Within fifteen (15) days after receipt of any such Notice, the other party shall, by notice to the first party, appoint a second Person as Appraiser ("Second Appraiser") on its behalf. The Appraisers thus appointed, each of whom must be a member of The Appraisal Institute/American Institute of Real Estate Appraisers (or any successor organization thereto, or, if no such organization exists, a similarly nationally recognized real estate appraisal organization) with at least twenty (20) years of experience appraising properties similar to such Premises, shall, within forty-five (45) days after the date of the notice appointing the First Appraiser, proceed to appraise the applicable Premises to determine the Fair Market Rent thereof as of the relevant date; provided, that if one Appraiser shall have been so appointed, or if two Appraisers shall have been so appointed but only one such Appraiser shall have made such determination within fifty (50) days after the making of the initial appointment, then the determination of

such Appraiser shall be final and binding upon the parties. If
two (2) Appraisers shall have been appointed and shall have made
their determinations within the respective requisite periods set
forth above and if the difference between the amounts so
determined shall not exceed five percent (5%) of the lesser of
such amounts, then the Fair Market Rent shall be an amount equal
to fifty percent (50%) of the sum of the two market rent amounts
so determined. If the difference between the amounts so
determined shall exceed five percent (5%) of the lesser of such
amounts, either party may request the appointment of a Third
Appraiser, which Appraiser shall be selected by Lessor and
Lessee, or, if they cannot agree, by the First and Second
Appraisers.

Once the Third Appraiser is selected, either by agreement of the
parties or by selection of both previously appointed Appraisers,
the Third Appraiser will determine the matter in question, by
proceeding as follows: (i) Lessor and Lessee shall submit to the
Third Appraiser the respective determinations of Fair Market
Rent of each Appraiser. The Third Appraiser will be instructed
to (x) make a determination as to the Fair Market Rent (the
"**Third Appraiser Fair Market Rent**") and (y) determine the
conclusive Fair Market Rent by performing its own appraisal and
calculating the arithmetic mean of the its appraised Fair Market
Value rent calculation and the Fair Market Rent of the Appraiser
closest to such Third Appraisal. The Third Appraiser shall
notify the parties within thirty (30) days of the submission of
the matter to the Third Appraiser in writing of their decision
as the conclusive determination of Fair Market Rent.


5. Paragraph 4.2 shall be eliminated in the entirety and the
   following language is substituted therefor:

   > Common Area Operating Expenses.  Lessee shall pay to Lessor
   > during the term hereof, in addition to the Base Rent,
   > Lessee's Share (as defined in Paragraph 1.6) of all Common
   > Area Operating Expenses during each calendar year of the
   > term of this Lease as described in Paragraph 3 of this
   > Lease Amendment.

6. Paragrah 10.  Paragraph 10(b) is eliminated in the entirety as
   this paragraph pertains to property taxes and the Lease per
   this amendment is converted from a Modified Gross Lease
   previously to a NNN Lease where the tenant is responsible for
   all property taxes for its portion of use of the property and
   any and all maintenance and repair of the Gaju Market
   Corporation Exclusive Use.

7. Paragraph 13.4 language is substituted therefor: 1% Late Fee shall become a 10% Late Fee.

8. Paragraph 13.5 language is substituted therefor: 10% Interest Rate shall become 15% Interest Rate.

9. Paragraph 49. LESSOR ACCESS TO PREMISES TO CONSTRUCT IMPROVEMENTS. The Parties understand that Lessor intends to construct substantial improvements to 450, including but not limited to the addition of residential units on top of the Parking Structure and possibly over the Premises itself.  In such event, construction of supplemental foundation footings and other improvements may be required to support said improvements, which may interfere in the operations and tenancy of Lessee.  Following coordination with Lessee, Lessor may make such improvements on and through the Premises provided such changes do not unreasonably interfere with Lessee's right to use or occupy the Premises and parking or access to the Premises or parking. Certain square footage of either or any of the following Premises, Common Area, or parking may be claimed at any time by the lessor for construction needs, lessor will proceed with construction for footings work when and if needed in small amounts of the total square footage of the property never to exceed footings work simultaneously greater than 20% of any space at a time even though more costly construction to the lessor so that lessee's business is not heavily impacted by any construction work or needs of the lessor for the project.

