1   BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
    Krista M. Enns, Cal. Bar No. 206430
2   Antonia Stabile, Cal. Bar No. 329559
3   100 Pine Street, Suite 3100
    San Francisco, California 94111
4   Telephone: 628-600-2250
    Email: kenns@beneschlaw.com
5          astabile@beneschlaw.com

6   BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
7   Kevin M. Capuzzi (*Pro Hac Vice*)
    Jacob H. Marshall (*Pro Hac Vice*)
8   Elliot M. Smith (*Pro Hac Vice*)
    1313 N. Market Street, Suite 1201
9   Wilmington, Delaware 19801
    Telephone: 302-442-7010
10  Email: kcapuzzi @beneschlaw.com
11          jmarshall@beneschlaw.com
            esmith@beneschlaw.com
12

13  Attorneys for CPIF California, LLC

14              **UNITED STATES BANKRUPTCY COURT**

15              **CENTRAL DISTRICT OF CALIFORNIA**

16                    **LOS ANGELES DIVISION**

17

| | |
|---|---|
| In re | Lead Case No.  2:24-bk-11409-SK |
| AGTJ13, LLC, a Delaware limited liability company, | Jointly administered with:<br>Case No.  2:24-bk-11412-SK |
| Debtor and Debtor in Possession. | Chapter 11 Cases |
| In re | |
| AGTJ13 Manager, LLC, a California limited liability company, | |
| Debtor and Debtor in Possession. | Date:   July 10, 2024<br>Time:   8:30 a.m.<br>Place:  Courtroom 1575<br>        255 E. Temple Street<br>        Los Angeles, CA 90012 |
| ☐ Affects All Debtors<br>☒ Affects AGTJ13, LLC only<br>☐ Affects AGTJ13 Manager only | Hon. Sandra R. Klein |

MOTION OF CPIF CALIFORNIA, LLC FOR RELIEF FROM THE AUTOMATIC STAY

**MEMORANDUM OF LAW IN SUPPORT OF CPIF CALIFORNIA, LLC'S MOTION FOR (A) RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (REAL PROPERTY), AND (B) RELIEF FROM TURNOVER UNDER 11 U.S.C. § 543 BY PREPETITION RECEIVER OR OTHER CUSTODIAN**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 2

    1.   The Loan, the Senior Loan, and the Debtor's Defaults .................................... 2

    2.   Brief Description of the Property and Its Vacancies ........................................ 5

    3.   The Defaults and Prepetition Enforcement Actions ........................................ 5

    4.   The Chapter 11 Cases, Leading Up to Filing of the Plan ................................ 8

    5.   The Debtors' Plan of Reorganization ............................................................. 9

JURISDICTION AND VENUE ............................................................................... 12

RELIEF REQUESTED .......................................................................................... 13

ARGUMENT.......................................................................................................... 13

  I.   Stay Relief Is Appropriate Under § 362(d)(3)(A) Because the Debtor Has Not Filed a Reasonably Confirmable Plan of Reorganization. ..................................... 14

    1.   The Plan Is Facially Deficient Because It Turns the Absolute Priority Rule Upside Down. ................................................................................................ 16

    2.   The Plan Is Patently Unconfirmable Because It Fails to Properly Treat Lender's Claims. .......................................................................................................... 17

    3.   The Plan Cannot Reasonably Be Confirmed Within a Reasonable Time Because the Plan Is Highly Speculative and Not Feasible. ............................. 18

    4.   The Plan Cannot Be Timely Confirmed Because It Lacks Disclosures Necessary for Confirmation. ......................................................................... 23

  II.   Stay Relief Is Appropriate Under § 362(d)(3)(A) Because the Proposed Plan Cannot Be Confirmed in a Reasonable time Period ........................................... 27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Archdiocese of St. Paul & Minneapolis*,
 579 B.R. 188 (Bankr. D. Minn. 2017)...................................................................... 19

*Bank of America National Trust & Savings Ass'n v. 203 N. LaSalle St. Partnership*,
 526 U.S. 434 (1999) ...................................................................................................... 17

*In re Bashas' Inc.*,
 437 B.R. 874 (Bankr. D. Ariz. 2010) ......................................................................... 20

*In re Beyond.com Corp.*,
 289 B.R. 138 (Bankr. N.D. Cal. 2003)........................................................................ 26

*In re BGM Pasadena, LLC*,
 No. 2:15-BK-27833-BB, 2016 WL 1738109, at *2 (Bankr. C.D. Cal. Apr. 27,
 2016)................................................................................................................................ 15

*In re BGM Pasadena, LLC*,
 No. 2:16-CV-03172-CAS, 2016 WL 3212243 (C.D. Cal. June 2, 2016) ........................ 15, 24

*In re CHL, LLC*,
 No. 18-00630-5-DMW, 2018 WL 3025310 (Bankr. E.D.N.C. June 14, 2018) ..................... 18

*In re Claar Cellars LLC*,
 623 B.R. 578 (Bankr. E.D. Wash. 2021)............................................................... *passim*

*In re Curiel*,
 651 B.R. 548 (B.A.P. 9th Cir. 2023)........................................................................... 21

*In re Diversified Invs. Fund XVII*,
 91 B.R. 559 (Bankr. C.D. Cal. 1988) .......................................................................... 24

*In re Gen. Teamsters, Warehousemen & Helpers Union, Loc. 890*,
 265 F.3d 869 (9th Cir. 2001)................................................................................ 16, 17

*In re Green Pharms., Inc.*,
 617 B.R. 131 (Bankr. C.D. Cal. 2020) ........................................................................ 16

*In re Heather Apartments L.P.*,
 366 B.R. 45 (Bankr. D. Minn. 2007)............................................................................... 1

*In re Islet Scis., Inc.*,
 640 B.R. 425 (Bankr. D. Nev. 2022)............................................................................ 24

*In re Las Vegas Monorail Co.*,
  462 B.R. 795 (Bankr. D. Nev. 2011)...................................................................................20

*In re Metrocraft Publishing Services Inc.*,
  39 B.R. 567 (Bankr. N.D. Ga. 1984)...................................................................................24

*In re Mountain Edge LLC*,
  No. 12-10835 T11, 2012 WL 4839784 (Bankr. D.N.M. Oct. 10, 2012) ..............................23

*In re NNN Parkway 400 26, LLC*,
  505 B.R. 277 (Bankr. C.D. Cal. 2014) ................................................................................17

*In re Olde Prairie Block Owner, LLC*,
  467 B.R. 165 (Bankr. N.D. Ill. 2012) .................................................................................20

*In re Pac. Shores Dev., Inc.*,
  No. BR 10-11351MM-11, 2011 WL 778205 (Bankr. S.D. Cal. Feb. 25, 2011)....................24

*In re Reilly*,
  71 B.R. 132 (Bankr. D. Mont. 1987)...................................................................................25

*In re River E. Plaza, LLC*,
  669 F.3d 826 (7th Cir. 2012)........................................................................................14, 15

*In re RYYZ, LLC*,
  490 B.R. 29 (Bankr. E.D.N.Y. 2013) ..........................................................................*passim*

*In re Seasons Partners, LLC*,
  439 B.R. 505 (Bankr. D. Ariz. 2010) .............................................................................19, 20

*In re Sierra-Cal*,
  210 B.R. 168 (Bankr. E.D. Cal. 1997) ................................................................................23

*In re Summit, LLC*,
  2023 WL 634174 (Bankr. C.D. Cal. Jan. 26, 2023)............................................................14

*In re Sundance Self Storage-El Dorado LP*,
  No. 10-36676-D-11, 2012 WL 8255484 (Bankr. E.D. Cal. Apr. 12, 2012) ...................19, 20

*In re Trigee Found., Inc.*,
  2013 WL 1401889, 2013 Bankr. LEXIS 1432 (Bankr. D.D.C. Apr. 8, 2013) ..... 15, 18, 23, 27

*Wiersma v. O.H. Kruse Grain & Milling* (*In re Wiersma*),
  324 B.R. 92 (B.A.P. 9th Cir. 2005), *rev'd on other grounds*, 483 F.3d 933 (9th
  Cir. 2007) ..........................................................................................................................25

*In re Windwood Heights, Inc.*,
  385 B.R. 832 (Bankr. N.D. Va. 2008)..................................................................................15

MOTION OF CPIF CALIFORNIA, LLC FOR RELIEF FROM THE AUTOMATIC STAY

**Statutes**

11 U.S.C. § 101(51B) .................................................................................................... 2

11 U.S.C. § 329 ........................................................................................................... 18

11 U.S.C. § 363 ........................................................................................................... 22

11 U.S.C. § 362 ...................................................................................................... *passim*

11 U.S.C. § 543 ........................................................................................................... i, 1

11 U.S.C. § 547 ........................................................................................................... 26

11 U.S.C. § 548 ........................................................................................................... 26

11 U.S.C. § 1122 ......................................................................................................... 18

11 U.S.C. § 1123 ......................................................................................................... 20

11 U.S.C. § 1125 .................................................................................................... 23, 24

11 U.S.C. § 1129 .................................................................................................... *passim*

28 U.S.C. § 157 ........................................................................................................... 13

