BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
Krista M. Enns, Cal. Bar No. 206430
Antonia Stabile, Cal. Bar No. 329559
100 Pine Street, Suite 3100
San Francisco, California 94111
Telephone: 628-600-2250
Email: kenns@beneschlaw.com
       astabile@beneschlaw.com

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
Kevin M. Capuzzi (*Pro Hac Vice*)
Jacob H. Marshall (*Pro Hac Vice*)
Elliot M. Smith (*Pro Hac Vice*)
1313 N. Market Street, Suite 1201
Wilmington, Delaware 19801
Telephone: 302-442-7010
Email: kcapuzzi@beneschlaw.com
       jmarshall@beneschlaw.com
       esmith@beneschlaw.com

Attorneys for CPIF California, LLC

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>    AGTJ13, LLC,<br><br>           Debtor. | Case No. 2:24-bk-11409-SK<br>Chapter 11<br>Hon. Sandra R. Klein |
| In re:<br><br>    AGTJ13 Manager, LLC,<br><br>           Debtor. | Case No. 2:24-bk-11412-SK<br>Chapter 11<br>Hon. Sandra R. Klein |

**DECLARATION OF ROBERT SHIELDS IN SUPPORT OF MOTION OF CPIF CALIFORNIA, LLC FOR AN ORDER GRANTING (A) RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. 362 (REAL PROPERTY), AND (B) RELIEF FROM TURNOVER UNDER 11 U.S.C. BY <u>PREPETITION RECEIVER OR OTHER CUSTODIAN</u>**

I, Robert Shields, under penalty of perjury, hereby declare as follows:

---
**DECL. OF R. SHIELDS ISO MOTION FOR RELIEF FROM AUTOMATIC STAY**
Case Nos. 2:24-bk-11409-SK; 2:24-bk-11412-SK

1. I am Director of Underwriting for the Real Estate Lending strategy group at Columbia Pacific Advisors, an affiliate of CPIF California, LLC (the "Lender"). In that capacity, I have personal knowledge of the facts set forth herein and, if sworn as a witness, can testify competently as to the matters affirmed in this declaration.

2. I make this declaration in support of the Lender's Motion to for an order seeking relief from the automatic stay pursuant to Bankruptcy Code Section 362(d)(3) (the "Motion") filed concurrently herewith. Capitalized terms used but not otherwise defined herein shall have the meanings given in the Motion.

### A. The Debtors, Mr. Sharp, and the Subject Property

3. Debtor AGTJ13, LLC (the "Borrower") filed its case as a Chapter 11 single asset real estate case. The case was filed on the eve of a hearing in California state court to consider the appointment of a receiver over the Borrower's primary asset—a shopping center commonly known as the multi-tenant retail center located at 450 South Western Avenue, Los Angeles, California (the "Property")—which secures a $29,190,000 loan made by the Lender to the Borrower as described in greater detail below (the "Loan").

4. Mr. Sharp is the Borrower's manager, and in that capacity, he executed all of the loan documents for the Loan on behalf of the Borrower and is otherwise in control of the Borrower. Mr. Sharp is also the managing member and majority member of the Borrower's sole member, Debtor AGTJ13 Manager, LLC (the "AGTJ Manager"), and a personal guarantor for the Loan under a Limited Recourse Guaranty dated as of January 10, 2022 (the "Guaranty").

5. The anchor tenant at the Property is Gaju Market Corporation ("Gaju").

### B. The Lender's Prepetition Loan to the Borrower

6. On or about January 10, 2022, the Borrower executed and delivered to the Lender, among other loan documents, a Promissory Note (the "Note") and a Loan Agreement (the "Loan Agreement") that provided the terms of a Loan to the Borrower

in the amount of $25,103,000.00.[1] On or about December 30, 2022, the Loan was modified pursuant to an Amended and Restated Promissory Note (the "Amended Note") and a First Omnibus Modification and Reaffirmation Agreement (the "First Omnibus Agreement"), pursuant to which, among other things, the principal amount of the Loan was increased to $29,190,000.00 and the maturity date was extended to July 10, 2023. On or about September 28, 2023, the Loan was further modified pursuant to a Second Omnibus Modification and Reaffirmation Agreement (the "Second Omnibus Agreement"), pursuant to which, among other things, the maturity date for the Loan was further extended to February 10, 2024.

