1  BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
   Krista M. Enns, Cal. Bar No. 206430
2  Antonia Stabile, Cal. Bar No. 329559
3  100 Pine Street, Suite 3100
   San Francisco, California 94111
4  Telephone: 628-600-2250
   Email: kenns@beneschlaw.com
5         astabile@beneschlaw.com

6  BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
7  Kevin M. Capuzzi (*Pro Hac Vice*)
   Jacob H. Marshall (*Pro Hac Vice*)
8  Elliot M. Smith (*Pro Hac Vice*)
   1313 N. Market Street, Suite 1201
9  Wilmington, Delaware 19801
   Telephone: 302-442-7010
10 Email: kcapuzzi@beneschlaw.com
11        jmarshall@beneschlaw.com
          esmith@beneschlaw.com
12

13 Attorneys for CPIF California, LLC

14              **UNITED STATES BANKRUPTCY COURT**

15               **CENTRAL DISTRICT OF CALIFORNIA**

16                   **LOS ANGELES DIVISION**

17

| | |
|---|---|
| In re | Lead Case No. 2:24-bk-11409-SK |
| AGTJ13, LLC, a Delaware limited liability company, | Jointly administered with: Case No. 2:24-bk-11412-SK |
| Debtor and Debtor in Possession. | Chapter 11 Cases |
| In re | |
| AGTJ13 Manager, LLC, a California limited liability company, | |
| Debtor and Debtor in Possession. | |
| | Date: July 10, 2024 |
| | Time: 8:30 a.m. |
| | Place: Courtroom 1575 |
| ☒ Affects All Debtors | 255 E. Temple Street |
| ☐ Affects AGTJ13, LLC only | Los Angeles, CA 90012 |
| ☐ Affects AGTJ13 Manager only | Hon. Sandra R. Klein |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Am. Cap. Equip., LLC*,
    688 F.3d 145 (3d Cir. 2012) ................................................................................... 13

*In re Appalachian Fuels, LLC*,
    493 B.R. 1, 21 (B.A.P. 6th Cir. 2013) .................................................................... 15

*In re Arnold*,
    471 B.R. 578 (Bankr. C.D. Cal. 2012) .................................................................. 14

*Duff v. U.S. Tr. (In re* Cal. Fidelity, Inc.),
    198 B.R. 567, 571 (B.A.P. 9th Cir. 1996) ............................................................ 15

*in Re Claar Cellars LLC*,
    623 B.R. 578, 597 (Bankr. E.D. Wash. 2021) ...................................................... 22

*Comput. Task Grp., Inc. v. Brotby (In re* Brotby),
    303 B.R. 177, 193 (B.A.P. 9th Cir. 2003) ............................................................ 12

*In re Diversified Invs. Fund XVII*,
    91 B.R. 559 (Bankr. C.D. Cal. 1988) .................................................................... 16

*In re Divine Ripe, L.L.C.*,
    554 B.R. 395 (Bankr. S.D. Tex. 2016) .................................................................. 16

*In re East Redley Corp.*,
    16 B.R. 429, 430 (Bankr. E.D. Pa. 1982) ............................................................. 18

*State St. Bank v. Elmwood, Inc. (In re* Elmwood, Inc.),
    182 B.R. 845 (D. Nev. 1995) ................................................................................ 20

*In re EQK Bridgeview Plaza, Inc.*,
    No. 10-37054-SGJ-11, 2011 WL 2458068, at *2 (Bankr. N.D. Tex. June 16,
    2011) ...................................................................................................................... 13

*In re Islet Scis., Inc.*,
    640 B.R. 425 (Bankr. D. Nev. 2022) ..................................................................... 16

*In re Main St. AC, Inc.*,
    234 B.R. 771 (Bankr. N.D. Cal. 1999) .................................................................. 13

*In re Malek*,
    35 B.R. 443 (Bankr. E.D. Mich. 1983) ................................................................. 22

*In re Meldrum*,
   No. 19-14084-MKN, 2019 WL 5777652 (Bankr. D. Nev. Oct. 5, 2019) .................. 13, 17, 23

*In re Metrocraft Publ'g Servs. Inc.*,
   39 B.R. 567 (Bankr. N.D. Ga. 1984) ........................................................................ 16, 18, 22

*In re Pac. Shores Dev., Inc.*,
   No. 10-11351MM-11, 2011 WL 778205, at *4-5 (Bankr. S.D. Cal. Feb. 25,
   2011) ..................................................................................................................................... 16

*In re Reilly*,
   71 B.R. 132 (Bankr. D. Mont. 1987) .................................................................................. 18

*In re RIM Dev., LLC*,
   448 B.R. 280 (Bankr. D. Kan. 2010) ................................................................................. 14

*In re Scioto Valley Mortg. Co.*,
   88 B.R. 168, 171-72 (Bankr. S.D. Ohio 1988) ................................................................. 18

*In re Silberkraus*,
   253 B.R. 890 (Bankr. C.D. Cal. 2000) .............................................................................. 13

*Sun Valley Newspapers, Inc. v. Sun World Corp.* (*In re* Sun Valley Newspapers
   Inc.), 171 B.R. 71 (BAP 9th Cir. 1994) ............................................................................ 14

*In re Tapang*,
   No. 11-59479-ASW, 2015 WL 1815697 ........................................................................... 19

*In re Villa Diablo Assocs.*,
   156 B.R. 650 (Bankr. N.D. Cal. 1993) .............................................................................. 23

**Statutes**

11 U.S.C. § 101(51B) ............................................................................................................... 2

11 U.S.C. § 362(d)(3) ...................................................................................................... 1, 2, 8

11 U.S.C. § 547 ....................................................................................................................... 21

11 U.S.C. § 1125 ..................................................................................................................... 12

11 U.S.C. § 1129(b)(2)(B)(i) .................................................................................................. 14

Cal. Civ. Proc. Code § 2938 .................................................................................................... 7

**Other Authorities**

Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1125.03[4] (16th ed.
   2011)..................................................................................................................................... 13

Debtors' *Disclosure Statement and Plan of Reorganization for AGTJ13, LLC and
AGTJ13 Manager, LLC* ......................................................................................................... 1

## <u>TABLE OF CONTENTS</u>

Table of Authorities ........................................................................................................ i

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ........................................................ 2

    1.   The Loan, the Senior Loan, and the Debtor's Defaults ..................................... 2

    2.   Brief Description of the Property and Its Vacancies ........................................ 4

    3.   The Defaults and Prepetition Enforcement Actions ........................................ 5

    4.   The Chapter 11 Cases, Leading Up to Filing of the Plan ................................. 7

    5.   The Debtors' Plan of Reorganization ............................................................. 8

OBJECTION TO DISCLOSURE STATEMENT ............................................................ 12

I.    The Plan Ignores the Absolute Priority Rule and is Patently Unconfirmable. ............... 13

II.   The Disclosure Statement Lacks Necessary Information Regarding the Value of the
        Property and the Likelihood of a Successful Sale or Refinance. ............................... 16

    1.   The Plan Lacks any Reliable Information on the Value of the Only Asset
        Available to Pay Creditors ............................................................................ 17

