VEDDER PRICE (CA), LLP
Marie E. Christiansen (SB# 325352)
1925 Century Park East, Suite 1900
Los Angeles, California 90067
Telephone: (424) 204-7770
Email: mchristiansen@vedderprice.com

VEDDER PRICE P.C.
David L. Kane  (*Admitted Pro Hac Vice*)
222 North LaSalle Street, Suite 2400
Chicago, Illinois 60601
Telephone: (312) 609-7500
Email: dkane@vedderprice.com

*Attorneys for Creditor Gaju Market Corporation*

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>AGTJ13, LLC,<br><br>    Debtor and Debtor-in-Possession.<br><br>―――<br><br>In re:<br><br>AGTJ Manager, LLC,<br><br>    Debtor and Debtor-in-Possession.<br><br>―――<br><br>[ ] Affects both Debtors<br>[X] Affects AGTJ13, LLC only<br>[ ] Affects AGTJ13 Manager, LLC only | Lead Case No. 2:24-bk-11409-SK<br><br>Jointly administered with Case No: 2:24-bk-11412-SK<br><br>Chapter 11 Cases<br><br>**GAJU MARKET CORPORATION'S OBJECTION TO DEBTOR'S MOTION FOR AN ORDER: (1) APPROVING SALE OF REAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (2) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND DETERMINING CURE AMOUNTS; (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND GRANTING RELATED RELIEF ([DKT NO. 279]** |

Gaju Market Corporation ("Gaju Market"), by and through its undersigned counsel, states as follows for its Objection (this "Objection") to the *Motion for an Order: (1) Approving Sale of Real Property Free and Clear of All Liens, Claims, Encumbrances and Interests; (2) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Determining Cure Amounts; (3) Waiving the 14-Day Stay Periods Set Forth in Bankruptcy Rules 6004(H) and 6006(D); and (4) Granting Related Relief* [Dkt. No. 279] (the "Sale Motion") filed by AGTJ13, LLC (the "Debtor"):

## RELEVANT BACKGROUND

1. As further detailed in Gaju Market's amended Proof of Claim [Claim No. 8-2] (the "Proof of Claim"), the Debtor, as lessor, and Gaju Market, as lessee, are parties to that certain Market Lease and that certain Office Lease (collectively, the "Leases"), pursuant to which Gaju Market holds leasehold interests in Units 101 and 201, respectively, of the real property owned by the Debtor and commonly known as 450 S. Western Avenue, Los Angeles, CA 90020 (the "Property").

2. Additional facts and background relevant to this Objection are set forth in the Gaju Objection [Dkt. No. 272],[1] which is incorporated by reference as though fully set forth herein. As further described in the Proof of Claim and the Cure Objection, the Debtor is indebted to Gaju Market in an amount of not less than $2,151,527.20.

3. As set forth in the detailed summary accounting attached hereto as **Exhibit 1**, Gaju Market believes the Debtor may have actually over-collected more than $2.965 million from Gaju Market.[2] As further detailed in the Proof of Claim, the Gaju Objection and below,

---

[1] Capitalized terms used but not otherwise defined herein have the same meanings assigned to such terms in the Sale Motion and the Gaju Objection, as applicable.

[2] Gaju Market recently discovered additional payments to the Debtor that were not accounted for in the Proof of Claim. Gaju Market intends to amend the Proof of Claim accordingly.

the amounts owed by the Debtor to Gaju Market primarily fall within six general categories:

(a) <u>First</u>, pursuant to the Market Lease, the Debtor has consistently overcharged Gaju Market for Annual Base Rent over the last four (4) years. *See* <u>Ex. 1.B</u>; Proof of Claim at Section A and Schedule 1. The amount of Debtor's corresponding monetary obligations to Gaju Market under the Market Lease are, in the aggregate, no less than $136,321.23. *Id*.