Prior to commencing construction of improvements, Lessor agrees to consult with Lessee regarding the scope of improvements and the timing thereof.  The parties agree to work together to create a comprehensive plan for the scope, schedule and timing of the improvements.  Two months prior to the commencement of construction, the joint plan and construction schedule will be finalized and presented to Lessee so that Lessee may make adjustments as and if needed. Said plan will provide detailed references to the extent of construction in the Premises, together with schedules for commencement and completion.

The Rent and Operating Expenses payable by Lessee for the period required for the entire construction job, including revmoval of Lessee's equipment, completion of construction, replacement of equipment and repair and restoration of tenant improvments, shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired. To the extent

Lessee's use of the Premises is permanently reduced as a result of the construction, Base Rent shall likewise be abated in proportion to the degree to which Lessee's use of the Premises is permanently impaired.

Lessor, at its sole cost and expense, shall perform whatever repositioning of Lessee's equipment, leasehold improvements and material as is necessary in the Premises to accommodate the Construction plan and schedule. Alternatively, Lessee may perform such work itself, subject to reimbursement by Lessor. Upon completion of construction the Premises shall be restored into substantially the equivalent condition to that in which the Original Premises were in prior to such construction, and Lessor shall also reimburse Lessee for Lessee's reasonable out-of-pocket expenses in so accommodating to the construction on the Premises upon billing therefor from Lessee, which billing shall include reasonable evidence thereof in the form of paid invoices, receipts and the like. Lessor shall use reasonable efforts to coordinate such relocation so as to minimize disruption with Lessee's business.

10. This Amendment, together with the March 1, 2015 Lease and all documents referenced or incorporated therein, constitutes the entire agreement between the Parties with respect to its subject matter and supersedes all prior agreements and understandings, both oral and written, between the Parties with respect to its subject matter. No subsequent terms, conditions, understandings, or agreements purporting to modify the terms of this Amendment will be binding unless in writing and signed by both Parties. This Amendment may be executed in counterparts, each of which when so executed and delivered will be deemed an original, and all of which taken together will constitute one and the same instrument.

11. The Gaju Market shall provide Lessor quarterly financial reports.

12. The Gaju Market as a condition of this lease amendment agrees to move its major banking for The Gaju Market as needed to a bank that will offer the financing of the property at special or attractive terms for the greater success for the property, The Gaju Market, and the Joint Venture. The Gaju Market shall not withhold any such request by Jake Sharp to move its banking relationship in order to benefit the property providing such a banking relationship remains competitive in the general banking market within reason.

13.   GAJU Market Corporation shall also guaranty a base rent payment of $4.00/sq.ft.NNN +$1.50 CAM charges with 2.5% annual increases for any vacancies or non-payment of rents, or CAM for any reason in 450 so that the Lessor is receiving 100% of both the rents and CAMs at all times on time ("Vacancy Guaranty") for a period of five (5) years from the date of this agreement.

14.   Should Gaju Market Corporation be sold at any time during the term of the Lease, either the Seller or the new owner will deposit with Lessor simultaneously with the close of sale a sum equal to 12 months rent as security for the continued performance of the lease.   Provided the successor tenant is not in default after 24 months ("Hold Period"), a total of 6 month's rent ("Return Amount") shall be returned to Seller within one month of the expiration of the 24 month Hold Period or to the entity making the Security Deposit.   Lessor is to retain the remaining six (6) months' security deposit as assurance for the continued performance of new owner's compliance with the lease. However, in the event Lessor fails to refund the Return Amount within the one month following the expiration of the Hold Period the parties agree that such failure will result in damages difficult or impossible to ascertain as the Lessee may have committed funds elsewhere in reliance on the Return Amount and delay may impact Lessee's reputation or require it to provide, _inter alia_, non-monetary concessions.   The parties futher stipulate that a reasonable measure of damages, based upon the parties' experience, would be the immediate return of an additional four (4) months' rent based on the nature of the losses that may result from delay, with Lessor retaining two months' rent as last month and a one month security deposit.