28 U.S.C. § 1334 ......................................................................................................... 12

28 U.S.C. § 1408 ......................................................................................................... 13

28 U.S.C. § 1409 ......................................................................................................... 13

California Civil Code § 2938 ......................................................................................... 7

**Other Authorities**

Bankruptcy Rule 4001 .................................................................................................. 13

Bankruptcy Rule 4001(a)(3) ................................................................................... 14, 29

Bankruptcy Rule 9013 .................................................................................................. 13

General Order No. 13-05 ............................................................................................... 12

CPIF California, LLC (the "Lender"), by and through undersigned counsel, hereby submits this Memorandum of Law in support of its *Motion for (a) Relief from the Automatic Stay Under 11 U.S.C. § 362 (Real Property), and (b) Relief from Turnover Under 11 U.S.C. § 543 by Prepetition Receiver or Other Custodian*, filed concurrently herewith (the "Stay Relief Motion"). In support hereof, the Lender respectfully states as follows:

## PRELIMINARY STATEMENT

"Congress enacted 11 U.S.C. § 362(d)(3) in 1994 to fast-track single asset real estate cases." *In re RYYZ, LLC*, 490 B.R. 29, 33 (Bankr. E.D.N.Y. 2013). "[C]oncerned about the relative unfairness of lengthy delay in Chapter 11 cases involving single-asset real estate projects," Congress gave "very special deference to the mortgagee of single-asset real estate" cases. *In re Heather Apartments L.P.*, 366 B.R. 45, 49 (Bankr. D. Minn. 2007).

In short, if a debtor cannot pay regular debt service to its secured lenders in a single-asset real estate case, it must propose a realistically confirmable plan that does not rely on a "miracle." *In re RYYZ, LLC*, 490 B.R. at 33 (warning of debtors "[w]ith insufficient cash flow, an inability to obtain alternative financing, [and] few creditors besides the lender").

Here, the single-asset real estate Debtor, AGTJ13, LLC and its parent company have proposed such a miracle plan: even though the Debtors cannot commit to paying regular debt service to their secured lenders due to ongoing disputes with their two largest tenants, they believe they will be able to find a refinancing partner or purchaser by March 31, 2025 that will pay all creditors in full. *See* Disclosure Statement and Plan of Reorganization for AGTJ13, LLC and AGTJ13 Manager, LLC, ECF No. 131 (the "Plan").

The basis for this belief is slim: the Debtors have no appraisal, have not engaged a broker, hold no term sheets, and do not even have historical financial statements. Instead, they rely on the opinion of their indirect equity owner that the underlying property is worth $100 million. No explanation for how this number was calculated has been presented beyond stating that the valuation is "[b]ased on the rents generated by the Property, and the expenses of the Property, and the significant net operating income and cash flow generated by the Property." Plan § VII.D.

Notably, the Debtors have not generated enough cash flow to pay contract-rate debt service

to both secured lenders during the pendency of this case and are not committing to paying debt service going forward, as payments to the Lender are subject to the availability of surplus cash. And if the refinance process fails (or if the Debtors simply elect not to proceed with an available transaction), creditors have no recourse beyond their state law remedies.

The proposed Plan also has facial defects, including a violation of the absolute priority rule and a failure to reserve the right of secured lenders to credit bid in any sale process. And even if these facial deficiencies were resolved, the Debtors lack the hallmarks of a feasible plan, offering little more to creditors than a "hope certificate." *In re Claar Cellars LLC*, 623 B.R. 578, 593 (Bankr. E.D. Wash. 2021) (warning of single asset real estate plans that rely on refinance and sale processes that are not supported by evidence of "indications of interest, term sheets, or the like").

The likelihood of a swift confirmation is further diminished by how much work is left to do before the Debtors can pursue their miracle plan. A bar date has not been set, new claims are emerging, disputes with tenants are unresolved, and the Debtors are still attempting to recreate financial statements (which they promise will be filed by June 28, 2024).

After nearly four months in bankruptcy, more progress should have been made towards reorganization. The lack of financial statements and a reliable valuation of the real estate is telling. There is no meaningful probability that the proposed Plan can be confirmed, let alone confirmed as-filed in a reasonable amount of time. Given the clear instruction from Congress that deference should be provided to the secured lenders, the automatic stay should be lifted so that Lender can complete the foreclosure process it was pursuing prior to the Petition Date.

## **BACKGROUND**

*1.    The Loan, the Senior Loan, and the Debtor's Defaults*

Debtor AGTJ13, LLC (the "Borrower") is a single-asset real estate debtor under 11 U.S.C. § 101(51B). Its primary asset is an open air shopping center commonly known as the multi-tenant retail center located at 450 South Western Avenue, Los Angeles, California (the "Property").

On or about January 10, 2022, the Borrower executed and delivered to the Lender, among other loan documents, a Promissory Note (the "Note") and a Loan Agreement (as amended, the "Loan Agreement," and together with the Note and all other agreements, documents, and

instruments constituting "Loan Documents" as defined in the Loan Agreement, and all amendments thereto, the "Loan Documents") that provided the terms of a loan to the Borrower in the initial amount of $25,103,000.00 (as amended, the "Loan"). Decl. of Robert Shields in Supp. of Mot. of CPIF California, LLC for an Order Granting (A) Relief from the Automatic Stay Under 11 U.S.C. 362 (Real Property), and (B) Relief from Turnover Under 11 U.S.C. by Prepetition Receiver or Other Custodian ("Shields Declaration") ¶ 6. As security for the Loan, the Borrower granted the Lender a lien and deed of trust, as described below, in the Property. Mr. Lafayette "Jake" Jackson Sharp, IV, in his capacity as the Debtors' manager and indirect majority equity owner (the "Manager"), executed all of the Loan Documents on behalf of the Borrower and is otherwise in control of the Borrower (subject to the limited powers of the CRO appointed in this case). Mr. Sharp remains the Manager of both Debtors.

When the Borrower entered into the Loan with Lender, it also entered into a $29.8 million loan agreement with Lone Oak Fund LLC (the "Senior Lender"), creating a debt with priority over the Loan (the "Senior Loan"), and through which the Senior Lender, like the Lender, obtained a lien on substantially all assets of the Debtors. Shields Declaration ¶ 11. The Senior Lender and the Lender are parties to that certain Subordination and Intercreditor Agreement dated as of January 10, 2022 (the "Intercreditor Agreement"). *Id.* Pursuant to the Intercreditor Agreement, the Lender and the Senior Lender acknowledged that the Lender was entitled to pursue its remedies under the Loan without triggering a default of the Senior Loan, and that the Lender has "the right, but shall not have any obligation whatsoever, to cure" any defaults of the Borrower's obligations under the Senior Loan. Shields Declaration, Ex. 13 (Intercreditor Agreement) §§ 3, 4(a).

The proceeds of the Loan and Senior Loan were used, among other things, to refinance existing secured debt owing by Borrower to Lender that had previously been used by Borrower to purchase the Property.

On or about December 30, 2022, Borrower and Lender agreed to modify the Loan to increase the funds available to Borrower and provide additional time for repayment. As part of that loan modification, the principal amount of the Loan was increased to $29,190,000.00, and the maturity date was extended to July 10, 2023. Shields Declaration ¶ 6. On or about September 28, 2023, the

1   Borrower and the Lender agreed to a second modification to the Loan, pursuant to which, among

2   other things, the maturity date for the Loan was further extended to February 10, 2024. Shields

3   Declaration ¶ 6.

4        The Loan is secured by, among other things: (i) a Deed of Trust, Assignment of Leases and

5   Rents, Assignment of Contracts, Security Agreement, and Fixture Filing dated as of January 10,

6   2022, which was recorded in the Official Records of the Recorder's Office of Los Angeles County,

7   California on January 14, 2022, as Instrument No. 20220057045 (as amended by that certain First

8   Amendment to Deed of Trust, dated as of December 30, 2022 and properly recorded in the Official

9   Records of the Recorder's Office of Los Angeles County, California, on January 30, 2023, as

10  Instrument No. 20230000663, the "Deed of Trust") and (ii) an Assignment of Leases and Rents

11  dated as of January 10, 2022, which was recorded in the Official Records of the Recorder's Office

12  of Los Angeles County, California on January 14, 2022, as Instrument No. 20220057046 (as

13  amended by that certain First Amendment to Assignment of Leases and Rents dated as of December

14  30, 2022, which was recorded in the Official Records of the Recorder's Office of Los Angeles

15  County, California on January 3, 2023, as Instrument No. 20230000664, the "ALR"). Shields

16  Declaration ¶ 7.

17       As additional security for the Loan: (i) Debtor AGTJ13, LLC Manager pledged to Lender,

18  as security for the Loan, all outstanding equity of the Borrower pursuant that certain Pledge

19  Agreement dated as of January 10, 2022 (the "Pledge Agreement"); and (ii) Mr. Sharp executed the

20  Limited Recourse Guaranty (the "Guaranty") in favor of the Lender, through which he personally

21  guaranteed the Loan, with Mr. Sharp becoming fully liable for all obligations owing under the Loan

22  Documents upon certain conditions precedent occurring. Shields Declaration ¶ 8. The filing of these

23  bankruptcy cases is such a condition precedent.