7. The Loan is secured by, among other things: (i) a Deed of Trust, Assignment of Leases and Rents, Assignment of Contracts, Security Agreement, and Fixture Filing dated as of January 10, 2022 (the "Deed of Trust"), which was recorded in the Official Records of the Recorder's Office of Los Angeles County, California on January 14, 2022, as Instrument No. 20220057045; (ii) an Assignment of Leases and Rents dated as of January 10, 2022 (the "ALR"), which was recorded in the Official Records of the Recorder's Office of Los Angeles County, California on January 14, 2022, as Instrument No. 20220057046; (iii) the First Amendment to Deed of Trust, dated as of December 30, 2022 (the "Amended Deed of Trust"), which was recorded in the Official Records of the Recorder's Office of Los Angeles County, California, on January 30, 2023, as Instrument No. 20230000663; and (iv) the First Amendment to Assignment of Leases and Rents dated as of December 30, 2022 (the "Amended ALR"), which was recorded in the Official Records of the Recorder's Office of Los Angeles County, California on January 3, 2023, as Instrument No. 20230000664.

---

[1] The Loan in January of 2022 was part of a refinance of a prior loan the Lender made to the Borrower in December of 2020 in the amount of $52,500,000.00 to finance the acquisition of the Property. As explained below, the balance of the prior loan was refinanced through a loan with the Borrower's current senior lender, Lone Oak Fund, LLC (the "Senior Lender") in the amount of $29,810,000.00 (the "Senior Loan").

8. As additional security for the Loan: (i) Debtor AGTJ Manager pledged to Lender, as security for the Loan, all outstanding equity of the Borrower pursuant that certain Pledge Agreement dated as of January 10, 2022 (the "Pledge Agreement"); and (ii) Mr. Sharp executed the Guaranty in favor of the Lender.

9. All rents generated from the leases at the Property were assigned to the Lender pursuant to the recorded ALR and the recorded Amended ALR. So long as the Borrower was not in default with respect to the Loan, the Borrower was permitted to continue collecting rents but was required to deposit them into a bank account (the "Lender Controlled Account") subject to that certain Deposit Account Control Agreement dated December 4, 2020 between the Lender and First Republic Bank (the "DACA").

10. True and correct copies of the Note, Loan Agreement, Amended Note, First Omnibus Agreement, Second Omnibus Agreement, Deed of Trust, ALR, Amended Deed of Trust, Amended ALR, Pledge Agreement, Guaranty, and DACA noted above are attached hereto as **Exhibits 1-12**.

### C. The Senior Debt and the Intercreditor Agreement

11. Lender's original loan to the Borrower (the "Original Loan") was in the amount of $52,500,000.00 and was made in or about December 2020. The Original Loan provided financing to acquire the Property, which was purchased out of a bankruptcy process for a purchase price of approximately $57.2 million. That original loan was refinanced in January of 2022 through: (i) the Senior Loan made by the Senior Lender; and (ii) the Loan made by the Lender. The Senior Lender, like the Lender, has a lien on substantially all assets of the Debtors. The Senior Lender and the Lender are parties to that certain Subordination and Intercreditor Agreement dated as of January 10, 2022 (the "Intercreditor Agreement"), a true and correct copy of which is attached hereto as **Exhibit 13**.