    2.   The Plan Does Not Clearly Explain What Happens After a Default ................ 20

    3.   The Plan Fails to Inform Creditors that Other Assets—Namely, $4 Million in
        Preference Actions—Exist that Could be Monetized for their Benefit ........................ 21

    4.   The Plan Requires a Stabilized Property to Consummate a Refinance or Sale
        Process, but Fails to Explain When or How the Property Will Be Stabilized ................ 22

1

2    **OBJECTION OF CPIF CALIFORNIA, LLC TO APPROVAL OF**

3    **THE DEBTORS' JOINT DISCLOSURE STATEMENT**

4        CPIF California, LLC (the "Lender"), by and through its undersigned counsel, hereby

5    Objects to the Debtors' *Disclosure Statement and Plan of Reorganization for AGTJ13, LLC and*

6    *AGTJ13 Manager, LLC* (respectively, "Disclosure Statement" and the "Plan" ), ECF No. 131,

7    together with the *Motion for an Order (1) Approving Disclosure Statement and Plan of*

8    *Reorganization for AGTJ13, LLC and AGTJ13 Manager, LLC; and (2) Setting Plan Solicitation*

9    *and Confirmation Procedures* (the "Approval Motion"), ECF No. 132, seeking approval of the

10   Disclosure Statement to proceed with the confirmation process. In support of this Objection, the

11   Lender respectfully states as follows:

12    **PRELIMINARY STATEMENT**

13       On the last day it could comply with 11 U.S.C. § 362(d)(3), the Debtors filed a proposed

14   plan and disclosure statement (as defined below, the "Plan") that seeks to pursue a refinance process

15   and, if that fails, a sale process for the primary asset of the Debtors: a 3-story, open air retail center

16   in Koreatown.

17       Unfortunately, the terms of the proposed plan reflect that it was a hurried attempt to comply

18   with the timeline Section 362(d)(3) sets for single-asset real estate debtors. The proposed plan

19   ignores the legal separateness of the two co-debtors and ignores the absolute priority rule by

20   allowing equity to retain its interests without paying unsecured creditors the present value of their

21   claims.

22       As such, the Plan is patently unconfirmable and approval of the Disclosure Statement should

23   be denied.

24       Moreover, the combined Plan and Disclosure Statement lack adequate information necessary

25   for claimants to properly evaluate the likelihood of success of the Plan. The heart of the Plan is

26   monetizing the real property of Debtor AGTJ13, LLC, but the Plan lacks any meaningful discussion

27   regarding what the property is worth. Instead, the Plan includes an unsubstantiated and unsupported

28   estimate that the property is worth at least $100 million. Without further disclosures on how such

amount was calculated, such estimated value is misleading and the solicitation process should not move forward without additional information regarding the value of the Property and what factors could deteriorate that value.

Likewise, the Plan lacks needed disclosures regarding the other assets of the estates, including the value of any avoidance actions. In their schedules, the Debtors disclosed over $4 million of *prima facie* avoidable transfers to insiders, but the Plan barely addresses these potential claims.

Finally, the Plan does not adequately disclose the risk factors that could lead to a failed reorganization process. The Debtors currently have open disputes with their two largest tenants, and the "vacancy guaranty" that the Debtors rely upon to state that the property is 100% occupied will terminate in November 2025, only eight months after the deadline for a sale or refinance to close. These risks raise serious questions about the likelihood of the Debtors' success, particularly given that the Debtors have, at this point, not disclosed any appraisal, broker opinion of value, term sheets, or historical financial statements.

In short, despite the Debtors having run out of time under 11 U.S.C. § 362(d)(3), the filing of the Plan was premature and additional information is needed before creditors have adequate information to evaluate the Plan.

## **BACKGROUND AND PROCEDURAL HISTORY**

Below, Lender provides a brief background related to its lending relationship with the Debtors and its position in the Debtors' capital structure to better provide context for its objection.

*1.     The Loan, the Senior Loan, and the Debtor's Defaults*

Debtor AGTJ13, LLC (the "Borrower") is a single-asset real estate debtor under 11 U.S.C. § 101(51B). Its primary asset is an open air shopping center commonly known as the multi-tenant retail center located at 450 South Western Avenue, Los Angeles, California (the "Property").

On or about January 10, 2022, the Borrower executed and delivered to the Lender, among other loan documents, a Promissory Note (the "Note") and a Loan Agreement (as amended, the "Loan Agreement," and together with the Note and all other agreements, documents, and instruments constituting "Loan Documents" as defined in the Loan Agreement, and all amendments

thereto, the "Loan Documents") that provided the terms of a loan to the Borrower in the initial amount of $25,103,000.00 (as amended, the "Loan"). *See* Decl. of Robert Shields in Supp. of Objection of CPIF California, LLC to Approval of the Debtors' Joint Disclosure Statement ("Shields Declaration") ¶ 6. As security for the Loan, the Borrower granted the Lender a lien and deed of trust, as described below, in the Property. Mr. Lafayette "Jake" Jackson Sharp, IV, in his capacity as the Debtors' manager and indirect majority equity owner (the "Manager"), executed all of the Loan Documents on behalf of the Borrower and is otherwise in control of the Borrower (subject to the limited powers of the CRO appointed in this case). Mr. Sharp remains the Manager of both Debtors.

When the Borrower entered into the Loan with Lender, it also entered into a $29.8 million loan agreement with Lone Oak Fund LLC (the "Senior Lender"), creating a debt with priority over the Loan (the "Senior Loan"), and through which the Senior Lender, like the Lender, obtained a lien on substantially all assets of the Debtors. Shields Declaration ¶ 11. The Senior Lender and the Lender are parties to that certain Subordination and Intercreditor Agreement dated as of January 10, 2022 (the "Intercreditor Agreement"). *Id.* Pursuant to the Intercreditor Agreement, the Lender and the Senior Lender acknowledged that the Lender was entitled to pursue its remedies under the Loan without triggering a default of the Senior Loan, and that the Lender has "the right, but shall not have any obligation whatsoever, to cure" any defaults of the Borrower's obligations under the Senior Loan. Shields Declaration, Ex. 13 (Intercreditor Agreement) §§ 3, 4(a).

The proceeds of the Loan and Senior Loan were used, among other things, to refinance existing secured debt owing by Borrower to Lender that had previously been used by Borrower to purchase the Property.

The Loan is secured by, among other things: (i) a Deed of Trust, Assignment of Leases and Rents, Assignment of Contracts, Security Agreement, and Fixture Filing dated as of January 10, 2022, which was recorded in the Official Records of the Recorder's Office of Los Angeles County, California on January 14, 2022, as Instrument No. 20220057045 (as amended by that certain First Amendment to Deed of Trust, dated as of December 30, 2022 and properly recorded in the Official Records of the Recorder's Office of Los Angeles County, California, on January 30, 2023, as Instrument No. 20230000663, the "Deed of Trust") and (ii) an Assignment of Leases and Rents

dated as of January 10, 2022, which was recorded in the Official Records of the Recorder's Office of Los Angeles County, California on January 14, 2022, as Instrument No. 20220057046 (as amended by that certain First Amendment to Assignment of Leases and Rents dated as of December 30, 2022, which was recorded in the Official Records of the Recorder's Office of Los Angeles County, California on January 3, 2023, as Instrument No. 20230000664, the "ALR"). Shields Declaration ¶ 7.