(b) <u>Second</u>, Gaju Market is obligated to pay Lessee's Share of Common Area Operating Expenses for the Property (collectively, the "<u>CAM Payments</u>") under the Market Lease. *See* <u>Ex. 1.C</u>; Proof of Claim at Section B. On November 1, 2024 – nearly six months after Gaju Market's initial request and more than three month's past the Debtor's deadline to produce – the Debtor finally produced its "reconciliations" of CAM Payments. Sale Motion, Section II.D(1)(b). Unfortunately, the so-called reconciliations were not produced in accordance with general market terms, are incomplete and provide no data, documents or analysis to support the Debtor's conclusions therein. Based on its history of CAM payments made, Gaju Market believes it overpaid its CAM obligations by $232,005.53. *See* <u>Ex. 1.C</u>. Investigation continues.

(c) <u>Third</u>, the Market Lease requires Gaju Market to make certain Vacancy Guaranty payments to Debtor, however, the Debtor has consistently overcharged Gaju Market for the same. *See* <u>Ex. 1.D</u>; Proof of Claim at Section C and Schedule 2. The amount overcharged by the Debtor's under the Market Lease related to the Vacancy Guaranty is estimated to be no less than $1,948,605.28. *Id*. Notably, the Debtor has continually failed to provide Gaju

Market with the basic backup documents or information the Debtor uses to determine amounts charged under the Vacancy Guaranty.

(d) <u>Fourth</u>, under the Office Lease, Gaju Market is required to pay the Debtor (i) a base rent of $3,000 per month and (ii) a CAM obligation originally estimated at $1.50/sq. foot. *See* <u>Ex. 1.E</u>; Proof of Claim at Section E and Schedules 5 and 6. However, since May of 2024, the Debtor has been overcharging Gaju Market for both of these obligations. *Id*. As a result, the amount of the Debtor's monetary defaults is currently no less than $17,964 under the Office Lease. *Id*.

(e) <u>Fifth</u>, the Debtor has required Gaju Market to incur and pay for various repair costs which the Market Lease prescribes to the Debtor. *See* <u>Ex. 1.G</u>; Proof of Claim at Section D and Schedules 3 and 4. The current amount of Debtor's related monetary defaults under the Market Lease total no less than $57,600.69. *Id*.

(f) Sixth, in addition to the overcharges and overpayments under the Leases noted in ¶3(a)-(e) above, Gaju Market recently discovered that an additional $571,720.15 was paid to the Debtor without explanation. *See* <u>Ex. 1.F</u>. Investigation is ongoing into how the Debtor applied such funds to Gaju Market's obligations under the Leases, if at all.

4. The Debtor is in default of its obligations under the Leases as a result of its failure to return the overpayments to Gaju Market or properly credit such overpayments against Gaju Market's future obligations.

5. Notwithstanding the prima facie validity of Gaju Market's Proof of Claim, the Debtor incorrectly (and purposefully) maintains under the Sale Motion and the

4

GAJU MARKET'S OBJECTION TO DEBTOR'S SALE MOTION [DKT. NO. 279]

Assumption/Assignment Notice that the "Proposed Cure Amount" for both Leases is $0.00.

**OBJECTION**

6. As a threshold issue, Gaju Market supports the Debtor's efforts to sell the Property and assign the Leases to the winning bidder. That said, however, the Debtor must satisfy its obligations to Gaju Market under Section 365 of the Bankruptcy Code in order to do so.

**A.  The Debtor Cannot Assume the Leases Without Compensating Gaju Market for Its Pecuniary Losses.**

7. The Leases are executory contracts governed by Section 365 of the Bankruptcy Code.³ Pursuant to Section 365 of the Bankruptcy Code, "[i]f there has been a default in a executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee … cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ." 11 U.S.C. § 365(b)(1)(A). "The language of § 365(b)(1) clearly and unambiguously requires the cure of all defaults before a lease may be assumed." *In re Bldg. Block Child Care Ctrs., Inc.*, 234 B.R. 762, 765 (B.A.P. 9th Cir. 1999); *see also In re Arriva Pharms., Inc.*, 456 B.R. 419, 423–24 (Bankr. N.D. Cal. 2011) ("Bankruptcy Code § 365(b) provides that a debtor in possession may not assume an executory contract if there has been a default, unless such default is cured at the time of assumption.").