IN WITNESS WHEREOF, the Parties have executed this Amendment by persons duly authorized below:


_Signatures on following page_

GAJU MARKET CORPORATION

BY: _____
        HYUN RHEE

JAKE SHARP CAPITAL, a California corporation

BY: _____
        Lafayette J. Sharp IV / JAKE SHARP

# EXHIBIT "4"

450 S. Western Ave.

90D RENT PROJECTIONS

| UNIT | TENANT | SEPT. | OCT. | NOV. | 2024 DEC. | 2025 JAN. | FEB. | MAR |
|------|--------|-------|------|------|-----------|-----------|------|-----|
| Roof | T-Mobile West, LLC | $ 2,719.84 | $ 2,719.84 | $ 2,719.84 | $ 2,719.84 | $ 2,719.84 | $ 2,719.84 | $ 2,719.84 |
| 101 | Gaju Market, California Market | $ 278,526.66 | $ 278,526.66 | $ 278,526.66 | $ 283,655.86 | $ 283,655.86 | $ 283,655.86 | $ 283,655.86 |
| 201 | Gaju Market Office | $ 6,972.00 | $ 6,972.00 | $ 6,972.00 | $ 6,972.00 | $ 6,972.00 | $ 6,972.00 | $ 6,972.00 |
| 203 | | | | | | | | |
| 203, 222 | Kreation Enterprise, Inc. | | | | | | | |
| 204 | Gaju Market Corporation | $ 5,497.31 | $ 5,497.31 | $ 5,497.31 | $ 5,590.30 | $ 5,590.30 | $ 5,590.30 | $ 5,590.30 |
| 205-206 | BMB Medical Group | $ 9,768.00 | $ 9,768.00 | $ 9,768.00 | $ 9,768.00 | $ 9,768.00 | $ 9,768.00 | $ 9,768.00 |
| 207 | Emerald Enterprise | $ 3,367.59 | $ 3,367.59 | $ 3,367.59 | $ 3,367.59 | $ 3,367.59 | $ 3,367.59 | $ 3,367.59 |
| 208 | Aritaum | $ 4,345.02 | $ 4,345.02 | $ 4,345.02 | $ 4,345.02 | $ 4,345.02 | $ 4,345.02 | $ 4,345.02 |
| 209 | E Young Collection | $ 3,259.10 | $ 3,259.10 | $ 3,259.10 | $ 3,259.10 | $ 3,259.10 | $ 3,259.10 | $ 3,259.10 |
| 210 | Gaju Market Corporation | $ 8,523.06 | $ 8,523.06 | $ 8,523.06 | $ 8,667.23 | $ 8,667.23 | $ 8,667.23 | $ 8,667.23 |
| 212 | Gaju Market Corporation | $ 13,727.35 | $ 13,727.35 | $ 13,727.35 | $ 13,959.55 | $ 13,959.55 | $ 13,959.55 | $ 13,959.55 |
| 212-B | Kimberly  Kim | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 |
| 212-A | Jiyoung  Park | $ 1,900.00 | $ 1,900.00 | $ 1,900.00 | $ 1,900.00 | $ 1,900.00 | $ 1,900.00 | $ 1,900.00 |
| 213 | Pacific City Bank | $ 13,590.81 | $ 13,590.81 | $ 13,590.81 | $ 13,590.81 | $ 13,590.81 | $ 13,590.81 | $ 13,590.81 |