24       In the absence of any defaults with respect to the Loan, the Borrower was permitted to

25  continue collecting rents but was required to deposit them into a bank account (the "Lender

26  Controlled Account") subject to that certain Deposit Account Control Agreement dated December

27  4, 2020 between the Lender and First Republic Bank (the "DACA"). Shields Declaration ¶ 9.

28

    *2.    Brief Description of the Property and Its Vacancies*

The Property is a three-story, open air retail space consisting of retail space and a 362-space parking garage. The anchor tenant at the Property is Gaju Market Corporation ("<u>Gaju</u>"), which operates as specialty grocery stores and retail space.

Pursuant to a lease agreement with Borrower, Gaju leases several spaces from the Borrower. *See* Plan Ex. 3. In addition, until November 13, 2025, Gaju has agreed to pay base rent of $4.00/sq. foot plus $1.50 CAM charges (subject to 2.5% annual increases) to backstop vacancies and non-payment of rent by other tenants, such that the Property will generate cash flow from 100% of its leasable space. *Id.* ¶ 13. Based on the rent roll attached to the Plan, this "backstop guaranty" currently covers 15.6% of the total leasable space of the Property.[1] However, Gaju has not been consistently paying the amounts owing under the vacancy guaranty during the postpetition period and a dispute exists between Gaju, the Debtors, and the Manager regarding their leasing obligations.

There is also an ongoing dispute with the Property's second largest (by rent amount) tenant, Kreation Enterprise, Inc. ("<u>Kreation</u>"). Kreation is currently in breach of its lease agreement with Borrower (*see* Plan § VII.C n.3) and leases another 16.9% of the Property. Plan Ex. 2.

In other words, while the disputed backstop guaranty provides the Borrower with a legal entitlement to rents for 100% of the Property, over 32% of the Property is vacant or subject to a non-performing lease.

    *3.    The Defaults and Prepetition Enforcement Actions*

In late 2023, Lender noticed discrepancies in the Borrower's bank statements, including, among other things, several unexplained decreases in rent deposits indicating diversion of rents and an October 13, 2023 transfer of $274,000 for "AGTJ partial loan repayment to [Jake Sharp Capital]." The Manager is "the owner of . . . Jake Sharp Capital." Plan § XV.a.3.

If accurately labeled, the October 13, 2023 transfer to an affiliate would represent a breach of the Loan Agreement, which prohibits the Borrower from incurring additional debt for borrowed

---

[1]    This is based on Exhibit 2 of the Plan, which shows Gaju Market paying $4.31/sq. foot for 12,636 of the 80,046 available square feet of leasable space at the Property.

money and from making distributions and payments to certain insiders. Shields Declaration ¶¶ 14–20. The Debtors have asserted that this payment (and others like it) was justified based upon an undocumented "line of credit" that Jake Sharp Group and Jake Sharp Capital made available to the Debtors. *See* Plan § VII.F (suggesting that such funds were necessary to provide "sufficient capital and liquidity to [Borrower]"). To date, the Debtors have not provided any documentary evidence of the existence or terms of this purported line of credit, nor have they provided evidence proving their contention that the Lender has been "aware of this arrangement since December 2020." *Id*.[2] The Debtors have confirmed that over $4,000,000 of such insider payments were made in the twelve months prior to the Petition Date, despite all such payments being prohibited by the Loan Documents. Official Form 207, Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy §§ 4.2, 4.5, ECF No. 25 (showing transfers of $3,429,556.00 to Jake Sharp Capital and of $1,749,000.000 to Jake Sharp Group, each for "Loan repayments").

After the Borrower refused to provide additional information about the October 13, 2023 payment, Lender delivered a Notice of Default and Reservation of Rights dated November 13, 2023 (the "November 13 Default Notice"), notifying the Borrower of the defaults and Events of Default under the Loan Documents and accelerating repayment of the Loan. Shields Declaration ¶ 15. In response to the unexplained discrepancies, and to protect its collateral, Lender sent the Notice of Exclusive Control (the "DACA Notice") to First Republic Bank on November 14, 2023, by which it gained control of the DACA account. Shields Declaration ¶ 16.

When the Borrower continued to refuse to cooperate regarding the absent funds, Lender sent a second notice of default, the Notice of Default, Request for Information, and Reservation of Rights, dated December 5, 2023 (the "December 5 Default Notice"). Among other things, the December 5 Notice of Default identified additional defaults regarding the Borrower's obligations to

---

[2] Indeed, the idea that Lender was aware of this purported arrangement is undermined by the fact that the "line of credit" was not disclosed on the schedules of the Loan Documents as part of the negotiation and execution of the Loan Agreement in 2022. If this arrangement were actually uncontroversial and understood by all parties, there would be no reason not to disclose the line of credit in the Loan Documents. Instead, the Borrower warranted that it did not have any undisclosed "material liability, contingent or otherwise." Shields Declaration, Ex. 2 § 3.1.12.

market and sell the Subject Property to provide for repayment of the accelerated Loan and requested a budget so that Lender could release funds from the Lender Controlled Account to fund expenses at the Property. Shields Declaration ¶ 18. In particular, the December 5 Default Notice noted that the Debtors had failed to provide the Lender with the opportunity to review and approve of any brokerage agreement, as required under the Loan Documents. Shields Declaration, Ex. 18. The Debtors do not contest the facts of this default, stating that, "the Second CPIF Modification provides that CPIF's review and approval of the brokerage 'shall not be unreasonably withheld, conditioned or delayed,'" which is irrelevant when the review process was altogether circumvented. *See* Plan at 20 n.1.

Prior to the Petition Date, the Debtors never provided a budget or a list of expenses to be paid out of the Lender Controlled Account, other than communications relating to the release of debt service to the Senior Lender. Pursuant to the Intercreditor Agreement, the Lender exercised its right to cure the Borrower's default under the Senior Loan. Shields Declaration ¶ 13.

On January 9, 2024, Lender filed a Verified Complaint for Specific Performance to Enforce Terms and Provisions of an Assignment of Leases and Rents, Appointment of Receiver, and Injunctive Relief in the Superior Court of the State of California, Case No.: 24STCV00589 (the "State Court Action"). Shields Declaration ¶ 21.

Instead of working with its lenders, in response to the State Court Action, Borrower doubled down on its defaults and refused to pay the debt service due to Senior Lender on February 10, 2024. Lender notified the Borrower of the Events of Default caused by this non-payment by letter dated February 22, 2024.  Shields Declaration ¶ 12.

Lender also began enforcing its rights as the assignee of rents under the recorded ALR. Shields Declaration ¶ 23. Specifically, on January 12, 2024, the Lender sent the Borrower, Mr. Sharp, and the Borrower's property manager a Demand to Turn Over Rents Pursuant to § 2938 of the California Civil Code and the Assignment of Leases and Rents, and it sent Gaju a Demand to Pay Rent to Party Other Than Landlord (Section 2938 of the Civil Code). Shields Declaration ¶¶ 23–24. Unfortunately, the Borrower refused to comply with the Loan Documents and did not turn over rents, and a representative from Gaju later informed the Lender that Mr. Sharp had instructed

1    him to disregard communications with the Lender. Lender continues to maintain that rents are no

2    longer part of the Debtors' estates due to its prepetition enforcement action under the ALR. *See*

3    Joshua Park Decl., Mot. of CPIF California, LLC for the Appointment of a Chapter 11 Trustee, Ex.

4    A, ECF No. 18.

5         On January 23, 2024, the Lender filed a Motion for Order Appointing Receiver and for

6    Preliminary Injunction (the "Receiver Motion") in the State Court Action, which was scheduled to

7    be heard on February 27, 2024. Shields Declaration ¶ 22. Senior Lender eventually joined the

8    Receiver Motion but proposed an alternative receiver (Mr. Kevin Singer, who now serves as CRO

9    of the Debtors).

10        *4.    The Chapter 11 Cases, Leading Up to Filing of the Plan*

11        On February 26, 2024 (the "Petition Date"), the day before the hearing date for the Lender's

12    Receiver Motion in the State Court Action, the Debtors commenced these chapter 11 cases, filing

13    the Borrower's case as a single asset real estate case. Shields Declaration ¶ 22. The Borrower's case

14    was a bare-bones filing without any first day motions, schedules of assets and liabilities or statement

15    of financial affairs, any motion to use cash collateral or obtain financing for the case, or any other

16    substantive filing.[3] With only a handful of scheduled unsecured claims and only two secured

17    creditors, both of whom had filed support for the appointment of a receiver in the State Court Action,

18    the Borrower's case was barely more than a two-party dispute between it and its similarly positioned

19    secured lenders.