12. The Borrower stopped paying the Senior Lender in February 2024, having failed to pay the amount due to the Senior Lender on February 10, 2024, which

constituted another default under the Loan Agreement. On February 22, 2024, the Lender sent the Borrower a Notice of Protective Advance and Additional Default (the "Protective Advance Notice"), advising the Borrower of such default and of Lender's decision to make a protective advance under Section 7.7 of the Loan Agreement in the amount of $221,090.83 to pay the Borrower's outstanding and past-due payment to the Senior Lender. A true and correct copy of the Protective Advance Notice is attached hereto as **Exhibit 14**.

13. On or about December 14, 2023, the Lender released funds in the amount of $221,190.83 from the DACA to the Senior Lender. The Senior Lender has agreed not to exercise remedies with respect to the Senior Loan provided that the Senior Lender continues to receive its contract rate of interest.

### D. The Borrower's Prepetition Defaults with Respect to the Loan

14. In late 2023, the Lender noticed suspicious account activity on the Borrower's bank statements: on October 13, 2023, the Borrower made a transfer of $274,000 for "AGTJ partial loan repayment to [Jake Sharp Capital]." Not only would an insider loan of this nature be a breach of section 14.27.8 of the Loan Agreement (which prohibits the Borrower from incurring any additional debt for borrowed money), but the $274,000 repayment also violated section 14.27.7 of the Loan Agreement (which prohibits Borrower from making cash distributions and payments to its partners, members, principals, shareholders, equity holders, owners, and/or Affiliates).

15. The Borrower refused to provide additional information about this payment (which constituted an additional default due to failure to deliver financial reporting information and documentation as required by Section 14.12 and Exhibit B of the Loan Agreement), resulting in the Lender sending a Notice of Default and Reservation of Rights dated November 13, 2023 (the "November 13 Default Notice"), notifying the Borrower of the defaults and Events of Default under the Loan

1 | Documents and accelerating repayment of the Loan.[2]  A true and correct copy of the
2 | November 13 Default Notice is attached hereto as **Exhibit 15**.

16. In order to prevent further diversion of funds, the Lender also exercised its control over the DACA account by sending a Notice of Exclusive Control (the "DACA Notice") to First Republic Bank on November 14, 2024. A true and correct copy of the DACA Notice is attached hereto as **Exhibit 16**.

17. Shortly thereafter, the Lender, concerned that the Borrower may have made additional improper distributions and loans to insiders, began reconciling the Borrower's bank statements, only to identify over a million dollars of diverted funds. Based on the Lender's review, the Borrower also made multiple improper cash distributions to its partners, members, principals, shareholders, equity holders, owners and/or affiliates in violation of Section 14.27.7 of the Loan Agreement, including as follows:

- January 2023 - $10,000 (**Exhibit 17** at 3-4 (showing $110,000 in withdrawals and only $100,000 in reimbursement))
- February 2023 - $265,000 (**Exhibit 17** at 10)
- March 2023 - $395,556 (**Exhibit 17** at 16-17)
- April 2023 - $35,000 (**Exhibit 17** at 25-26 (showing $275,000 in withdrawals and only $240,000 in reimbursement))
- May 2023 - $225,000 (**Exhibit 17** at 32-33 (showing $400,000 in withdrawals and only $175,000 in reimbursement))
- June 2023 - $135,000 (**Exhibit 17** at 39-40 (showing $440,000 in withdrawals and only $305,000 in reimbursement))
- August 2023 - $50,000 (**Exhibit 17** at 46-48 (showing $300,000 in withdrawals and only $250,000 in reimbursement))
- October 2023 - $274,000 (**Exhibit 17** at 55)
- November 2023 - $60,000 (**Exhibit 17** at 62)

18. With the Borrower and Mr. Sharp refusing to return the diverted funds, on December 5, 2023, the Lender sent a second notice of default, that certain Notice of Default, Request for Information, and Reservation of Rights (the "December 5 Default Notice"), wherein the Lender, among other things, identified additional

---

[2] Even had the Loan not been accelerated, the maturity date for the Loan without acceleration was February 10, 2024.