As additional security for the Loan: (i) Debtor AGTJ13, LLC Manager pledged to Lender, as security for the Loan, all outstanding equity of the Borrower pursuant that certain Pledge Agreement dated as of January 10, 2022 (the "Pledge Agreement"); and (ii) Mr. Sharp executed the Limited Recourse Guaranty (the "Guaranty") in favor of the Lender, through which he personally guaranteed the Loan, with Mr. Sharp becoming fully liable for all obligations owing under the Loan Documents upon certain conditions precedent occurring. Shields Declaration ¶ 8. The filing of these bankruptcy cases is such a condition precedent.

### 2. Brief Description of the Property and Its Vacancies

The Property is a three-story, open air retail space consisting of retail space and a 362-space parking garage. The anchor tenant at the Property is Gaju Market Corporation ("Gaju"), which operates as specialty grocery stores and retail space. *See* Plan § VII.A.

Pursuant to a lease agreement with Borrower, Gaju leases several spaces from the Borrower. *See* Plan Ex. 3. In addition, until November 13, 2025, Gaju has agreed to pay base rent of $4.00/sq. foot plus $1.50 CAM charges (subject to 2.5% annual increases) to backstop vacancies and non-payment of rent by other tenants, such that the Property will generate cash flow from 100% of its leasable space. *Id.* ¶ 13. Based on the rent roll attached to the Plan, this "vacancy guaranty" currently covers 15.6% of the total leasable space of the Property.[1] However, Gaju has not been consistently paying the amounts owing under the vacancy guaranty during the postpetition period and a dispute exists between Gaju, the Debtors, and the Manager regarding their leasing obligations. Plan § VII.C.

---

[1] This is based on Exhibit 2 of the Plan, which shows Gaju Market paying $4.31/sq. foot for 12,636 of the 80,046 available square feet of leasable space at the Property.

There is also an ongoing dispute with the Property's second largest (by rent amount) tenant, Kreation Enterprise, Inc. ("<u>Kreation</u>"). Kreation is currently in breach of its lease agreement with Borrower (*see* Plan § VII.C n.3) and leases another 16.9% of the Property. Plan Ex. 2.

In other words, while the disputed backstop guaranty provides the Borrower with a legal entitlement to rents for 100% of the Property, over 32% of the Property is vacant or subject to a non-performing lease.

3.    *The Defaults and Prepetition Enforcement Actions*

In late 2023, Lender noticed discrepancies in the Borrower's bank statements, including, among other things, several unexplained decreases in rent deposits indicating diversion of rents and an October 13, 2023 transfer of $274,000 for "AGTJ partial loan repayment to [Jake Sharp Capital]." The Manager is "the owner of . . . Jake Sharp Capital." Plan § XV.a.3.

If accurately labeled, the October 13, 2023 transfer to an affiliate would represent a breach of the Loan Agreement, which prohibits the Borrower from incurring additional debt for borrowed money and from making distributions and payments to certain insiders. Shields Declaration ¶¶ 14–20. The Debtors have asserted that this payment (and others like it) was justified based upon an undocumented "line of credit" that Jake Sharp Group and Jake Sharp Capital made available to the Debtors. *See* Plan § VII.F (suggesting that such funds were necessary to provide "sufficient capital and liquidity to [Borrower]"). To date, the Debtors have not provided any documentary evidence of the existence or terms of this purported line of credit, nor have they provided evidence proving their contention that the Lender has been "aware of this arrangement since December 2020." *Id*.[2] The Debtors have confirmed that over $4,000,000 of such insider payments were made in the twelve months prior to the Petition Date, despite all such payments being prohibited by the Loan

---

[2]    Indeed, the idea that Lender was aware of this purported arrangement is undermined by the fact that the "line of credit" was not disclosed on the schedules of the Loan Documents as part of the negotiation and execution of the Loan Agreement in 2022. If this arrangement were uncontroversial and understood by all parties, there would be no reason not to disclose the line of credit in the Loan Documents. Instead, the Borrower warranted that it did not have any undisclosed "material liability, contingent or otherwise." Shields Declaration, Ex. 2 § 3.1.12.

1    Documents. Official Form 207, Statement of Financial Affairs for Non-Individuals Filing for

2    Bankruptcy §§ 4.2, 4.5, ECF No. 25 (showing transfers of $3,429,556.00 to Jake Sharp Capital and

3    of $1,749,000.000 to Jake Sharp Group, each for "Loan repayments").

4         After the Borrower refused to provide additional information about the October 13, 2023

5    payment, Lender delivered a Notice of Default and Reservation of Rights dated November 13, 2023

6    (the "November 13 Default Notice"), notifying the Borrower of the defaults and Events of Default

7    under the Loan Documents and accelerating repayment of the Loan. Shields Declaration ¶ 15. In

8    response to the unexplained discrepancies, and to protect its collateral, Lender sent the Notice of

9    Exclusive Control (the "DACA Notice") to First Republic Bank on November 14, 2023, by which

10   it gained control of the DACA account. Shields Declaration ¶ 16.

11        When the Borrower continued to refuse to cooperate regarding the absent funds, Lender sent

12   a second notice of default, the Notice of Default, Request for Information, and Reservation of

13   Rights, dated December 5, 2023 (the "December 5 Default Notice"). Among other things, the

14   December 5 Notice of Default identified additional defaults regarding the Borrower's obligations to

15   market and sell the Subject Property to provide for repayment of the accelerated Loan and requested

16   a budget so that Lender could release funds from the Lender Controlled Account to fund expenses

17   at the Property. Shields Declaration ¶ 18. In particular, the December 5 Default Notice noted that

18   the Debtors had failed to provide the Lender with the opportunity to review and approve of any

19   brokerage agreement, as required under the Loan Documents. Shields Declaration, Ex. 18. The

20   Debtors do not contest the facts of this default, stating that, "the Second CPIF Modification provides

21   that CPIF's review and approval of the brokerage 'shall not be unreasonably withheld, conditioned

22   or delayed,'" which is irrelevant when the review process was altogether circumvented. *See* Plan at

23   20 n.1.

24        On January 9, 2024, Lender filed a Verified Complaint for Specific Performance to Enforce

25   Terms and Provisions of an Assignment of Leases and Rents, Appointment of Receiver, and

26   Injunctive Relief in the Superior Court of the State of California, Case No.: 24STCV00589 (the

27   "State Court Action"). Shields Declaration ¶ 21.