8. As detailed in the Proof of Claim and the Gaju Objection, the Debtor has overcharged and/or collected overpayments from Gaju Market in the amount of no less than $2,151,527.20 under the Leases. After further investigation, Gaju Market now believes the

---

³ There is no dispute the Market Lease is an executory contract that can be assumed under Section 365, however the Debtor disputes whether the Office Lease was timely renewed. The damages owed under the Office Lease are nominal, however, with 99% of the amounts owed falling under the Market Lease. This Objection is therefore primarily focused on the Market Lease.

Debtor has over-collected more than $2.965 million. *See* Ex. 1. Despite receiving this windfall at the expense of Gaju Market, the Debtor has neither returned nor credited Gaju Market's account.

9. To date, Gaju Market has elected not to recoup the funds owed by the Debtor against amounts coming due under the Leases in order to assist the Debtor in its post-petition operations and to facilitate the sale of the Property. But Gaju Market must be made whole for its pecuniary losses – either through reimbursement or by future rental credit – if the Debtor intends to assume and assign the Leases are part of its sale.[4] *See In re Minesen Co.*, 635 B.R. 533, 552-58 (Bankr. D. Haw. 2021) (required cure payment included refund of $1,097,438.95 overcharged and collected by debtor under assumed contracts); *see also In re B & L Oil Co.*, 782 F.2d 155 (10th Cir. 1986) (creditor was entitled to recovery of prepetition overpayments); *California Canners & Growers, Inc. v. Military Distribs. of Virginia* (*In re California Growers & Canners*), 62 B.R. 18, 24 (B.A.P. 9th Cir. 1986) ("Congress has clearly authorized full satisfaction of valid prepetition claims for defaults by the debtor under an executory contract when the contract is assumed."). Indeed, the "purpose of [§] 365(b)(1)(B) is to indemnify the other party to the contract or lease being assumed, against loss." *Andrew v. KMR Corp.*, 17 B.R. 438, 439 (B.A.P. 9th Cir. 1982).

**B.    The Debtor's Responses to the Gaju Objectionare Misplaced and Unsupported.**

10. Pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, the Debtor cannot carry its burden to assume or assign the Leases as contemplated by Sale Motion and the Assumption/Assignment Notice. *In re Hawkeye Ent., LLC*, 49 F.4th 1232, 1236 (9th Cir. 2022);

---

[4] In the event the Debtor elects not to assume the Leases then Gaju Market would be entitled to imposition of a constructive trust over the sale proceeds to reimburse it for its overpayments to the Debtor. Gaju Market would also be entitled to remain in the Property under 11 U.S.C. § 365(h) for the term of the Leases.

*see also Minesen Co.*, 635 B.R at 542 (noting that debtors bear burden of proof with respect to curing defaults for assumptions). Indeed, the Debtors' opposition to the Gaju Objection relies on self-serving and unreasonable interpretations of the Leases and is devoid of any caselaw or evidentiary support.

11. The Debtor curiously dedicates a substantial portion of the Sale Motion responding to the Gaju Objection, rather than separately responding to the Gaju Objection itself. Nonetheless, the Debtor's attempts to "explain away" its wrongdoing fall flat. While the proper forum to address the Gaju Objection is an evidentiary hearing before this Court rather than through the Sale Motion, Gaju Market provides the following initial responses to the Debtor's asserted "defenses" to liability:

- Section II.D(1)(a)(i): With respect to Base Rent under the Market Lease, the Debtor first alleges that Gaju Market's calculations are incorrect. The Debtor misreads the Market Lease and Amendment as to the timing and amounts due. But even were Gaju Market to accept this argument in entirety, which it does not, the Debtor's new accounting would only reduce its liability by a total of $8,000 over the applicable four years, leaving it liable to Gaju Market in the amount of no less than $128,321.23.

- Section II.D(1)(a)(ii): The Debtor incorrectly alleges that Gaju Market's rent payments under the Market Lease and Office Lease were combined ("Gaju has not provided any evidence that it made additional, separate payments on account of its obligations under the Office Lease during that time period."). To the contrary, Exhibit 1.E hereto sets forth each and every *separate* Office Lease payment made by Gaju Market, thereby refuting this argument in its entirety.