| 214 | Elsis | $ 3,084.54 | $ 3,084.54 | $ 3,084.54 | $ 3,084.54 | $ 3,084.54 | $ 3,084.54 | $ 3,084.54 |
| 215A | Elsis #2 | $ 2,765.58 | $ 2,765.58 | $ 2,765.58 | $ 2,765.58 | $ 2,765.58 | $ 2,765.58 | $ 2,765.58 |
| 215B | Guardian Computer | $ 1,538.82 | $ 1,538.82 | $ 1,538.82 | $ 1,538.82 | $ 1,538.82 | $ 1,538.82 | $ 1,538.82 |
| 215C | Yoon's Watch Co. | $ 825.00 | $ 825.00 | $ 825.00 | $ 825.00 | $ 825.00 | $ 825.00 | $ 825.00 |
| 216 | Donginbi | $ 6,573.99 | $ 6,573.99 | $ 6,573.99 | $ 6,573.99 | $ 6,573.99 | $ 6,573.99 | $ 6,573.99 |
| 217 | Kreation Enterprise, Inc. | $ 5,809.44 | $ 5,809.44 | $ 5,809.44 | $ 5,907.71 | $ 5,907.71 | $ 5,907.71 | $ 5,907.71 |
| 218 | Etude W | $ 10,962.77 | $ 10,962.77 | $ 10,962.77 | $ 11,148.21 | $ 11,148.21 | $ 11,148.21 | $ 11,148.21 |
| 219, 221 | Kreation Enterprise, Inc. | $ 39,181.87 | $ 39,181.87 | $ 39,181.87 | $ 39,844.64 | $ 39,844.64 | $ 39,844.64 | $ 39,844.64 |
| 305-FC5 | Jungabok-VACANT Pending Lease | | | | | | | |
| 305/FC1 | CNP Gaju #1, Inc. and Dong Hun Yoo | $ 10,082.16 | $ 10,082.16 | $ 10,082.16 | $ 10,229.56 | $ 10,229.56 | $ 10,229.56 | $ 10,229.56 |
| 305/FC2 | Seoul Pho-Legal Collections-PG | | | | | | | |
| 305/FC3 | Catherine Park | $ 6,000.00 | $ 6,000.00 | $ 6,000.00 | $ 6,000.00 | $ 6,000.00 | $ 6,000.00 | $ 6,000.00 |
| 305/FC4 | Alice  Kang | $ 9,846.32 | $ 9,846.32 | $ 9,846.32 | $ 10,199.65 | $ 10,199.65 | $ 10,199.65 | $ 10,199.65 |
| 307 | Mealtop | $ 6,975.15 | $ 6,975.15 | $ 6,975.15 | $ 7,093.14 | $ 7,093.14 | $ 7,093.14 | $ 7,093.14 |
| , 310, 311, | Gaju | $ 37,079.77 | $ 37,079.77 | $ 37,079.77 | $ 37,706.98 | $ 37,706.98 | $ 37,706.98 | $ 37,706.98 |
| 313 | Two Hands Corn Dog | $ 4,782.73 | $ 4,782.73 | $ 4,782.73 | $ 4,782.73 | $ 4,782.73 | $ 4,782.73 | $ 4,782.73 |
| 314 | JeongJu Han | $ 8,918.00 | $ 8,918.00 | $ 8,918.00 | $ 9,068.85 | $ 9,068.85 | $ 9,068.85 | $ 9,068.85 |
| 315-316 | Ye Tea House | $ 8,338.28 | $ 8,338.28 | $ 8,338.28 | $ 8,338.28 | $ 8,338.28 | $ 8,338.28 | $ 8,338.28 |
| | **TOTAL MONTHLY RENTS** | **$ 517,961.16** | **$ 517,961.16** | **$ 517,961.16** | **$ 525,902.98** | **$ 525,902.98** | **$ 525,902.98** | **$ 525,902.98** |