20        Lender initially filed motions seeking (i) adequate protection of its interest and a finding that

21    the rents were not part of the Debtors' estate and (ii) seeking appointment of a chapter 11 trustee

22    based on, among other things, the existence of at least $4 million worth of avoidable transfers being

23    made to the Manager and Manager-associated entities in the twelve months preceding the Petition

24    Date and ongoing disputes between the Manager and the equity owners of Gaju, the anchor tenant.

25        Eventually, Lender agreed to withdraw its motions without prejudice in connection with the

26

27    _____

      [3]      Indeed, the Debtors did not obtain authority to use cash collateral until over a month

28    later on April 1, 2024, after having to file an emergency motion to use cash collateral.

appointment of Mr. Kevin Singer as the Chief Restructuring Officer (the "CRO") of the Borrower.

Likewise, Lender has consented to Borrower's use of Lender's cash collateral through August 2024, subject to the terms and conditions and the Budget set forth in that certain cash collateral order, entered June 13, 2024. ECF No. 150.

Lender's understanding from its conversations with the CRO is that refinance efforts have not yet commenced. Instead, the Debtors have primarily been engaged in negotiations with Gaju regarding disputes over the anchor tenant's amended lease, the rights of the owners of Gaju in connection with the "vacancy guarantee" related to a joint venture agreement with Manager, and trying to recreate historical financial information for the Property (since such historical information is a necessary prerequisite for a refinancing or owner-controlled sale process).

On May 28, 2024, the Debtors filed the Plan.

At this time, (i) no committee has been appointed, and (ii) no bar date has been set in these cases.

5.    *The Debtors' Plan of Reorganization*

The Debtors seek to exit bankruptcy shortly after the proposed confirmation of the Plan in order to pursue a dual track process seeking (i) a refinance of the Borrower's secured debt and (ii) a sale of the Property. However, nearly all stakeholders will be left in essentially the same or worse position as they were prepetition: the secured lenders would continue to have their state law rights curtailed—the Debtors are not proposing to cure the past defaults on the now-matured loans and Lender is not guaranteed any interest payments at a risk-based interest rate—and unsecured creditors can anticipate that no more than $70,000 of their estimated $243,000 worth of claims will be paid by March 31, 2025, with speculative and uncertain balloon payments occurring if the Debtors manage to secure takeout financing or a sale. If the refinance and sale process fails, creditors are left to fall back on their state law remedies.

Some claimants will benefit from the Plan: administrative claimants will be paid in full out of Lender's collateral on the Effective Date and the equity holders will "retain their membership interests" on the Effective Date, even if the creditors go unpaid. To summarize the proposed Plan's treatment of the various classes:

| Class | Treatment | Impaired/Unimpaired |
|---|---|---|
| Administrative Claimants | Paid in full on Effective Date | N/A |
| Class 1 – LA County Secured Tax Claim | Monthly Interest Payments at 18%; lump sum if Property sold/refinanced | Impaired |
| Class 2 – Lone Oak Secured Claim | $221,090.83 monthly interest payment; lump sum if Property sold/refinanced | Impaired |
| Class 3 – Lender's Secured Claim | Monthly payments to the extent operating cash is available; lump sum if Property sold/refinanced | Impaired |
| Class 4 – General Unsecured Creditors | Up $10,000 monthly payments per month to the extent operating cash is available; lump sum if Property sold/refinanced | Impaired |
| Equity Holders | Retention of Equity | Unimpaired |

Notably, Lender is <u>not</u> entitled to ongoing interest payments but rather will be granted periodic payments to the extent there is a surplus of operating cash. Its claim will accrue interest at the non-default contract rate.

Under the proposed Plan, the Debtors would be required to meet certain milestones to demonstrate progress in connection with the refinance and sale process. However, none of the proposed milestones guarantee any meaningful progress towards payment of the creditors, as no milestone requires any deliverables from a third-party purchaser or financing source until the March 31, 2025 outside date:

| Milestone | Deadline |
|---|---|
| Debtors identify three real estate brokers | 9/1/24 |
| Debtors retain a real estate broker | 9/30/2024 |
| Broker begins actively marketing the Property | 10/1/2024 |
| Sale or refinancing of Property must close | 3/31/25 |

Plan § XVI.A.[4]

---

[4]    While the Plan includes a January 17, 2025 deadline for third parties to "submit offers

In other words, the Debtors have proposed milestones that only require them to prepare marketing materials related to the Property; creditors have no meaningful way to cut the marketing process short even if it is failing or if cash flows from the Property deteriorate such that the Debtors cannot make the proposed monthly payments to Class 3 or 4 claimants.

If the refinance and sale process fails (or the Manager simply decides not to close on a proposed transaction), creditors are left with little recourse. Despite equity retaining its interests in the Debtors, the impaired classes of creditors will be forced to pursue their state law remedies, leaving them in the same position they were in prior to the filing of these cases, just with added interest costs and delays. There is no reason to believe that the Debtors could afford the "super-priority" administrative claims that the Lender and Senior Lender would be entitled to receive due to the failure of adequate protection in this scenario.

The proposed Plan, which also serves as a combined disclosure statement, provides very limited information regarding the likelihood of the success of the proposed sale and refinance process.

For example, the Debtors claim that secured creditors are adequately protected through a purported equity cushion provided by the Property's $100,000,000 "valuation." However, that valuation is based solely on the opinion of the Manager. Plan § VII.D. No methodology is provided (let alone any kind of cash flow analysis or analysis of sales of comparable properties) and the qualifications of the Manager are not sufficiently described to qualify him as an expert witness for purposes of establishing the value of the Property. In short, the Debtors have presented no credible evidence regarding the value of the Property to establish any equity cushion, let alone such a large equity cushion. For perspective, the Property last sold for approximately $57.5 million in December of 2020. Plan § VII.F.

Likewise, while the Debtors suggest that the Plan offers significant value over a hypothetical

_____

and deposits," the failure for any offer or deposit to be submitted would *not* be a default under the Plan. *Compare* Plan § XVI.A (deadlines "for interested parties," not the Debtors), *with* Plan § VIII.A.f (Lender may not exercise remedies so long as "Debtor remains in compliance with the terms of the Plan" or if "Debtor fails to meet any of the refinancing/sale milestones").

chapter 7 case, no information is provided that would allow creditors to evaluate the numbers presented in that liquidation analysis. No basis is provided for the assertion that a chapter 7 would result in a "fire sale" that only obtains a $70 million sale price. Plan § XIV.

Finally, the Plan provides little information regarding the financial solvency of the Debtors. No historical financial statements are currently available, so creditors are unable to compare the proposed cash flow forecasts against historical norms. Notably, there is no way to determine whether the budgeted $50,000 of monthly maintenance costs accurately reflect historical maintenance expenses, or if there are any material deferred maintenance issues to be resolved at the Property.

On the income side of the ledger, the Plan lacks meaningful information regarding the expected rents available to the Debtors. Although the Debtors have indicated that they plan to pursue eviction actions against Kreation Enterprises, rent from Kreation is still included in the cash flow budget attached to the Plan. Plan Ex. 4. Likewise, it appears that the Debtors expect Gaju to pay all its obligations under its lease, including the vacancy guarantee, despite the ongoing disputes between Gaju, on the one hand, and the Debtors and Manager, on the other hand. The Plan also lacks any information regarding the solvency of Gaju, despite Gaju representing the primary source of the Debtors' income during the sale and refinance process.[5]

The Debtors acknowledge in the Plan that significant information is missing and promise to supplement the Plan with historical financial statements for 2023 and YTD no later than June 28, 2024 (i.e., two days *after* the objection deadline to the disclosure statement). Plan § XI.

Because the Plan is not feasible, is not supported by sufficient information, has facial confirmability issues, and has no reasonable likelihood of being confirmed in its current state, Lender requests relief from the stay under 11 U.S.C. § 362(d)(3).

## **JURISDICTION AND VENUE**

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and the standing order of reference to the Bankruptcy Court provided for in General Order No. 13-05 (Reference of

---

[5]        Lender notes that, under the Gaju lease included as an exhibit to the Plan, the Debtors have the right to obtain historical financial statements from Gaju, in addition to the rights of the Debtors under the Bankruptcy Code.

1  Cases and Proceedings to the Bankruptcy Judges of the Central District of California, and Reference

2  of Appeals to the Bankruptcy Appellate Panel) dated July 1, 2013. This matter is a core proceeding

3  pursuant to 28 U.S.C. § 157. Venue for the Motion is proper in this Court pursuant to 28 U.S.C. §§

4  1408 and 1409. The statutory predicates for the relief sought are 11 U.S.C. § 362(d) and Fed. R.

5  Bankr. P. 4001 and 9013.

6  **RELIEF REQUESTED**

7      By this Motion, Lender seeks entry of an order modifying the automatic stay, to the extent

8  necessary, to permit Lender to pursue its remedies under applicable law with respect to the Property.

9  Lender respectfully requests that the Court additionally waive the 14-day stay under Bankruptcy

10  Rule 4001(a)(3).

11  **ARGUMENT**

12      In a single-asset real estate case like that of the Borrower, "cause" exists to provide relief

13  from the automatic stay for secured creditors if the debtor fails, in the first ninety days of the

14  bankruptcy case, to (i) commence making contract-rate interest payments to such secured creditor

15  and (ii) file a plan of reorganization that "has a reasonable probability of being confirmed within a

16  reasonable time. . . ." 11 U.S.C. § 362(d)(3).