Main Document    Page 7 of 11

defaults regarding the Borrower's obligations under Section 8 of the Second Omnibus Agreement in connection with the requirement to market and sell the Property. A true and correct copy of the December 5 Default Notice is attached hereto as **Exhibit 18**.

### E. The Borrower's Diversion of Prepetition Rents

19.  In addition to the foregoing improper cash distributions, the Borrower has also diverted rent proceeds from the Property. Throughout 2023, the rents collected and deposited into the DACA account were relatively steady with little variation month-to-month. *See* **Exhibit 17**. However, in November 2023, the rents deposited into the DACA account dropped by more than 33% from the previous month—a drop of $189,578. *See id.* at 60–62. The drop in rents deposited into the DACA account for December 2023 was even more stark. As shown by the December 2023 DACA account bank statement, Borrower diverted virtually all rents from December 2023—more than $500,000. *See id.* at 64–66.

20.  I am aware that Debtors have asserted that these purported repayments were connected to a line of credit between AGTJ13, LLC and Jake Sharp Capital and Jake Sharp Group. I was not aware of this purported arrangement and, after reviewing Lender's records, I do not believe that Lender was aware of this arrangement (to the extent it actually represents a lender/borrower agreement, which Lender cannot confirm).

### F. The Prepetition Lawsuit and Motion to Appoint Receiver

21.  On January 9, 2024, the Lender filed a Verified Complaint for Specific Performance to Enforce Terms and Provisions of an Assignment of Leases and Rents, Appointment of Receiver, and Injunctive Relief (the "Complaint"), a copy of which is attached hereto as **Exhibit 19**, in the Superior Court of the State of California, Case No.: 24STCV00589 (the "State Court Action").

22.  On January 23, 2024, the Lender filed a Motion for Order Appointing Receiver and for Preliminary Injunction (the "Receiver Motion"), which was scheduled to be heard on February 27, 2024 (the "Receiver Hearing"). The Borrower

DECL. OF R. SHIELDS ISO MOTION FOR RELIEF FROM AUTOMATIC STAY
Case Nos. 2:24-bk-11409-SK; 2:24-bk-11412-SK

Main Document    Page 8 of 11

### G. The Lender's Enforcement of the Assignment of Rents, Mr. Sharp's Intentional Interference with the Same, and Mr. Sharp's Threats and Intimidation of Gaju

23. Based on all of the Borrower's Events of Default under the Loan Agreement and other Loan Documents, the Lender began enforcing its rights under the recorded ALR and the recorded Amended ALR. Specifically, on January 12, 2024, the Lender sent the Borrower, Mr. Sharp, and the Borrower's property manager a Demand to Turn Over Rents Pursuant to § 2938 of the California Civil Code and the Assignment of Leases and Rents (the "**ALR Enforcement Demand**"), a true and correct copy of which is attached hereto as **Exhibit 20**.

24. The Lender also sent a Demand to Pay Rent to Party Other Than Landlord (Section 2938 of the Civil Code) dated January 12, 2024 to Gaju, the anchor tenant at the Property (the "**Gaju Rent Demand**"), a true and correct copy of which is attached hereto as **Exhibit 21**.

25. It was subsequently discovered, however, that Mr. Sharp instructed Gaju's corporate secretary, Mr. Park, to disregard the Gaju Rent Demand. Mr. Park submitted a sworn declaration in the State Court Action stating that he was contacted by Mr. Sharp, who demanded that Gaju pay monthly rent and Backstop obligation payments to the Borrower notwithstanding the Gaju Rent Demand because Mr. Sharp had purportedly negotiated a loan extension with the Lender and Gaju Rent Demand could safely be ignored. No such loan extension existed. Mr. Park executed a declaration to support Lender's motion for a chapter 11 trustee filed in these cases, a true and correct copy of which is attached hereto as **Exhibit 22**.

26. I note that, in the past month, Lender has been informed by representatives of the Debtors that Mr. Park no longer represents or is employed by Gaju.