28        Lender also began enforcing its rights as the assignee of rents under the recorded ALR.

Shields Declaration ¶ 23. Specifically, on January 12, 2024, the Lender sent the Borrower, Mr. Sharp, and the Borrower's property manager a Demand to Turn Over Rents Pursuant to § 2938 of the California Civil Code and the Assignment of Leases and Rents, and it sent Gaju a Demand to Pay Rent to Party Other Than Landlord (Section 2938 of the Civil Code). Shields Declaration ¶¶ 23–24. Unfortunately, the Borrower refused to comply with the Loan Documents and did not turn over rents, and a representative from Gaju later informed the Lender that Mr. Sharp had instructed him to disregard communications with the Lender. Lender continues to maintain that rents are no longer part of the Debtors' estates due to its prepetition enforcement action under the ALR. *See* Joshua Park Decl., Mot. of CPIF California, LLC for the Appointment of a Chapter 11 Trustee, Ex. A, ECF No. 18.

On January 23, 2024, the Lender filed a Motion for Order Appointing Receiver and for Preliminary Injunction (the "Receiver Motion") in the State Court Action, which was scheduled to be heard on February 27, 2024. Shields Declaration ¶ 22. Senior Lender eventually joined the Receiver Motion but proposed an alternative receiver (Mr. Kevin Singer, who now serves as CRO of the Debtors).

4.    *The Chapter 11 Cases, Leading Up to Filing of the Plan*

On February 26, 2024 (the "Petition Date"), on the eve of the hearing to appoint a receiver in the State Court Action, the Debtors commenced these chapter 11 cases, filing the Borrower's case as a single asset real estate case. Shields Declaration ¶ 22. The Borrower's case was a bare-bones filing without any first day motions, schedules of assets and liabilities or statement of financial affairs, any motion to use cash collateral or obtain financing for the case, or any other substantive filing.[3] With only a handful of scheduled unsecured claims and only two secured creditors, both of whom had filed support for the appointment of a receiver in the State Court Action, the Borrower's case was barely more than a two-party dispute between it and its similarly positioned secured lenders.

---

[3]    Indeed, the Debtors did not obtain authority to use cash collateral until over a month later on April 1, 2024, after having to file an emergency motion to use cash collateral.

Lender initially filed motions seeking (i) adequate protection of its interest and a finding that the rents were not part of the Debtors' estate and (ii) seeking appointment of a chapter 11 trustee based on, among other things, the existence of at least $4 million worth of avoidable transfers being made to the Manager and Manager-associated entities in the twelve months preceding the Petition Date and ongoing disputes between the Manager and the equity owners of Gaju, the anchor tenant.

Eventually, Lender agreed to withdraw its motions without prejudice in connection with the appointment of Mr. Kevin Singer as the Chief Restructuring Officer (the "<u>CRO</u>") of the Borrower.

Likewise, Lender has consented to Borrower's limited use of Lender's cash collateral through August 2024, subject to the terms and conditions and the Budget set forth in that certain cash collateral order, entered June 13, 2024. ECF No. 150.

Lender's understanding from its conversations with the CRO is that refinance efforts have not yet commenced. Instead, the Debtors have primarily been engaged in negotiations with Gaju regarding disputes over the anchor tenant's amended lease, the rights of the owners of Gaju in connection with the "vacancy guarantee" related to a joint venture agreement with Manager, and trying to recreate historical financial information for the Property (since such historical information is a necessary prerequisite for a refinancing or owner-controlled sale process).

On May 28, 2024, the Debtors filed the Plan.

On June 18, 2024, Lender filed a motion for relief from stay under 11 U.S.C. § 362(d)(3), arguing that the Plan did not have a reasonable likelihood of being confirmed in a reasonable time period. ECF No. 152 (the "<u>Stay Relief Motion</u>"). As part of the Stay Relief Motion, Lender raised the fact that no bar date had yet been set, making it difficult to understand the universe of claims that needed to be addressed by the Plan.

Two days after the Stay Relief Motion was filed, the Debtors moved the Court to establish a bar date. The Court granted that motion and the deadline to file proofs of claims was set for July 31, 2024 (the "<u>Bar Date</u>").

No committee has been appointed in these Cases.

5.    *The Debtors' Plan of Reorganization*

The Debtors seek to exit bankruptcy shortly after the proposed confirmation of the Plan in

OBJECTION OF CPIF CALIFORNIA, LLC TO THE DEBTORS' DISCLOSURE STATEMENT

order to pursue a dual track process seeking (i) a refinance of the Borrower's secured debt and (ii) a sale of the Property. However, nearly all stakeholders will be left in essentially the same or worse position as they were prepetition: the secured lenders would continue to have their state law rights curtailed—the Debtors are not proposing to cure the past defaults on the now-matured loans and Lender is not guaranteed any interest payments at a risk-based interest rate—and unsecured creditors can anticipate that no more than $70,000 of their estimated $243,000 worth of claims will be paid by March 31, 2025, with speculative and uncertain balloon payments occurring if the Debtors manage to secure takeout financing or a sale. If the refinance and sale process fails, creditors are left to fall back on their state law remedies.

Some claimants will benefit from the Plan: administrative claimants will be paid in full out of Lender's collateral on the Effective Date and the equity holders will "retain their membership interests" on the Effective Date, even if the creditors go unpaid. To summarize the proposed Plan's treatment of the various classes:

| Class | Treatment | Impaired/Unimpaired |
|---|---|---|
| Administrative Claimants | Paid in full on Effective Date | N/A |
| Class 1 – LA County Secured Tax Claim | Monthly Interest Payments at 18%; lump sum if Property sold/refinanced | Impaired |
| Class 2 – Lone Oak Secured Claim | $221,090.83 monthly interest payment; lump sum if Property sold/refinanced | Impaired |
| Class 3 – Lender's Secured Claim | Monthly payments to the extent operating cash is available; lump sum if Property sold/refinanced | Impaired |
| Class 4 – General Unsecured Creditors | Up $10,000 monthly payments per month to the extent operating cash is available; lump sum if Property sold/refinanced | Impaired |
| Equity Holders | Retention of Equity | Unimpaired |

Notably, Lender is _not_ entitled to ongoing interest payments but rather will be granted periodic payments to the extent there is a surplus of operating cash. Its claim will accrue interest at the non-default contract rate.

In addition, the Plan does not include any separate classes for creditors of AGTJ13 Manager, LLC.[4] Based on Lender's review of the Plan, the only asset available to fund distributions to creditors of AGTJ13 Manager is the equity issued by Borrower. Given that creditors of AGTJ13 Manager are structurally subordinated to creditors of Borrower, it would appear necessary to separately classify such creditors in order to avoid absolute priority issues.

Under the proposed Plan, the Debtors would be required to meet certain milestones to demonstrate progress in connection with the refinance and sale process. However, none of the proposed milestones guarantee any meaningful progress towards payment of the creditors, as no milestone requires any deliverables from a third-party purchaser or financing source until the March 31, 2025 outside date:

| Milestone | Deadline |
|---|---|
| Debtors identify three real estate brokers | 9/1/24 |
| Debtors retain a real estate broker | 9/30/2024 |
| Broker begins actively marketing the Property | 10/1/2024 |
| Sale or refinancing of Property must close | 3/31/25 |

Plan § XVI.A.[5]

In other words, the Debtors have proposed milestones that only require them to prepare marketing materials related to the Property; creditors have no meaningful way to cut the marketing process short even if it is failing or if cash flows from the Property deteriorate such that the Debtors cannot make the proposed monthly payments to Class 3 or 4 claimants.