- Section II.D(1)(b): The Debtor rests its CAM arguments on the idea that the Amendment eliminated certain CAM-related provisions. But its interpretation is illogical and, if accepted, would render multiple other provisions of the Lease inoperable (for example, the Debtor would have the Court believe it intentionally deleted the definition of "CAM" while at the same time using such term throughout the Market Lease). It is well-settled that even "where different parts of the instrument appear to be contradictory and inconsistent with each other, the court will, if possible, harmonize the parts and construe the instrument in such way that all parts may stand and will not strike down any portion unless there is an irreconcilable conflict wherein one part of the instrument destroys in effect another part." (citing cases); *see also* Civ.Code, § 1641; *Frittelli, Inc. v. 350 N. Canon Drive, LP*, 202 Cal. App. 4th 35, 46–47 (2011) (same). Applicable law therefore instructs that the inconsistent provisions should be interpreted in a way that maintains the integrity of the Market Lease.

- Section II.D(1)(c): The Debtor first alleges that "Gaju itself calculated the Vacancy Guaranty" and then doubles-down by saying that many of Gaju Market's payments were actually rent collected from other tenants. No evidentiary support is provided for either theory (and both are contrary to the duties of the Debtor as landlord). Indeed, the Debtor's books and records are within its own control, not Gaju Market's, and it must certainly have a ledger of how and when every tenant paid rent. Similarly, the calculation of the Vacancy Guaranty is solely in the control of the Debtor, as it should be accountable for tenancy and vacancy at the Property, maintenance of the leases, floorplans, historical rent rolls and related pertinent

information. To date, the Debtor has made none of this information available to the Debtor or the Court.

- Section II.D(1)(d): The Market Lease clearly sets forth the maintenance obligations of the Debtor as landlord. Despite this, the Debtor has repeatedly attempted to shift such responsibilities to Gaju Market. Gaju Market will prove at trial that the invoices in question relate to the Debtor's common areas expenses, as well as provide evidence that such payments were actually made by Gaju Market.

- Section II.D(2): The Debtor mistakenly asserts that Gaju Market is a holdover tenant as to the Office Lease ("Unit 201") because it allegedly never renewed its lease. However, the Debtor accepted rent at the original lease rates of $3,000 for base rent and $1,800 for CAM for nearly two years (July 2022 to May 1, 2024). Under California law, Debtor's repeated acceptance of the rent for Unit 201 under the lease rates has the effect of renewing the lease for Unit 201 under the same terms, thereby creating a periodic tenancy. *See Kaufman v. Goldman*, 195 Cal. App. 4th 734, 740 (2011) ("If instead the owner accepts rent from a tenant at sufferance he accepts the tenant's possession as rightful and the tenancy is converted into a periodic one."); *see also* Civ. Code § 1945. As a result, Debtor's acceptance of the rent under the original lease for 22 months created a periodic tenancy that prohibits the Debtor from now claiming that Gaju Market is a holdover tenant. Further, Gaju Market does not owe any holdover rent for July 2022 to November 2024.[5] California courts hold that a lessor's acceptance of rent amounts

---

[5] Debtor's calculation is incorrect as a preliminary matter. Gaju Market has been paying the increased rates since May 15, 2024, so the Debtor's calculation of holdover liability is incorrect. Nonetheless, Gaju Market did not discover it was mistakenly paying the increased rates until June 2024 when it was able to obtain a copy of the Unit 201 lease agreement from a third party. Since that time, Gaju Market has been paying the increased rent amounts under protest.

9

GAJU MARKET'S OBJECTION TO DEBTOR'S SALE MOTION [DKT. NO. 279]

under the terms of an expired lease despite the existence of a holdover provision for increased rent effectively waives the lessor's right to seek holdover rents because the lessor consented to the continued occupancy under the same terms of the supposedly expired lease. *See Jeffrey Kavin, Inc. v. Frye*, 204 Cal. App. 4th 50–51 (2012) ("Even if lessor did not waive its right to seek the full amount of the holdover rent from lessees, lessor consented to [lessee's continued occupancy of the premises—she was not in 'violation' of any provision in the lease. Therefore, the holdover provision providing for a monthly rent of 200 percent of the base rent does not apply."). As a result, Debtor has accepted Gaju Market's continued occupancy and cannot assert a claim against Gaju Market for holdover rents.