$ 3,657,495.39

450 S. Western Ave, Los Angeles, CA 90020 **BUDGET**
Monthly Vendor / Services List

| | SEP | OCT | NOV | DEC<br>2024 | JAN<br>2025 | FEB | MAR |
|---|---|---|---|---|---|---|---|
| ACOSTA | $ 20,795.00 | $ 20,795.00 | $ 20,795.00 | $ 20,795.00 | $ 20,795.00 | $ 20,795.00 | $ 20,795.00 |
| LADWP | $ 16,000.00 | $ 16,000.00 | $ 16,000.00 | $ 16,000.00 | $ 16,000.00 | $ 16,000.00 | $ 16,000.00 |
| ATHENS | $ 15,000.00 | $ 15,000.00 | $ 15,000.00 | $ 15,000.00 | $ 15,000.00 | $ 15,000.00 | $ 15,000.00 |
| SECURED PROPERTIES MANAGEMENT Mar/Apr | $ 15,538.83 | $ 15,538.83 | $ 15,538.83 | $ 15,777.09 | $ 15,777.09 | $ 15,777.09 | $ 15,777.09 |
| JU MA SECURITY $574.20/DAY | $17,226.00 | $17,800.20 | $17,226.00 | $17,800.20 | $17,800.20 | $16,077.60 | $17,800.20 |
| MITSUBISHI elevator/escalator service | $ 5,537.53 | $ 5,537.53 | $ 5,537.53 | $ 5,537.53 | $ 5,537.53 | $ 5,537.53 | $ 5,537.53 |
| PEST CONTROL / POINT EXTERMINATORS INC. | $ 280.00 | $ 280.00 | $ 280.00 | $ 280.00 | $ 280.00 | $ 280.00 | $ 280.00 |
| INTERNET | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 |
| GAS | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 |
| PROPERTY INSURANCE AMTRUST NA | $ 6,246.00 | $ 6,246.00 | $ 6,246.00 | $ 6,246.00 | $8,120.00 | $8,120.00 | $8,120.00 |
| AT&T WIRELESS ELEVATORS | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 |
| SMU Manu Bank monthly fees | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 |
| Expense Reserves, Repairs & Maintenance | $50,000.00 | $50,000.00 | $50,000.00 | $50,000.00 | $50,000.00 | $50,000.00 | $50,000.00 |
| **CRO** | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 |
| LEGAL-UNLAWFUL DETAINERS/COLLECTIONS | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 |
| LEGAL - BANKRUPTCY COUNSEL | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 |
| TOTALS | $ 188,353.36 | $ 188,927.56 | $ 188,353.36 | $ 189,165.82 | $ 191,039.82 | $ 189,317.22 | $ 191,039.82 | **$ 1,326,196.97** |

# EXHIBIT "5"

## EXHIBIT 5 TO DISCLOSURE STATEMENT AND PLAN

Executory Contracts and Unexpired Leases of Property Co[1]