17      Here, the deadline set by section 362(d)(3) passed on May 28, 2024. *See* I. Stipulation

18  Between AGTJ13, LLC, CPIF California, LLC, and Loan Oak Fund, LLC Regarding Deadline

19  Under 11 U.S.C. § 362(d)(3) to file Plan or Commence Monthly Payments, ECF No. 125. The

20  Borrower has not commenced making regular debt service payments to Lender or Senior Lender.

21  Thus, to the extent the proposed Plan cannot be confirmed in a reasonable time or to the extent the

22  Plan is unlikely to be confirmed at all, the stay must be modified to provide relief to Lender. *See* 11

23  U.S.C. § 362(d)(3) (noting that the court "shall grant relief" if cause exists).

24      Here, relief from the automatic stay is necessary because the Debtors have not filed a

25  feasible, reasonably confirmable plan of reorganization: not only does it include a blatant violation

26  of the absolute priority rule but also it does not provide any of the hallmarks of a feasible "toggle

27  plan," as the Debtors have not obtained any financing sources or term sheets, or even an appraisal.

28  Moreover, even if the Plan were feasible and confirmable (it is not), it is unclear that the Debtors

MOTION OF CPIF CALIFORNIA, LLC FOR RELIEF FROM THE AUTOMATIC STAY

can confirm the Plan in a reasonable amount of time: given that Lender intends to object to the Plan, the Debtors will need to pursue a cramdown but no accepting impaired class has been identified. Given that (i) a bar date has not yet been set, and (ii) the Debtors lack historical financial statements such that the universe of unsecured claims can be reliably estimated, the solicitation process likely needs to wait until parties better understand the universe of claimants. Indeed, new claims continue to emerge, such as the priority tax claim, Claim 3, filed on June 17, 2024 against AGTJ13 Manager, LLC, the day before this Motion was filed. The Debtors will also need to obtain an appraisal and further provide necessary information to round out the disclosure statement, information that the Debtors are currently trying to rebuild from their inadequate historical books and records.

In short, the Debtors have no probability of timely confirming the Plan as filed, and Lender should be given relief from the automatic stay. In light of the delay these chapter 11 cases have already imposed on the pending State Court Action, Lender respectfully submits that waiver of the 14-day stay under Bankruptcy Rule 4001(a)(3) is warranted in these circumstances.

## I.   STAY RELIEF IS APPROPRIATE UNDER § 362(d)(3)(A) BECAUSE THE DEBTOR HAS NOT FILED A REASONABLY CONFIRMABLE PLAN OF REORGANIZATION.

Under section 362(d)(3)(A), the debtor bears the burden to show that the plan filed has a reasonable probability of meeting the confirmation criteria listed in Section 1129 of the Bankruptcy Code in a reasonable amount of time. 11 U.S.C. § 362(g); *see In re Summit, LLC*, 2023 WL 634174 (Bankr. C.D. Cal. Jan. 26, 2023) (placing the burden of proof on the debtor).

Though "the debtor's burden is less onerous under Section 362(d)(3)(A) than it is at confirmation," and "[a] mini-confirmation hearing is not required," the proposed plan "together with the evidence and the debtor's arguments, must delineate a credible path to reorganization" or else relief from the stay must be granted. *In re RYYZ, LLC*, 490 B.R. at 37. Consistent with the statutory purpose of providing for streamlined administration of single asset real estate cases, the proposed plan should provide a quick and efficient resolution to the case. *See In re River E. Plaza, LLC*, 669 F.3d 826, 828 (7th Cir. 2012) ("[T]he Bankruptcy Code directs speedy resolution of single asset real estate bankruptcies."); *In re RYYZ, LLC*, 490 B.R. at 33 ("Congress enacted 11 U.S.C. § 362(d)(3)

in 1994 to fast-track single asset real estate cases."). "The purpose of section 362(d)(3) is to 'ensure that the automatic stay provision [is] not abused' by the debtor, while also 'giving the debtor the opportunity to create a workable plan of reorganization" within ninety days.'" *In re BGM Pasadena, LLC*, No. 2:16-CV-03172-CAS, 2016 WL 3212243, at *6 (C.D. Cal. June 2, 2016) (quoting *In re Leeward Subdivision Partners, LLC*, 2010 WL 6259983, at *4 (B.A.P. 9th Cir. June 11, 2010)).

Because of the strict time limit set by section 362(d)(3), courts have limited their review to the plan as filed prior to the ninety-day deadline. *See In re Trigee Found., Inc.*, 2013 WL 1401889, at *3, 2013 Bankr. LEXIS 1432 (Bankr. D.D.C. Apr. 8, 2013) ("§ 362(d)(3) requires that . . . the debtor show a reasonable possibility of *that* plan being confirmed within a reasonable period of time" (emphasis in original)). Courts will generally disregard supplements and amendments to plans as attempts to circumvent the timing requirements of section 362(d)(3): "[u]nrealistic bare-bones" plan drafts "are insufficient to prevent the grant of relief from stay under section 362(d)(3)" when the plans proposed do not have any "realistic prospect of reorganization within a reasonable period." *In re BGM Pasadena, LLC*, 2016 WL 1738109, at *2; *In re RYYZ, LLC*, 490 B.R. at 37 (noting that "Section 362(d)(3) is not as elastic as Section 362(d)(2), and does not permit a wait-and-see approach"). Likewise, a plan filed without a sufficient disclosure statement militates against a finding that 362(d)(3)(B) has been satisfied, as the court cannot properly evaluate a plan or the timing of confirmation until the initial step—approval of a disclosure statement—is resolved. *Trigee Found.*, 2013 WL 1401889 at *3 (suggesting that a seven-month delay in before confirmation was too long).

In other words, a debtor cannot extend a case or end-run the statutory deadline through amendments and disclosures after ninety days have passed. *See In re River E. Plaza, LLC*, 669 F.3d at 833–34 (finding that relief from the automatic stay was appropriate when the debtor "compromised its credibility by submitting two plans that sought to circumvent the statute, and the 90–day deadline having expired long ago"). The plan, as filed, must present a reasonable likelihood of confirmation by demonstrating that (i) the proposed plan has a realistic chance of being confirmed and (ii) the proposed plan is not patently unconfirmable. *See In re Windwood Heights, Inc.*, 385 B.R. 832, 839 (Bankr. N.D. Va. 2008).

Here, the proposed Plan has material deficiencies that make it both patently unconfirmable and suggests that a lack of feasibility will result in the Plan not being confirmed. Thus, the Debtor is unable to meet its burden and relief from the stay should be granted.

1.    *The Plan Is Facially Deficient Because It Turns the Absolute Priority Rule Upside Down.*

It is generally understood that equity cannot retain its interest in a reorganized debtor when creditors are impaired. "Claims of equity holders are always junior to claims of both secured and unsecured creditors." *In re Gen. Teamsters, Warehousemen & Helpers Union, Loc. 890*, 265 F.3d 869, 873 (9th Cir. 2001). Because of this, "[i]f a debtor retains its interest in the estate, then the objecting class is entitled to one hundred cents on the dollar; otherwise, the plan violates the absolute priority rule." *In re Green Pharms., Inc.*, 617 B.R. 131, 136 (Bankr. C.D. Cal. 2020) (citing *Everett v. Perez* (*In re Perez*), 30 F.3d 1209, 1214 (9th Cir. 1994)).

Yet that is exactly what the proposed Plan offers: all creditors are impaired, with only an unsupported promise of future payment, yet equity will retain all of its rights in the Debtors on the Effective Date.

Specifically, it is black-letter law that an impaired class of unsecured creditors that does not accept its treatment must be provided either (i) deferred payments equal to the present value of their claim or (ii) the protection of the absolute priority rule; otherwise, the requirements for cramdown have not been met. 11 U.S.C. § 1129(b)(2)(B).

Here, the Plan does not propose any interest being paid to Class 4 creditors to ensure they receive the present value of their claim, yet equity will retain its rights on the Effective Date. Plan § IX.g–i. While it is possible that the unsecured creditors of Class 4 could accept the Plan, such acceptance is impossible to determine or predict because the full universe of unsecured creditors is currently unknown. The bar date has not yet been set, and the Debtors lack historical financial statements, meaning that the schedules cannot be relied upon as an accurate estimate of claims.[6]

---

[6]    The lack of a readily ascertainable impaired accepting class is another basis to lift the stay, as Lender intends to object to the Plan and require the Debtors to seek confirmation through cramdown. *See In re RYYZ, LLC*, 490 B.R. at 32 (citations omitted) (finding that the debtors' plan was not reasonably confirmable when they could not establish that "they can obtain acceptance of

Moreover, the Plan and disclosure statement lack any credible analysis of the value of the Property. If Lender is undersecured, it too would have standing to raise an absolute priority issue that the Plan, as currently proposed, could not overcome.[7] Alternatively, as described below, Lender asserts an unsecured claim against AGTJ13 Manager, LLC based on the Pledge Agreement executed by that Debtor. *See* Shields Declaration, Ex. 10 §§ 13, 19 (creating an obligation of AGTJ13 Manager to repay certain expenses of Lender that are separate from the definition of "Secured Obligations"). Given that the proposed Plan does not substantively consolidate the two Debtors, such claim against AGTJ13 Manager is entitled to be classified separately from Lender's secured claims, and Lender would be entitled to object to the proposed violation of the absolute priority rule on the basis of its unsecured claim.