DECL. OF R. SHIELDS ISO MOTION FOR RELIEF FROM AUTOMATIC STAY
Case Nos. 2:24-bk-11409-SK; 2:24-bk-11412-SK

### H. Postpetition Developments / Appointment of CRO

27. As part of resolving the Lender's motion for a chapter 11 trustee, the Debtors agreed to appoint Kevin Singer as Chief Restructuring Officer ("CRO"). Such appointment was approved by the court on May 1, 2024.

28. Lender has continued to negotiate in good faith with the Debtors regarding cash collateral usage and recently consented to the use of cash collateral through August 2024, subject to a budget and other terms.

29. Beginning on June 10, 2024, the CRO began having weekly calls with representatives of Lender and Senior Lender. Based on these discussions, Lender understands that refinance efforts have not yet commenced. Instead, the Debtors have primarily been focused on negotiating with Gaju regarding disputes over the anchor tenant's amended lease, the rights of the owners of Gaju in connection with the "vacancy guarantee" related to a joint venture agreement with Manager, and trying to recreate historical financial information for the Property. Based on my experience in commercial real estate lending, including underwriting refinacing loans to similarly positioned debtors, I believe that such historical financial information is a necessary prerequisite for a refinancing or owner-controlled sale process.

30. As part of closing the Original Loan, Lender received a copy of the joint venture agreement that governs the rights of Gaju's owners in connection with payments made under the vacancy guaranty, a true and correct copy of which is attached hereto as **Exhibit 23**.

### I. The Lender Will Not Vote to Accept the Plan as 100% of the Claims in Class 3 or as an Unsecured Creditor in Class 4

31. On May 28, 2024, the Debtors filed the Disclosure Statement and Plan of Reorganization for AGTJ13, LLC and AGTJ13 Manager, LLC (the "Plan"). The Plan places Lender's claims in a single-member class of creditors holding secured claims, Class 3, and estimated that the allowed amount of the Lender's claim would be "approximately $29,074,389.25."

32. Lender holds claims against both AGTJ13, LLC and, through the Pledge Agreement, AGTJ13 Manager, LLC. At least a portion of the claim against AGTJ13 Manager, LLC is unsecured.

33. In the proposed Plan, the Debtors do not guarantee any payment to the Lender beyond release of the funds in the DACA account, already under the Lender's control, and potentially past-due rent funds collected from Gaju. *See supra* ¶ 16. Proposed monthly payments to the Lender will consist of "net operating income available after setting aside an operating reserve . . . after taking into account monthly payments to class 1 and class 2." Plan IX.f.

34. The Plan proposes that interest will accrue on the Lender's claim at the non-default contract rate, without any adjustments to compensate the Lender for risk and in light of the Borrower's defaults and the delay of these chapter 11 cases. Prior to the Petition Date and during the pendency of these Cases, Lender's claim has been accruing interest at the default rate under the Loan Documents.

35. Lender disputes the Debtors' estimate of its claim(s), as the claim understates the extent of Lender's rights to pursue repayment, including its right to recover penalties under applicable state law based on the Debtors' lengthy, uncured defaults, and the amount of Lender's unsecured claim against Debtor AGTJ13 Manager based on its indemnification under the Pledge Agreement.

36. Accordingly, in the event that the Debtors seek confirmation of the Plan as currently filed, Lender intends to vote to reject confirmation of such Plan and would assert all of its rights to prevent confirmation of the Plan, including an argument that the treatment of Lender's claims is not fair and equitable.

37. Lender intends to assert that it holds title to the rents of the Property due to its prepetition exercise of its rights under the ALR.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of June, 2024, at Seattle, Washington.

1
2
3    _____
     Robert Shields, Declarant
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

11
**DECL. OF R. SHIELDS ISO MOTION FOR RELIEF FROM AUTOMATIC STAY**
Case Nos. 2:24-bk-11409-SK; 2:24-bk-11412-SK