If the refinance and sale process fails (or the Manager simply decides not to close on a

---

[4] As noted above, the Bar Date has not yet passed, but there are creditors of AGTJ13 Manager: Lender asserts an unsecured claim against AGTJ13 Manager for enforcement costs and a tax claim has been filed against AGTJ13 Manager by the California Franchise Tax Board.

[5] While the Plan includes a January 17, 2025 deadline for third parties to "submit offers and deposits," the failure for any offer or deposit to be submitted would *not* be a default under the Plan. *Compare* Plan § XVI.A (deadlines "for interested parties," not the Debtors), *with* Plan § VIII.A.f (Lender may not exercise remedies so long as "Debtor remains in compliance with the terms of the Plan" or if "Debtor fails to meet any of the refinancing/sale milestones").

proposed transaction), creditors are left with little recourse. Despite equity retaining its interests in the Debtors, the impaired classes of creditors will be forced to pursue their state law remedies, leaving them in the same position they were in prior to the filing of these cases, just with added interest costs and delays. There is no reason to believe that the Debtors could afford the "super-priority" administrative claims that the Lender and Senior Lender would be entitled to receive due to the failure of adequate protection in this scenario.

The combined Plan and disclosure statement provides very limited information regarding the likelihood of the success of the proposed sale and refinance process.

For example, the Debtors claim that secured creditors are adequately protected through a purported equity cushion provided by the Property's $100,000,000 "valuation." However, that valuation is based solely on the opinion of the Manager. Plan § VII.D. No methodology is provided (let alone any kind of cash flow analysis or analysis of sales of comparable properties) and the qualifications of the Manager are not sufficiently described to qualify him as an expert witness for purposes of establishing the value of the Property. In short, the Debtors have presented no credible evidence regarding the value of the Property to establish any equity cushion, let alone such a large equity cushion. For perspective, the Property last sold for approximately $57.5 million in December of 2020. Plan § VII.F.

Likewise, while the Debtors suggest that the Plan offers significant value over a hypothetical chapter 7 case, no information is provided that would allow creditors to evaluate the numbers presented in that liquidation analysis. No basis is provided for the assertion that a chapter 7 would result in a "fire sale" that only obtains a $70 million sale price. Plan § XIV.

Finally, the Plan provides little information regarding the financial solvency of the Debtors. No historical financial statements are currently available, so creditors are unable to compare the proposed cash flow forecasts against historical norms. Notably, there is no way to determine whether the budgeted $50,000 of monthly maintenance costs accurately reflect historical maintenance expenses, or if there are any material deferred maintenance issues to be resolved at the Property.

On the income side of the ledger, the Plan lacks meaningful information regarding the expected rents available to the Debtors. Although the Debtors have indicated that they plan to pursue

eviction actions against Kreation Enterprises, rent from Kreation is still included in the cash flow budget attached to the Plan. Plan Ex. 4. Likewise, it appears that the Debtors expect Gaju to pay all its obligations under its lease, including the vacancy guarantee, despite the ongoing disputes between Gaju, on the one hand, and the Debtors and Manager, on the other hand. The Plan also lacks any information regarding the solvency of Gaju, despite Gaju representing the primary source of the Debtors' income during the sale and refinance process.[6]

The Debtors acknowledge in the Plan that significant information is missing and promise to supplement the Plan with historical financial statements for 2023 and YTD no later than June 28, 2024 (i.e., two days *after* the objection deadline to the disclosure statement). Plan § XI.

Because the Plan is patently unconfirmable and lacks adequate information regarding critical aspects of the proposed refinance and sale process—including a reliable indication of the value of the Property—approval of the Disclosure Statement should be denied.

<u>**OBJECTION TO DISCLOSURE STATEMENT**</u>

One of the prerequisites of confirmation is that a debtor may not solicit votes unless and until each holder of a claim or interest receives "the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). Such disclosure statements must contain "'of a kind, and in sufficient detail' to enable 'a hypothetical investor of the relevant class to make an informed judgment about the plan.'" *Comput. Task Grp., Inc. v. Brotby* (*In re* Brotby), 303 B.R. 177, 193 (B.A.P. 9th Cir. 2003) (quoting *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir.1988)). The same standard applies regardless of whether a creditor ultimately votes for or against the Plan. *See Duff v. U.S. Tr.* (*In re* Cal. Fidelity, Inc.), 198 B.R. 567, 571 (B.A.P. 9th Cir. 1996) ("The purpose of a disclosure statement is to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan.").

Additionally, courts can deny approval of a disclosure statement when the associated plan is

---

[6]     Lender notes that, under the Gaju lease included as an exhibit to the Plan, the Debtors have the right to obtain historical financial statements from Gaju, in addition to the rights of the Debtors under the Bankruptcy Code.

facially deficient or otherwise patently unconfirmable, thus protecting creditors and the estate from the delay and expense of pursuing a futile confirmation process. *In re Am. Cap. Equip., LLC*, 688 F.3d 145 (3d Cir. 2012); *In re EQK Bridgeview Plaza, Inc.*, No. 10-37054-SGJ-11, 2011 WL 2458068, at *2 (Bankr. N.D. Tex. June 16, 2011) ("The court has also earlier declined to approve one disclosure statement filed by the Debtor in this case (at the urging of all of the Debtor's secured lenders), for the reason that the plan which it accompanied seemed patently unconfirmable."); *see also In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement . . . if the plan could not possibly be confirmed.").

Finally, where the universe of claims is not yet closed, courts have withheld approval of disclosure statements pending further clarity. *See In re Meldrum*, No. 19-14084-MKN, 2019 WL 5777652, at *2 (Bankr. D. Nev. Oct. 5, 2019) ("Without knowing the claims that must be addressed in a proposed Chapter 11 plan, it is puzzling at best why or even how a Chapter 11 plan would be proposed.").

Because the Debtors have proposed a patently unconfirmable Plan and have failed to provide adequate information, the Court should not permit the Plan confirmation process to continue along its current path.

## I. <u>The Plan Ignores the Absolute Priority Rule and is Patently Unconfirmable.</u>

"[W]here a plan is on its face nonconfirmable, as a matter of law, it is appropriate for the court to deny approval of the disclosure statement describing the nonconfirmable plan." *In re Silberkraus,* 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000); *see also* 7 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1125.03[4] at 1125–23 (16th ed. 2011) ("[M]ost courts will not approve a disclosure statement if the underlying plan is clearly unconfirmable on its face") (citations omitted).