12. It is worth noting that the Debtor complains about Gaju Market's summary exhibits attached to the Proof of Claim as not being "authenticated" (Sale Motion, pp. 27 and 29). To the contrary, the Proof of Claim and <u>Exhibit 1</u> hereto set forth detailed summaries of the payments and corresponding charges that are central to the determination of the Cure Amount in a format sufficient to satisfy Gaju Market's burden, if any, at this stage. Such summaries are supported by Gaju Market's payment records, invoices, bank and credit card statements and related financial information, all of which will be authenticated and admissible at trial. To date, the Debtor has produced no financial records or other evidence to support its variable positions.

**C.    The Debtor Must Escrow Sufficient Funds to Satisfy the Requirements of 11 U.S.C. §§ 365(b)(1))A) and (B)**

13. In order to satisfy Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, adequate assurance of payment "'requires that there be a firm commitment to make all payments [necessary to promptly cure the subject defaults] and at least a reasonably demonstrable capability to do so.'" *In re PRK Enterprises, Inc.*, 235 B.R. 597, 602 (Bankr. E.D. Tex. 1999) (citing *In re Embers 86th St., Inc.*, 184 B.R. 892, 900-01 (Bankr. S.D.N.Y. 1995)). In

determining what is adequate, "a court should strive to minimize the risks imposed upon [the non-debtor] as it awaits receipt of the curative payments." *Id.* Moreover, adequate assurance "requires a foundation that is nonspeculative and sufficiently substantive so as to assure the [contract counterparty] that it will receive the amount of the default." *Matter of World Skating Ctr., Inc.*, 100 B.R. 147, 148–49 (Bankr. D. Conn. 1989) (citing cases). A debtor must reserve sufficient cure amounts at the time of assumption even if it disputes the amount of the underlying claim. *In re Diamond Head Emporium, Inc.*, 69 B.R. 487-97 (Bankr. D. Haw. 1987) (ordering the debtor to deposit the full amount of the disputed cure claim into an interest-bearing account).

14. Here, the Debtor proposes to potentially delay payment of the cure amount and instead reserve funds until such time as the Gaju Objection is resolved. *See* Sale Motion, p. 27; Assumption/Assignment Notice, p. 4, ll. 9 – 16. Gaju Market is not adverse, at least in theory, to the concept of escrowing funds (as used herein, the "<u>Cure Escrow</u>") in the event the Gaju Objection is not resolved prior to the sale hearing, provided the process reserves sufficient funds to satisfy all amounts owed to Gaju Market. However, there are multiple holes evident in the Debtor's escrow proposal that must be resolved prior to the sale hearing if the Debtor wishes to procced with the Cure Escrow.

15. First, for purposes of this Objection, the parties should assume the amount of the Cure Escrow must be at least equal to $2.965 million. But it is entirely unclear from the Sale Motion whether the sale will produce sufficient proceeds to properly reserve the amount necessary to cure Gaju Market's pecuniary losses. To date, the Debtor, Lone Oak and CPIF have failed to disclose the cash value of the bids received for the Property or the starting bid at the Auction. Gaju Market understands the sale process is ongoing and bids remain at flux, but in order to satisfy Sections 365(b)(1)(A) and (B) the Debtor must, at a minimum, provide the Court and Gaju Market with evidence of its ability to escrow sufficient funds from the proceeds of the

sale.

16. Second, the Sale Motion fails to address how the Cure Escrow will be funded if Lone Oak or CPIF is the winning bidder. If either lender purchases the property through a credit there will be no cash proceeds to fund the Cure Escrow or satisfy Gaju Market's cure claims. In such a case Lone Oak and CPIF should be required to fully fund the Cure Escrow in cash even if the balance of the purchase price is satisfied through a credit bid.