| No. | Counterparty | Description |
|---|---|---|
| 1. | Acosta Power Sweeping Services, Inc. | Maintenance and Cleaning Services Agreement |
| 2. | AGTJ13 Manager, LLC | Limited Liability Company Agreement for AGTJ13, LLC |
| 3. | Alice Kang dba King Donkatsu | Real Property Lease |
| 4. | Athens Service | Waste Disposal Services |
| 5. | Catherine Park dba Bonjuk | Real Property Lease |
| 6. | CNP Gaju #1 and Dong Hun Yoo | Real Property Lease |
| 7. | CNP Gaju #2 and Dong Hun Yoo | Real Property Lease |
| 8. | Eden Beauty LLC | Real Property Lease |
| 9. | ELSIS LLC | Real Property Lease |
| 10. | Emerald Enterprise dba Dennis Optical | Real Property Lease |
| 11. | Gaju Market Corporation | Commercial Lease Agreement, as Amended |
| 12. | Gaju Market Corporation | Real Property Lease (Unit 201) |
| 13. | Gaju Market Corporation | Real Property Lease (Unit 204) |
| 14. | Jahyun Judy Hong dba Jungabok | Real Property Lease |
| 15. | Jay Hyung dba Donginbi | Real Property Lease |
| 16. | Jiyoung Park dba Clement | Real Property Lease |
| 17. | Ju Ma Security | Security Services Agreement |
| 18. | Kimberly Hae Sun Kim | Real Property Lease |
| 19. | Kreation Enterrpise, Inc., dba SR Hair Society | Real Property Lease |
| 20. | Kreation Enterprise, Inc., dba Etude | Real Property Lease |
| 21. | Kreation Enterprise, Inc., dba Etude Boutique | Real Property Lease |
| 22. | Marcus & Millichap Real Estate Investment Services, Inc. | Listing Agreement (expires May 30, 2024) |
| 23. | Mitsubishi Electric US Americas | Elevator/Escalator Repair/Maintenance Agreement |

---

[1] The inclusion of an agreement herein does not constitute an admission that any such agreement constitutes an executory contract or unexpired lease.  The Debtors reserve all rights to amend, modify and supplement this list.

| No. | Counterparty | Description |
|---|---|---|
| 24. | Myeong Ho Hwang dba Guardian Computer | Real Property Lease |
| 25. | Pacific Western Bank | Real Property Lease |
| 26. | Se Woon Park dba E Young Collection | Real Property Lease |
| 27. | Secured Properties Management Group, Inc./Secured Properties, Inc. | Management Agreement & Exclusive Authorization to Lease, as modified by Addendum 1 |
| 28. | T-Mobile West, LLC | Site Use Agreement |
| 29. | Tae Ub Yoon dba Yoon's Watch Co. | Real Property Lease |
| 30. | Walter Kim dba BMB Medical Group | Real Property Lease |
| 31. | Warren Wi Kim dba Ye Teahouse | Real Property Lease |

Executory Contracts and Unexpired Leases of Hold Co[2]

| No. | Counterparty | Description |
|---|---|---|
| 1. | Lafayette Jackson Sharp, IV; Kalo Avrio, LLC; and F&G Global, LLC | Operating Agreement for AGTJ13 Manager, LLC |

---

[2] The inclusion of an agreement herein does not constitute an admission that any such agreement constitutes an executory contract or unexpired lease.  The Debtors reserve all rights to amend, modify and supplement this list.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled **DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR AGTJ13, LLC AND AGTJ13 MANAGER, LLC** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 28, 2024** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Simon Aron    saron@wrslawyers.com, moster@wrslawyers.com
- Ron Bender    rb@lnbyg.com
- Marie E Christiansen    mchristiansen@vedderprice.com, ecfladocket@vedderprice.com,marie-christiansen-4166@ecf.pacerpro.com
- Krista M Enns    KEnns@beneschlaw.com, docket2@beneschlaw.com;SWolfish@beneschlaw.com;rkrueger@beneschlaw.com
- Alan Craig Hochheiser    ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com
- Elsa M Horowitz    ehorowitz@wrslawyers.com, jlee@wrslawyers.com
- Ron Maroko    ron.maroko@usdoj.gov
- David W. Meadows    david@davidwmeadowslaw.com
- Krikor J Meshefejian    kjm@lnbyg.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Gerrick Warrington    gwarrington@frandzel.com, achase@frandzel.com
- Beth Ann R. Young    bry@lnbyg.com, bry@lnbyb.com

**2.  SERVED BY UNITED STATES MAIL**:  On  **May 28, 2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 28, 2024**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ *Service **BY EMAIL** information continued on attached page*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| May 28, 2024 | Krikor J. Meshefejian | /s/ Krikor J. Meshefejian |
| *Date* | *Printed Name* | *Signature* |