Given that violation of the absolute priority rule is an absolute bar to confirmation, the Plan, as proposed, cannot be confirmed. Therefore, cause exists to provide relief from the automatic stay.

> 2.  *The Plan Is Patently Unconfirmable Because It Fails to Properly Treat Lender's Claims.*

As noted above, Lender holds separate claims against AGTJ13, LLC and AGTJ13 Manager, LLC, with AGTJ13 Manager agreeing to indemnify Lender for certain expenses and costs that AGTJ13, LLC may be liable for and are likely unsecured claims (i.e., AGTJ13 Manager agreed to indemnify and reimburse Lender for, among other things, enforcement costs and administrative costs related to enforcing and managing the Pledge Agreement, but such reimbursement rights are

---

their plan by at least one validly impaired class of claims").

[7] Lender notes that the Plan does not contemplate any substantial contribution by existing equity or any market-testing of the equity value as required by the Supreme Court's decision in *Bank of America National Trust & Savings Ass'n v. 203 N. LaSalle St. Partnership*, 526 U.S. 434, 457 (1999) (finding that it would be "a fatal flaw" for prepetition equity holders to retain interests "without paying full value"); *see also In re Gen. Teamsters*, 265 F.3d 869, 873 (9th Cir. 2001) ("Under the new value exception that this circuit recognizes, an equity holder may retain its interest only if it contributes sufficient new value to ensure successful reorganization."); *In re NNN Parkway 400 26, LLC*, 505 B.R. 277, 281 (Bankr. C.D. Cal. 2014) ("[I]f more (or better) could be gotten elsewhere, then the equity is effectively keeping a form of property or interest in the debtor despite not paying the dissenting creditors in full, by exercising its exclusive "option" to direct/determine the source of the new value.").

1    not defined as "Secured Obligations" secured by the pledged collateral).

2         It appears that the Plan treats Lender's claims as a single class, regardless of whether such

3    claim is secured or unsecured, and regardless of which Debtor is liable on such claim. Given that

4    the Plan does not propose to substantively consolidate the Debtors, Lender should be treated as an

5    unsecured creditor in connection with its unsecured claims against AGTJ13 Manager, LLC in any

6    plan involving AGTJ13 Manager.

7         Moreover, Lender believes that its unsecured claim against AGTJ13 Manager should be

8    separately classified from those of Class 4, since it is an independent claim against a separate legal

9    entity. To do otherwise would deprive Lender of its rights under 11 U.S.C. § 1129(b) to object to

10   the violation of the absolute priority rule described above, and it would effectively consolidate the

11   Debtors without meeting the requirements of substantive consolidation. Failure to properly

12   classify—or, failure to classify at all—each claim violates 11 U.S.C. § 1122 and makes the proposed

13   Plan patently unconfirmable. Thus, cause exists to lift the automatic stay.

14        In addition to this classification issue, the Plan also fails to preserve Lender's rights as a

15   secured creditor: under the Plan, Lender would not be entitled to credit bid at any sale,

16   notwithstanding the requirements of Section 1129(b)(2)(A). *See In re CHL, LLC*, No. 18-00630-5-

17   DMW, 2018 WL 3025310, at *4 (Bankr. E.D.N.C. June 14, 2018) (finding that a plan that proposed

18   a sale "free and clear" of the creditor's lien without providing that creditor with the option to credit

19   bid "fails to comply with 11 U.S.C. § 1129(b)(2)(A) and is not fair and equitable").

20        While ordinarily a proposed plan could be amended to resolve these issues, the requirements

21   of section 329(d)(3) are clear: the Debtors needed to propose a confirmable plan before the 90-day

22   deadline. *See Trigee Found., Inc.*, 2013 WL 1401889, at *3 (finding that "§ 362(d)(3) requires that

23   . . . the debtor show a reasonable possibility of *that* plan being confirmed within a reasonable period

24   of time" (emphasis in original)). Thus, because the Plan as filed is deficient, relief from the stay is

25   warranted.

26        3.    *The Plan Cannot Reasonably Be Confirmed Within a Reasonable Time Because the*

27   *Plan Is Highly Speculative and Not Feasible.*

28        Even assuming that this Plan could proceed to confirmation, the Debtors cannot prove that

it fulfills the necessary criteria, in particular the "linchpin" feasibility requirement that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11); *see In re Sundance Self Storage-El Dorado LP*, No. 10-36676-D-11, 2012 WL 8255484, at *8 (Bankr. E.D. Cal. Apr. 12, 2012) ("The linchpin for any plan-confirmation proceeding is a finding that the proposed plan is feasible.").

"The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promises creditors more under a proposed plan than the debtor can possibly attain after confirmation." *In re Archdiocese of St. Paul & Minneapolis*, 579 B.R. 188, 204 (Bankr. D. Minn. 2017) (citing *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1460 (10th Cir. 1985)). Hurdles to plan confirmation must be addressed in a way that provides the court with grounds to conclude (i) it is more likely than not they will be overcome, and (ii), because there is a time element, they can be overcome promptly.  *In re RYYZ, LLC*, 490 B.R. at 37; *In re Seasons Partners, LLC*, 439 B.R. 505, 515 (Bankr. D. Ariz. 2010) ("Every debtor is required to present 'ample evidence to demonstrate that the Plan has a reasonable probability of success.'" (quoting *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986)).

Feasibility is "not an overly-demanding standard" but still requires that a bankruptcy court "adopt a level-headed approach and evaluate the plan's chances based on objective facts." *In re Claar Cellars LLC*, 623 B.R. 578, 595 (Bankr. E.D. Wash. 2021) (citations omitted). The factors may relate to consideration of "several, non-exclusive factors: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." *In re Sundance Self Storage-El Dorado LP*, 2012 WL 8255484, at *9 (citing *Wiersma v. O.H. Kruse Grain & Milling (In re Wiersma)*, 324 B.R. 92, 113 (B.A.P. 9th Cir. 2005), *rev'd on other grounds*, 483 F.3d 933 (9th Cir. 2007)).

Where a plan relies on a possible sale or refinance, feasibility depends on evidence specifically indicating that the proposed refinance or sale transaction is likely to occur. *In re Claar*

1  *Cellars LLC*, 623 B.R. at 597 ("[T]he plan's reliance on a possible sale or refinance is not supported

2  by a sufficient showing that such events are likely to happen."); *In re Las Vegas Monorail Co.*, 462

3  B.R. 795, 800–01 (Bankr. D. Nev. 2011) ("[I]f refinancing is anticipated, the plan proponent has to

4  produce some credible evidence about the likelihood of that refinancing . . . ." (citations omitted));

5  *In re Seasons Partners, LLC*, 439 B.R. at 515 ("A court may not confirm a plan if its feasibility

6  depends on future refinancing, unless there is an adequate evidentiary showing that such refinancing

7  is likely to occur." (citations omitted)); *In re Bashas' Inc.*, 437 B.R. 874, 916 (Bankr. D. Ariz. 2010)

8  ("A court may not confirm a plan if its feasibility depends on future refinancing, unless there is an

9  adequate evidentiary showing that such refinancing is likely to occur."); *see also In re Sundance*

10  *Self Storage-El Dorado LP*, 2012 WL 8255484, at *9 (finding a lack of feasibility when the plan

11  depended on future financing, and "the Plan Proponents have not submitted any evidence to support

12  a finding that such a refinance or sale is reasonably likely").

13      Even when a debtor may have identified a potential investor, a lack of firm commitment

14  from the investor may still indicate that the plan is too speculative to be feasible within the meaning

15  of the statute. *See In re Olde Prairie Block Owner, LLC*, 467 B.R. 165, 171 (Bankr. N.D. Ill. 2012)

16  (finding that a plan was not feasible when "Debtor's counsel said that he expects that financing will

17  become available within the coming year" but there was "no present firm commitment from the Plan

18  Investor to make additional contributions to the Debtor's Plan").

19      *Claar Cellars* is particularly relevant. There, the debtors proposed a plan that promised to

20  pay creditors in full over a five-year time span. 623 B.R. at 590. While the debtors were hopeful

21  that improved cash flows could result in creditors being paid in full before the five-year period

22  ended, the plan also contemplated a potential refinancing or sale process. *Id.* at 591 ("The plan does

23  state that creditors will receive payments via funds from operations, asset sales, or future

24  refinancing."). However, the plan lacked any details on how such repayment would be

25  accomplished; the court found that 11 U.S.C. § 1123(a)(5) had not been met because "the plan

26  contains no trigger requiring the reorganized debtor to shift course, no firm milestones for

27  commencing or completing a sale or refinancing, and no range of sale or refinancing terms to which

28  the reorganized debtor is bound." *Id.* (noting that the secured creditor was "promised an outcome

1   but left in the dark about how the reorganized debtor will achieve that outcome").