Where a plan, like the Debtors' Plan, will require the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code,[7] a plan is patently unconfirmable if it violates the absolute priority

---

[7]    Lender intends to reject the Plan as a creditor of both AGTJ13 and AGTJ13 Manager,

rule. *In re Arnold*, 471 B.R. 578, 587 (Bankr. C.D. Cal. 2012). *See also In re RIM Dev., LLC*, 448 B.R. 280, 292 (Bankr. D. Kan. 2010) ("The retention by the current interest-holders of the exclusive right to retain their [equity] interest without competition or market valuation is prohibited by § 1129(b)(2)(B)(ii). This, too, renders the debtor's plan 'patently unconfirmable.'"); *Sun Valley Newspapers, Inc. v. Sun World Corp.* (*In re* Sun Valley Newspapers Inc.), 171 B.R. 71, 78 (BAP 9th Cir. 1994) (failure to satisfy the new value exception to the absolute priority rules rendered plan "unconfirmable as a matter of law" in context of stay relief motion).

To the extent that a proposed plan does not follow the requirements of Section 1129(b)(2)(B) of the Bankruptcy Code (which requires that either (i) objecting classes of unsecured creditors receive the present value of their claim or (ii) junior classes or claimants do not "receive or retain" any property on account of their claims until the objecting class if paid in full), denying approval of the disclosure statement will protect the estate from the confusion and waste of soliciting votes on an unconfirmable plan. *See In re Arnold*, 471 B.R. at 614 ("[T]he Debtors have left their interests unimpaired and propose that all property (prepetition and postposition) will revest in a revocable trust controlled by the Debtors after plan confirmation. This proposition is impermissible given that the conditions in § 1129(b)(2)(B) are not satisfied, and the court will therefore deny approval of the Amended Disclosure Statement.").

Here, the Debtors have proposed that existing equity will retain their interests in the Debtors without providing any new value and without paying unsecured creditors in full. *Contrast* Plan § XIII (noting that the Plan does not currently propose any interest for unsecured creditors) *with* 11 U.S.C. § 1129(b)(2)(B)(i) (requiring unsecured creditors to receive the present value of their claims).[8] This is a clear violation of the absolute priority rule and makes the Plan patently unconfirmable.

---

meaning that cramdown will be necessary.

[8]    Although the Plan alludes to providing general unsecured creditors with "interest to the extent required by the Court," it does not actually propose to pay unsecured creditors the present value of their claims as required by Section 1129(b)(2)(B).

This issue is compounded by the fact that the Plan fails to distinguish between claims against AGTJ13 and AGTJ13 Manager. Because AGTJ13 Manager has no material assets other than its equity investment in AGTJ13 (*see* Plan § XII), creditors at AGTJ13 Manager cannot be paid unless creditors at AGTJ13 have been paid in full, as the source of distributions to creditors of AGTJ13 Manager comes from distributions on account of the equity issued by AGTJ13:



By failing to separately classify the creditors of AGTJ13 from the creditors of AGTJ13 Manager, the Plan would permit structurally subordinated and junior creditors of AGTJ13 Manager to be paid *pari passu* with creditors of AGTJ13. Not only would this violate the absolute priority rule, but it functionally results in the substantive consolidation of AGTJ13 and AGTJ13 Manager without requiring the Debtors to satisfy the high burden required for substantive consolidation. *Cf. In re Appalachian Fuels, LLC*, 493 B.R. 1, 21 (B.A.P. 6th Cir. 2013) (recognizing that, absent substantive consolidation, a joint plan does not "merge the assets and liabilities of the debtor entities

into a unitary debtor estate, to which all holders of allowed claims are required to look for distribution.") (internal citations and quotations omitted).

Given that Lender holds an unsecured claim against AGTJ13 Manager, it would have standing to raise both the classification issue (i.e., it should be separately classified from creditors of AGTJ13, given that its claims are against a separate legal entity) and the absolute priority issue related to existing equity claimants retaining their interests in the Debtors despite unsecured creditors not receiving the present value of their claims. Given these potential objections by Lender, the Plan cannot be confirmed as currently drafted, and the approval of the Disclosure Statement should be denied until such issues are resolved.

## II.    The Disclosure Statement Lacks Necessary Information Regarding the Value of the Property and the Likelihood of a Successful Sale or Refinance.

For approval of a disclosure statement, the debtor must provide "adequate information," meaning "information of a kind, and in sufficient detail" to enable each claimant or interest holder "to make an informed judgment about the plan." *Id.* §§ 1125(a)–(b). Many courts, including courts in this district, refer to the type of information that a disclosure statement might contain by referring to the factors outlined in *In re Metrocraft Publ'g. Servs., Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984), and other cases. *See, e.g., In re Pac. Shores Dev., Inc.*, No. 10-11351MM-11, 2011 WL 778205, at *4-5 (Bankr. S.D. Cal. Feb. 25, 2011) (applying the *Metrocraft* factors); *In re Diversified Invs. Fund XVII*, 91 B.R. 559, 561 (Bankr. C.D. Cal. 1988) (citing *In re Metrocraft Publ'g Servs. Inc.*, 39 B.R.).

These factors include: "a description of the available assets and their value," "the scheduled claims," "the actual or projected realizable value from recovery of preferential or otherwise voidable transfers," and "the relationship of the debtor with affiliates." *In re Metrocraft Publ'g Servs. Inc.*, 39 B.R. at 568. Moreover, the debtor should disclose any "information relevant to the risks posed to creditors under the debtor's plan." *In re Islet Scis., Inc.*, 640 B.R. 425, 460 (Bankr. D. Nev. 2022) (citations omitted). The estimated return to creditors under a chapter 7 liquidation is also relevant to assessment of the potential risks of a proposed plan. *See In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401 (Bankr. S.D. Tex. 2016) (indirectly citing *In re Metrocraft Publ'g. Servs., Inc.*, 39 B.R. at 567).

Here, the Debtors have acknowledged that necessary information is currently missing from

the disclosure statement: historical financial statements are necessary to understand the credibility of the Debtors' cash flow forecasts and projected expenses, but that information will not be available under June 28, 2024 (i.e., two days *after* the objection deadline for the Disclosure Statement; Lender hereby reserves the right to update or otherwise supplement its objection once it has had the opportunity to review the financial statements). Plan § XI.

In addition to the missing financial statements—which the Debtors have functionally admitted are necessary to evaluate the Plan—other critical pieces of information are missing from the Disclosure Statement. Specifically, (i) no appraisal or other reliable evidence of the Property's value is included in the Plan and Disclosure Statement, even though the Property is the sole source of creditor recovery under the Plan; (ii) the Plan and Disclosure Statement fails to accurately describe the value of any avoidance actions; and (iii) the Plan and Disclosure Statement fails to adequately describe the operational headwinds facing the Debtors and requirements for a successful sale or refinance (including any discussion of required loan-to-value ratios for a refinance).

Finally, given that the Bar Date has not yet passed (it is set for July 31, 2024), and the Debtors lack historical financial statements such that the universe of unsecured claims cannot be reliably estimated, the solicitation process likely needs to wait until parties better understand the universe of claimants and can better understand how the proceeds of a sale or refinance would flow to various creditor classes. *See In re Meldrum*, 2019 WL 5777652, at *2 (finding that "it [was] not clear how the disclosure statement can meet the adequate information standard under Section 1125(a)" when the debtors did not file the valuation for a wholly-owned entity before seeking disclosure statement approval, omitted entities from the liquidation analysis, and did not mention the governmental claims bar date). Already, the Plan is stale because a tax claimant against AGTJ13 Manager was filed after the Plan was filed.