17. Third, there is a sense from the Sale Motion that the Debtor intends to use the Cure Escrow to slow the process of resolving Gaju Market's claims and determining its Cure Amount. Funding of the Cure Escrow alone, however, does not absolve the Debtor from its obligation to promptly satisfy the Cure Amount. The prospect of delay is enhanced by the Debtor's continued inability to date to satisfy straightforward requests for documents and information (for example, it took nearly 6 months to receive the CAM reconciliations). In the light of the foregoing, the dispute over Gaju Market's Cure Amount needs to be resolved in an expeditious and efficient manner, as any lengthy delay could derail the sale and preclude a finding that the Debtor will promptly satisfy its cure obligation under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code.

**D.    Gaju Market is Entitled to Attorneys' Fees as Part of Its Cure Payment**

18. The Leases provide that Gaju Market is entitled to its reasonable attorneys' fees in defense of its rights under the Leases. Proof of Claim, Exhibits A and B, § 31. In light of the requirements set forth in Section 365(b)(1)(B) of the Bankruptcy Code, the Debtor cannot assume or assign the Leases without including in the cure amount Gaju Market's reasonable attorneys' fees and costs (which continue to accrue) that may become due as result of the Debtor's actions under the Leases. *See*, *e.g.*, *In re Williams*, No. 10-11108 BLS, 2011 WL 2533046, at *1 (Bankr. D. Del. June 24, 2011) ("It is beyond cavil that attorneys' fees incurred

because of actions taken to enforce the underlying lease or contract may be properly recoverable as part of a cure payment if such lease or contract provides for attorneys' fees."); *Andrew*, 17 B.R. at 439 (affirming ruling that payment of certain attorneys' fees was required assume and assign lease); *see also* Leases (Exhibits A and B to Proof of Claim, at § 31).

### **RESERVATION OF RIGHTS**

19.    Gaju Market expressly reserves all rights under and in connection with the Leases and the Property with respect to any and all obligations of the Debtor, including, without limitation, the right to claim any amounts of rent (however so defined), overpayments, credits and/or expenses (including attorneys' fees) to compensate Gaju Market for defaults or other obligations under either or both of the Leases, and all actual pecuniary losses resulting from the same.

20.    Gaju Market reserves the right to modify or supplement this Objection and its Proof of Claim. Gaju Market further reserves all rights to raise further objections, as necessary or appropriate under the circumstances, with respect to the Proof of Claim, the Sale Motion and the assumption, assignment and/or rejection of either or both of the Leases, including, without limitation, with respect to the Cure Amout and adequate assurance of future performance.

### **CONCLUSION**

21.    Gaju Market generally supports the sale of the Property and is willing to work with the Debtor and potential buyers to reach a resolution of the Cure Amount and Cure Objection in order to facilitate the sale.

WHEREFORE, Gaju Market Corporation hereby requests that the Court:

(a) sustain this Objection;

(b) provide that any order approving the assumption and assignment of the Leases be consistent with this Objection and provide for (i) the cure of all monetary and non-monetary defaults existing under and in connection with the Leases and (ii) reimbursement (or credit) to

Gaju Market for its pecuniary losses in an amount of no less than $2,965,216.88, as set forth on Exhibit 1, plus attorneys' fees and interest;

(c) condition the assumption and assignment of the Leases upon the Debtor depositing with the Court no less than $2,965,216.88 (plus attorneys' fees and interest) to fund the Cure Escrow;

(d) condition the assumption and assignment of the Leases upon Lone Oak and CPIF fully funding the Cure Escrow in cash in the event either party purchase the Property through a credit bid or other non-cash consideration;

(e) absent a resolution of this Objection and the Gaju Objection prior to the Sale Hearing, schedule an evidentiary hearing to determine the Cure Amount and all other amounts owed by the Debtor to Gaju Market; and

(f) afford Gaju Market such other or further relief as is just and appropriate under the circumstances.

DATED: November 20, 2024

Respectfully submitted,

VEDDER PRICE P.C.

By: /s/ David L. Kane
    David L. Kane (*Admitted Pro Hac Vice*)

*Attorneys for Gaju Market Corporation*