2   Of particular concern was that "the plan's reliance on a possible sale or refinance is not

3   supported by a sufficient showing that such events are likely to happen." *Id.* at 597. The court

4   recognized that a refinancing was unlikely until the business had stabilized, and the lack of "a

5   possible refinancing counterparty, including indications of interest, term sheets, or the like" made

6   any reliance on a refinance not feasible. *Id.*; *see also In re Curiel*, 651 B.R. 548, 567 (B.A.P. 9th

7   Cir. 2023) (finding that a debtor must present "credible, concrete evidence demonstrating the

8   debtor's prospects for selling or refinancing the property" in order to achieve confirmation (citations

9   omitted)).

10   Likewise, the debtors' failure to show any progress towards a sale process rendered that

11   avenue not feasible. *In re Claar Cellars LLC*, 623 B.R. at 597 ("[N]o broker has been retained, no

12   property has been listed, and no potential buyer has been identified."). The court also questioned the

13   lack of a "'drop dead' date, deadline to begin the marketing process, or price range requiring the

14   consummation of a sale." *Id.*

15   Here, the Debtors have not provided any evidence or even description of the refinancing

16   efforts that they claim to be pursuing. Indeed, Lender's understanding is that refinancing efforts are

17   on pause while the Debtors prepare historical financial statements and attempt to stabilize rental

18   income by resolving the ongoing dispute with Gaju. *See* Plan § VII.C (describing dispute with Gaju).

19   And according to the Plan, sale efforts will not begin until *after* the Effective Date. *Id.* at XVI

20   (solicitation of refinancing to commence on or about the projected Effective Date September 1, 2024

21   and sale process on October 1, 2024).

22   Like the *Claar Cellars* debtors, the Debtors here are experiencing operational disruption and

23   do not have a clear answer for when the Property will stabilize. While it is promising that Gaju has

24   begun making payments to the Borrower for rent, no resolution has yet been achieved, and the

25   Debtors have not yet moved to assume the Gaju lease. In addition, the second largest tenant—

26   Kreation Enterprises—which, according to the Plan, pays $103,653.14 in monthly rent, will soon

27   become the subject of eviction actions. Plan § VII.C n.3 (Kreation may be served three-day pay-or-

28   quit notice); Ex. 2 (current rent roll showing Kreation's rental obligations). Once Kreation's rent is

removed from the rent roll, the Debtors project to have monthly income of only $485,670.88 against expenses of $434,607.65, with only an uncertain possibility of a backstop. *See* Plan Ex. 2 & 4 (using Exhibit 2's rent roll to project future income and taking an average monthly expense from Exhibit 4 of $190,000 and adding the proposed monthly payments to taxing authorities of $23,516.82 and Senior Lender of $221,090.83). This does not include any debt service on Lender's claim and assumes that Lender is not the proper owner of the rents generated by the Property. *See* Mot. of CPIF California, LLC for an Order Granting Adequate Protection and Prohibiting Use of Cash Collateral Pursuant to Section 363(e) of the Bankruptcy Code, ECF No. 22.[8]

The cash flow projection becomes even worse if Gaju's vacancy guaranty is removed: rental income will decrease by another $80,777.82 once Gaju's vacancy guaranty stops in November 2025 (assuming it does not terminate earlier as part of resolving the ongoing dispute between Gaju and the Debtors), meaning that the Debtors would not generate enough income to cover expenses and the proposed monthly payments under the Plan. Given those cash shortfalls, it is difficult to imagine how the Debtors will obtain financing even if Gaju pays all the amounts contemplated by the Plan, something it has not done in the past five months.

Likewise, no sale offers or stalking horse bidders have been identified. In fact, the Debtors do not currently have an appraisal or any meaningful valuation of the Property (and no employment application for an appraiser has been filed).

To make matters worse, just like the debtors in *Claar Cellars*, the Debtors have not created any drop-dead date, any guidelines that would force the Debtors to accept a sale or refinance offer, or any meaningful milestones to protect creditors. Instead, so long as the Debtors timely hire a real estate broker, creditors are stuck until March 31, 2025, regardless of any deterioration at the Property or indications from the market that the refinance and sale process is failing.

While an analysis for purposes of section 362(d)(3) does not require the Debtors to resolve all of these feasibility issues to the same extent required for confirmation, there needs to be some

---

[8]    Lender intends to reraise its argument regarding the effect of its prepetition exercise of remedies under the ALR in connection with plan confirmation.

evidence that such issues will be resolved in quick order. Instead, the Plan makes clear that the Debtors do not intend to resolve any of these issues prior to confirmation at all: the refinance and sale processes won't start until after confirmation and no appraiser or broker has even been identified (in *Claar Cellars*, a motion to employ a broker at least was pending). Moreover, there is no indication of when the issues with Gaju and Kreation will be resolved or what the resolution of those issues will mean for the projected cash flows. Given this uncertainty and the overall economic outlook for commercial real estate, it is unbelievable that the Debtors will be able to execute on the Plan.

Given the hurdles in front of the Debtors to demonstrate feasibility, and the stated intention of Debtors not to resolve those issues prior to confirmation, there is no reasonable probability that the Plan will be confirmed within a reasonable time period.

4. *The Plan Cannot Be Timely Confirmed Because It Lacks Disclosures Necessary for Confirmation.*

One of the prerequisites of confirmation is that a debtor may not solicit votes unless and until each holder of a claim or interest receives "the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b); *see In re Trigee Found., Inc.*, 2013 WL 1401889, at *1 (determining that a debtor's plan could not be found reasonably confirmable when "no disclosure statement is before the Court to assist it in making that determination" and the court could only rely upon "sketchy (as in shallow) testimony of an officer of the debtor"); *see also In re Sierra-Cal*, 210 B.R. 168, 177 (Bankr. E.D. Cal. 1997) (finding that inadequate disclosures "did not comply with applicable provisions of the Bankruptcy Code," meaning that "there has been a failure to satisfy the plan confirmation requirement specified by § 1129(a)(2), which failure independently precludes confirmation").

Put another way, a reasonably confirmable plan must include a disclosure statement or the informational equivalent, such that the court and creditors may properly assess it. *See In re Mountain Edge LLC*, No. 12-10835 T11, 2012 WL 4839784, at *4 (Bankr. D.N.M. Oct. 10, 2012) (finding a proposed plan facially unconfirmable because it did not contain, among other things, a disclosure

statement). Particularly here, where the plan and disclosure statement are not separate documents, the failure to present a plan with adequate information will necessarily require the Debtors to revise the Plan and thereby prevent confirmation of the "as filed" plan as required by 11 U.S.C. § 362(d)(3).

The necessary "adequate information" means that the debtor must provide "information of a kind, and in sufficient detail" to enable each claim or interest holder "to make an informed judgment about the plan." 11 U.S.C. §§ 1125(a)–(b). Many courts, including courts in this district, refer to the type of information that a disclosure statement might contain by referring to the factors outlined in *In re Metrocraft Publishing Services Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984), and other cases. *See, e.g.*, *In re Pac. Shores Dev., Inc.*, No. BR 10-11351MM-11, 2011 WL 778205, at *4 (Bankr. S.D. Cal. Feb. 25, 2011) (applying the *Metrocraft* factors); *In re Diversified Invs. Fund XVII*, 91 B.R. 559, 561 (Bankr. C.D. Cal. 1988) (citing *Metrocraft*). The factors include, for example, "a description of the available assets and their value," "the scheduled claims," "the actual or projected realizable value from recovery of preferential or otherwise voidable transfers," and "the relationship of the debtor with affiliates." *In re Metrocraft Publ'g Servs. Inc.*, 39 B.R. at 568; *see also In re BGM Pasadena, LLC*, 2016 WL 3212243, at *6 (finding that a plan did not have a reasonable "likelihood of confirmation" when the debtor mischaracterized the secured creditor's impaired claim as unimpaired and understated the extent of that creditor's liens). The debtor should also disclose any "information relevant to the risks posed to creditors under the debtor's plan." *In re Islet Scis., Inc.*, 640 B.R. 425, 460 (Bankr. D. Nev. 2022) (citations omitted).

Here, the Debtors have acknowledged that necessary information is currently missing from the disclosure statement: historical financial statements are necessary to understand the credibility of the Debtors' cash flow forecasts and expected expenses, but that information will not be available under June 28, 2024. Plan § XI.

In addition, the Plan lacks any meaningful information on the value of the Property, even though the entire Plan is premised on the idea that the Property is valuable enough to support a refinance or sale that will pay all creditors in full. Although section 1125(b) notes that a court "may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets," this does not mean that such information is never necessary to enable investors to make

informed judgments about a proposed plan, especially one involving proposed multimillion dollar transactions. Indeed, "a description of the available assets and their value" is one of *Metrocraft*'s many relevant factors. Here, where the crux of the Plan depends on the purported $100,000,000 value of the Property, an investor's judgment cannot fairly be informed without evidence of the Property's actual, objective market value.

Creditors are left to rely solely on the word of the Manager, who definitionally cannot supply an independent appraisal, particularly when he faces the conflict between providing an honest appraisal to stakeholders and marketing the Property to prospective lenders or purchasers. When the Plan depends upon a successful refinance or sale of the Property, any uncertainty regarding the Property's value cuts straight to the heart of the Plan, and here, there is no reason to believe that the Plan is anything more than "wholly speculative." *See In re Wiersma*, 324 B.R. at 114.