In short, the Debtors need to provide significantly more information and a Plan better tailored to their actual financial circumstances before claimants can adequately evaluate the Plan.

*1.    The Plan Lacks any Reliable Information on the Value of the Only Asset Available to Pay Creditors*

Although section 1125(b) notes that a court "may approve a disclosure statement without a

valuation of the debtor or an appraisal of the debtor's assets," most courts will require information regarding the value of a Debtors' primary assets, especially when such assets form the core value proposition of a plan or when cramdown provisions are implicated. *See In re Reilly*, 71 B.R. 132, 134 (Bankr. D. Mont. 1987); *In re East Redley Corp.*, 16 B.R. 429, 30 (Bankr. E.D. Pa. 1982) ("Information concerning the value of property [that is "the only substantial asset of the debtor"] would, therefore, be of paramount interest to the parties voting on the plan.").

The need for accurate valuations is enhanced when the proposed plan sets forth an unsubstantiated value for such key assets. For example, the court in *In re East Redley* found that "opinions without factual support are not proper content of a disclosure statement" since creditors would be unable to evaluate the merits of the valuation opinion. 16 B.R. at 430 ("No factual basis is given to support this valuation. . . . Without information sufficient to allow parties voting on the plan the opportunity to arrive at an independent and informed judgment, the disclosure statement cannot be approved.").

Indeed, the *Metrocraft* court itself dealt with a similar issue: the disclosure statement failed to provide a valuation for material assets, including certain machinery, fixtures, and equipment. 39 B.R. at 569-70. The court found that the failure to provide such a valuation ("or an explanation why such information has not been presented") rendered at least two of its factors unmet (the "Description of the Available Assets and their Value" and the "Estimated Return to Creditors Under a Chapter 7 Liquidation factors). *Id.* at 568 ("Absent a valuation of the assets with some factual basis, and absent a concise statement addressing the prospects of a Chapter 7 liquidation, the disclosure statement does not provide adequate information as required by the Bankruptcy Code."); *see In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 171-72 (Bankr. S.D. Ohio 1988) (requiring disclosure of "all accounting and valuation methods used in the preparation of the Disclosure Statement" before approval would be granted).

Here, the Plan does not set forth any quantitative basis for the assertion that the Property is worth $100 million (or that a chapter 7 trustee would only be able to sell the Property for $70 million). While the Plan gestures towards valuation methodologies by referencing "the significant net operating income and cash flow generated by the Property," it does not explain how the amount

of the net operating income was calculated (or what the net operating income is: once Kreation's rent is removed from the rent roll and the Gaju vacancy guaranty expires, the Debtors project to have monthly income of only $404,893.06 against expenses of $434,607.65[9]), or what capitalization rate was used to come to the $100 million valuation. Given that (i) the Property is not currently generating enough cash to pay ongoing debt service to Lender and (ii) the lack of historical financial statements, it is unclear how reliable the $100 million figure is or even could be. *See In re Tapang*, No. 11-59479-ASW, 2015 WL 1815697, at * 8 (describing the Income Capitalization Approach to valuing real estate and noting expert testimony stating that the lack of financial statements makes using such approach "unfeasible").

Indeed, most valuations would likely rely on market-based rents to calculate net operating income, particularly since the vacancy guaranty of Gaju will expire in November 2025. *Cf. id.* at *4 (noting that the Income Capitalization Approach would look to potential rent "by comparison with similar properties" in addition to looking at current rent rolls). Yet no discussion of market rents is included in the Plan and Disclosure Statement, and the Debtors do not include any discussions regarding efforts to fill the existing vacancies.

Indeed, the Debtors have provided practically no meaningful information that would permit third parties to independently determine the value of the Property. Perhaps more concerning, by providing a valuation number that lacks reliable factual support, the Plan and Disclosure Statement may be misleading, as creditors may believe that the valuation, which has no methodology or disclaimer attached to, has been more thoroughly vetted than it is.

Likewise, creditors may believe that the Property generates significant positive net cash flow despite it not currently generating enough income to support ongoing debt service to its lenders at the non-default rate because the Plan states that there is significant positive net income. Absent disclosures on how the Debtors are calculating such figures and referencing creditors back to the

---

[9] Lender calculates such amounts by using the current rent roll attached as Exhibit 2 to the Plan, removing the $103,653.14 currently paid by Kreation and the $80,777.82 currently paid by Gaju in connection with the vacancy guaranty. The expense projection is an estimated average of the expenses listed in Exhibit 4 of the Plan (which does not include debt service to Lender).

OBJECTION OF CPIF CALIFORNIA, LLC TO THE DEBTORS' DISCLOSURE STATEMENT

1  source of such calculations, the Plan and Disclosure Statement have unsupported opinions that may

2  mislead creditors.

3       Moreover, the Debtors should disclose whether or not the Property has any material deferred

4  maintenance expenses or other expenses that do no appear on the proposed budget. Given the lack

5  of historical financial statements, creditors have no way of evaluating whether such risks exist as

6  they cannot compare the projected expenses against historical financial statements. *See In re State*

7  *St. Bank v. Elmwood, Inc.* (*In re* Elmwood, Inc.), 182 B.R. 845, 851 (D. Nev. 1995) (affirming

8  bankruptcy court's consideration of vacancy rates and deferred maintenance costs when evaluating

9  value of debtor's real property).

10       The Plan and Disclosure Statement's $100 million valuation (and related $70 million

11  liquidation valuation) are self-serving numbers created by the plan proponents without any factual

12  basis included in the Plan to support those numbers. They lack any description of methodology and

13  are not reasonably tied to any quantitative calculations. Under the proposed Plan, creditors are being

14  asked to rely on the value of the Property as their sole source of recovery. In order to have adequate

15  information, the Plan must include reliable information on the value of the Property and must

16  eliminate misleading opinions that are not supported by facts and recognized methodologies. Until

17  those changes have been made, the Disclosure Statement should not be approved.

18      *2.    The Plan Does Not Clearly Explain What Happens After a Default*

19       The Plan suggests that a sale will happen no later than March 31, 2025: it states definitively

20  that "a sale of the Property shall occur by not later than March 31, 2025." Plan § XV.c. However,

21  there is no mechanism in the Plan that would force the Manager to agree to sale or refinance. Put

22  another way, if no purchaser makes an offer or the Manager declines to move forward with a sale

23  or refinance, creditors cannot force a transaction.

24       The Plan states that creditors will retain their state-law rights of enforcement, but it is

25  unclear the effect of confirmation on those rights. For example, on January 23, 2024, Lender filed

26  a Notice of Default in the applicable property records to being the non-judicial foreclosure

27  procedure under California law and Lender's Deed of Trust. It is unclear whether, under the terms

28  of the Plan, Lender's Notice of Default still be valid or would Lender be required to restart the

non-judicial foreclosure process following a default under the Plan. Given the significant time difference between leveraging the existing Notice of Default and starting with a new notice of default (approximately 90 days), the Plan should more clearly describe what happens following a default under the Plan.