Similarly, the Plan provides no meaningful information to support its "fire sale" calculation included as a liquidation analysis. Given the $30 million difference in expected sale price, the Debtors must be required to provide some methodology or analysis to support those numbers. Otherwise, creditors cannot meaningfully evaluate the pros and cons of the proposed Plan. Indeed, where a disclosure statement includes valuations and estimates for a liquidation test that are unsupported by facts or reliable methodology renders the disclosure statement inaccurate and incapable of approval. *In re Reilly*, 71 B.R. 132, 135 (Bankr. D. Mont. 1987).

Additionally, the Debtors have provided almost no clarity as to the status of negotiations with the anchor tenant, Gaju. The Debtors' financial projections and the Property's value to potential investors both depend on assurances of Gaju's continued operation within the Property, and on Gaju's continued "backstop" of tenant rent obligations. *See In re Claar Cellars*, 623 B.R. at 597 ("Even if there is significant operational improvement, a new lender would likely be reluctant to lend until the business stabilizes and shows the improvement is sustained."). To the extent that there is any possible risk that Gaju will not perform these functions in the future, the stakeholders in these chapter 11 cases deserve to assess such risk as fully as possible. Given that Gaju's contractual obligation to provide a vacancy guaranty ends in 2025, the Debtors should provide additional information regarding efforts to either replace such guaranty or the market value of the existing

1    vacancies and the likelihood of such vacancies being filled.[9] Similar questions can be raised about

2    Kreation Enterprises, the second largest tenant by rental value, which may be subject to eviction.

3        Finally, the Debtors have obscured the extent of the Manager's interest in the Debtors and

4    the nature of the relationships between the Debtors and any affiliates. *Cf. In re Beyond.com Corp.*,

5    289 B.R. 138, 146 (Bankr. N.D. Cal. 2003) ("The disclosure statement is also deficient because it

6    utterly fails to make disclosures about management. The lack of disclosure brings into question . . .

7    the ability of the debtor to fulfill its fiduciary responsibilities . . . ."). Where, as here, the Plan

8    proposes that prepetition equity interests in the Debtors remain unaffected after emerging from

9    bankruptcy, it is imperative that creditors understand the relationship between those equity interests

10    and the individuals charged with execution of the Plan. While the Plan acknowledges that the

11    Manager is "the owner of Jake Sharp Group and Jake Sharp Capital," it fails to clearly disclose all

12    relationships between Manager and his affiliates and the Debtors.

13        As noted above, Jake Sharp Capital and Jake Sharp Group received at least $4 million of

14    *prima facie* avoidable transfers in the twelve months preceding the Petition Date.[10] While the Plan

15    makes passing mention of "numerous disputes" including "loans made by affiliates of the Debtors

16    to Property Co, and distributions and other payments made by Property [Co] to affiliates of the

17    Debtors," such a description is hardly sufficient to describe avoidance actions that could, if

18    successfully prosecuted, result in unsecured creditors being paid in full on the Effective Date.

19    Instead, as currently proposed, the Plan would result in such avoidance actions essentially

20    disappearing, as only the Manager will have the authority to direct the Debtors to sue Manager-

21    controlled entities.

22        Likewise, part of the dispute with Gaju involves the effect of the vacancy guaranty on

23

24    ───────────────────

25        [9]    Lender notes that nothing prevents Debtors from filling those vacancies while the
    Gaju guaranty is in place. The fact that those vacancies remain raises material questions about the

26    future cash flow of the Property.

27        [10]    Either the funds were transferred to insiders on account of antecedent debt, making
    them preferences under 11 U.S.C. § 547 or they were made for no consideration, making them

28    fraudulent transfers under 11 U.S.C. § 548(a)(B)(ii)(IV).

ownership of the Debtors. *See* Plan at §§ VII.C (broadly describing the Gaju dispute); XV(c) (indicating that the Plan's projections of future income rely on the assumption that "Gaju, the anchor tenant, will pay its rent and other obligations on a timely basis"); Ex. B (rent roll including the various leases held or backstopped by Gaju and Kreation). Prior to voting on the Plan, creditors should understand that resolution of the dispute with the two largest tenants will affect the Manager's equity investment in the Debtors. Given that resolution of that dispute will almost certainly determine the success of the refinance and sale process that is the heart of the Plan, understanding the additional economic interests of the Manager is crucial in order for creditors to make an informed decision about the Plan.

Given that there are material deficiencies with the information included in the Plan, Lender does not believe that the disclosure statement can be approved. The related delay will prevent the Plan from being confirmed in a reasonable time period and establishes cause to lift the stay under 11 U.S.C. § 362(d)(3).

## II. STAY RELIEF IS APPROPRIATE UNDER § 362(d)(3)(A) BECAUSE THE PROPOSED PLAN CANNOT BE CONFIRMED IN A REASONABLE TIME PERIOD

Section 362(d)(3) requires not just that the proposed Plan have a reasonable probability of being confirmed, but it also requires that the Debtors can demonstrate that it is likely that such Plan be confirmed in a reasonable amount of time. Given the strong Congressional mandate that single asset real estate cases move expeditiously, courts have found that seven months from the Petition Date (i.e., September 26, 2024 is seven months after the Petition Date) is the outer limit acceptable under 11 U.S.C. § 362(d)(3). *In re Trigee Found., Inc.*, 2013 WL 1401889, at *3 (failure to confirm plan four months after filing the plan on the 90th day of the case was too long).

As noted above, the Plan cannot be confirmed as currently constructed based on the current information available. Indeed, prior to confirmation, the Debtors will need to take the following steps:

- Finalize and provide historical financial data;
- Obtain an order setting the bar date;

- Resolve issues with Gaju; update cash flow projections based on same;

- Resolve issues with Kreation; update cash flow projections based on same;

- Engage a broker and obtain either an appraisal or a broker's opinion of value;

- Obtain term sheets or letters of interest to support the feasibility of a refinance and/or sale process; and

- Determine the effect of Lender's prepetition ALR enforcement on title to the rents generated by the Property.

Many of these items are contingent on each other: refinancing and sale term sheets are unlikely without engaging a broker, which in turn requires the Debtors to select a broker, obtain Lender and Senior Lender approval of the broker and obtain and order approving the employment of same. Likewise, any appraisal or term sheet will likely require some kind of resolution with Gaju. It strains credulity to propose that the Debtors could, within a reasonable time, achieve these requirements necessary to obtain confirmation and properly inform creditors of such developments such that creditors can make informed decisions regarding Plan voting (which likely cannot commence until *after* the bar date passes).

While the timeline to plan confirmation is swift, that is the point of 11 U.S.C. § 362(d)(3): Debtors must move expeditiously or lose the benefit of the automatic stay. The fact that the creditors are nearly four months into these chapter 11 cases but do not have reliable financial statements for the Debtors is unbelievable. It is the exact type of delay tactic that Congress was attempting to prevent when it enacted section 362(d)(3) in the first place. *See In re RYYZ, LLC*, 490 B.R. at 33–37 (discussing the legislative history and statutory design of § 362(d)(3)).

The Debtors have failed to propose a reasonably confirmable plan that can be confirmed in a reasonable amount of time. In addition to the facial defects in the Plan—including a violation of the absolute priority rule—the Debtors are not positioned to meet the feasibility requirements set by other courts in this circuit, and the Plan specifies a timeline such that they will not be in a position to meet those requirements prior to confirmation. And if they began to attempt to obtain the requisite support (such as appraisals, identification of a broker, and term sheets/letters of interest), the delay would not satisfy the time requirements of section 362(d)(3).

MOTION OF CPIF CALIFORNIA, LLC FOR RELIEF FROM THE AUTOMATIC STAY

1    Given the failures of the Debtors to move their reorganization forward during the first four

2  months of the case, the stay should be lifted so that Lender may pursue the state law remedies it was

3  nearly finished exercising on the Petition Date.

4    **WHEREFORE**, for the foregoing reasons, the Lender respectfully requests that the Court

5  grant relief from the automatic stay imposed by Bankruptcy Code § 362(a), so that it may pursue its

6  remedies under applicable law with respect to the Property, that the Court waive the 14-day stay

7  imposed by Bankruptcy Rule 4001(a)(3), and such other and further relief the Court believes is just

8  and proper based on the facts and circumstances presented here.

9

10  Dated:  June 18, 2024

11                    BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

12

13

14        By:/s/ Kevin M. Capuzzi

15        _____
          KEVIN M. CAPUZZI (*pro hac vice*)
16        KRISTA M. ENNS, Cal Bar No. 206430
          ANTONIA STABILE, Cal. Bar No. 329559
17        JACOB H. MARSHALL (*pro hac vice*)
          ELLIOT M. SMITH (*pro hac vice*)
18
          Attorneys for CPIF California, LLC
19

20

21

22

23

24

25

26

27

28

MOTION OF CPIF CALIFORNIA, LLC FOR RELIEF FROM THE AUTOMATIC STAY