3. *The Plan Fails to Inform Creditors that Other Assets—Namely, $4 Million in Preference Actions—Exist that Could be Monetized for their Benefit*

Under 11 U.S.C. § 547, transfers made to insiders on account of antecedent debt in the year leading up to the petition date are *prima facie* avoidable as preferences. The Debtors here have disclosed over $4 million of such transfers with no documentary evidence provided to establish that they were made for reasonably equivalent value (which could make them avoidable as fraudulent transfers). Yet that potential source of recovery for the estates is barely mentioned in the Plan and Disclosure Statement, not even appearing as a potential source of recovery in the liquidation analysis. *See* Plan § XIV.

Once the Plan is confirmed, the likelihood that the Debtors—who will be managed by Manager, who also controls the recipients of such avoidable transfers—will pursue such claims is *de minimis*. The Plan should more clearly explain the magnitude of those potential claims, more clearly disclose the potential conflict of interest that will almost certainly prevent the Debtors from pursuing such claims, and explain whether the Debtors have performed any evaluation on whether such claims are subject to valid defenses or whether the Debtors will pursue such claims if the refinance and sale process fails (which would establish insolvency). Information regarding these transfers is also needed to understand the financial stability of the Debtors: if the transfers were truly needed to backfill liquidity shortfalls at the Property, as asserted by Debtors (*see* Plan § VII.F), then claimants need to understand such historical liquidity issues in order to evaluate the Plan's cash flow forecasts.

Absent such disclosures, the creditors lack adequate information regarding the largest unencumbered asset available to the estates and cannot possibly make an informed decision regarding the Plan.

4.  *The Plan Requires a Stabilized Property to Consummate a Refinance or Sale Process, but Fails to Explain When or How the Property Will Be Stabilized*

A key part of an approvable disclosure statement is a description of the risk factors and steps necessary to successfully complete the reorganization. *See Metrocraft*, 39 B.R. at 568; *In re Malek*, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983) (requiring disclosure related to all operational assumptions and, "[i]f the future operations contain a risk of loss of income or anticipated financial instability, the factors that may cause a loss or diminution of income should be set forth").

The Plan's success hinges entirely on a refinance and sale process. *See gen.* Plan. However, the Plan fails to discuss what that process entails and how third-party financing sources and purchasers evaluate investment opportunities in similarly situated real estate.

For example, most lenders and purchasers discount the value of a property unless it is "stabilized," or otherwise has demonstrated improved or stable financial performance for a significant time period. *See in Re Claar Cellars LLC*, 623 B.R. 578, 597 (Bankr. E.D. Wash. 2021) (noting that "a new lender would likely be reluctant to lend until the business stabilizes and shows the improvement is sustained" which could take "a few years").[10]

Here, the Debtors are currently pursuing eviction actions against the second-largest tenant at the Property, Kreation. The vacancy guaranty with Gaju has also been in dispute and will expire by its terms next November. It is unclear whether a lender or purchaser would invest in the Property given those uncertainties, particularly since the Plan lacks any meaningful discussion of where negotiations with Gaju stand or the status of the Debtors' efforts to fill any vacancies at the Property and what rental rates the Debtors believe to be achievable (and, because creditors do not have the benefit of an independent appraisal, there is no guidance on how the credit and sale markets might evaluate these factors and the uncertainty related to such disputes and vacancies). The Plan also lacks any discussion of the solvency of Gaju, the current market environment for the Property, sales of similar retail establishments, and the current lending and interest rate environment, all factors

---

[10]  Lender acknowledges that the current credit markets would not require potential borrowers to demonstrate stabilization for several years but suggests that requiring six months of stabilization would not be uncommon.

1  relevant to the potential success or failure of the Plan.

2      Further complicating the stabilization process, the anchor tenant, Gaju, appears to have an

3  indirect equity interest in the Debtors through the terms of the vacancy guaranty. The resolution of

4  Gaju's disputes with the Debtors may depend on the Manager making concessions about his

5  individual investment in the Debtors. Creditors evaluating the Plan should have sufficient

6  information to fully understand how the interplay between the Debtors, the Manager, Gaju, and the

7  other equity owners of the Debtors will affect resolution of the Gaju disputes and the timing of when

8  the Property may begin to stabilize.[11] These questions go to the heart of whether the Plan's dual-

9  track process and proposed timeline are feasible and likely to succeed.

10      In addition, creditors should be aware that, in a refinance, it is almost impossible for the

11  Debtors to realize the entire value of the Property as proceeds of the refinance. *See In re Villa Diablo*

12  *Assocs.*, 156 B.R. 650 (Bankr. N.D. Cal. 1993) (recognizing that a loan-to-value ratio of up to 70%

13  represents a market norm and that a 100% LTV would be particularly risky). Even assuming that

14  that the Debtors' unsubstantiated $100 million valuation was correct as of the Petition Date, if the

15  Debtors can only obtain a loan at a 65% to 70% LTV, it would not take a significant deterioration

16  in the value of the Property to result in creditors not being paid in full after a refinance.

17      This risk is enhanced when the entire universe of claims is currently unknown: if there are

18  significantly more unsecured creditors than estimated, some creditors may be at risk of not being

19  paid in full (particularly unsecured creditors at the AGTJ13 Manager level, where claims are

20  structurally subordinated to those at the fee-owner level). Indeed, when the bar date has not yet

21  passed and historical financial statements are lacking, many courts will refuse to approve a

22  disclosure statement on the basis of solicitation being premature. *In re Meldrum*, 2019 WL 5777652,

23  at *2.

24      Creditors currently do not know the value of the Property. The Plan lacks the historical

25  financial information necessary to properly evaluate the cash flow forecasts included in the Plan.

26  Major uncertainties surround the rental income available to the Debtors and how disputes with the

27  

_____

28  [11]    Lender notes that, at this time, the Gaju contract has not yet been assumed.

two largest tenants will be resolved and the Property stabilized. And the Debtors fail to adequately disclose information regarding potential avoidance actions that could represent over $4 million of unencumbered assets.

While the Debtors are allowed to present optimistic views of their proposed Plan, the Disclosure Statement must include all relevant information, including risk factors, to enable creditors to properly evaluate the likelihood of the Plan's success. Such information is currently missing and should be included prior to the Disclosure Statement being approved.

Moreover, the Plan does not follow the absolute priority rule and fails to respect the legal separateness of the two Debtors. The Plan is facially and patently unconfirmable and the Disclosure Statement should not be approved until such defects are remedied.

WHEREFORE, the Lender respectfully requests that the Court (a) deny approval of the Disclosure Statement, and (b) grant the Lender such other and further relief as is just and proper.


Dated:  June 26, 2024


BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP


By:/s/ Kevin M. Capuzzi
_____
KEVIN M. CAPUZZI (*pro hac vice*)
KRISTA M. ENNS, Cal Bar No. 206430
ANTONIA STABILE, Cal. Bar No. 329559
JACOB H. MARSHALL (*pro hac vice*)
ELLIOT M. SMITH (*pro hac vice*)

Attorneys for CPIF California, LLC